**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**HUNTINGTON DIVISION**

JUSTIN ADKINS, JUSTIN BLAKE, EDWIN
GLOWACKI, ERIC JORDAN, KEVIN
PALMER, SAMUEL PRESTON, DENNIS
SARGENT, TRAVIS THORNSBERRY,
MICHAEL WILLIAMS, JOHN BAKER, JAMES          Civil Action Number: 3:18-cv-00321
BLAIN, DEVERY BROWN, JAMES DEAL,
JONATHAN JEFFERS, ROBERT MOSTELLER,
MICHAEL POTTER, JESSEE WALLACE,
TIMOTHY WITT, BOBBY AKERS, GERALD
BARBER, JOHN BILLS, MICHAEL CLARK,
RANDALL CRAYCRAFT, JOHN FRASURE,
JOSHUA HALL, SAMMY MADDIX, ZACK
POTTER, JAMES STINNETT, TODD THAYER,
DEANNA LANHAM, MICHAEL CAMPBELL,
TONY ABDON, CHAD LITTLE, BRANDON
ADKINS, JACQUELINE MARSHALL, HOMER
MAYNARD, SCOTT MORRISON, JEREMY
NAPIER, SHAWN PATTERSON, MATTHEW
WOODS, JOHN CARPENTER, QUINCY
CHRISTIAN, GREGORY HAMM, ETHAN
MULLINS, MICHAEL OWENS, JONATHAN
ROWE, DANNY STEWART, LLOYD
WILLIAMS, DAVID MANIS, JOSHUA
FERGUSON, ERIC SPEAKS, DONALD
STEPHENS, JASON BARKER, CHAD DOWDY,
JERRY FLOCKER, GROVER KELLEY, CLAY
STILTNER, DENNIS HUTCHINSON,

        Plaintiffs,

    vs.

CSX TRANSPORTATION, INC.;
CSX CORPORATION;
CRAIG S. HELIGMAN, M.D.;
GUS THOELE; CURT SHOGREN,
MILTON STORM; DILLON DOUG
JONES; TOM DEANGELO; SHAWN
LUSK; ELIZABETH CREEDON; and
KENNETH RAY EMERSON.

        Defendants.

1

**AMENDED COMPLAINT**

AND NOW, come the Plaintiffs, by and through their undersigned counsel and file the within Complaint, to obtain declaratory relief and all available remedies under Section 510 of the Employee Retirement Income Security Act (ERISA), Section 504 of the Rehabilitation Act of 1973 (Rehab Act), the West Virginia Human Relations Act (WVHRA), the Family and Medical Leave Act (FMLA), and state law causes of action including defamation, invasion of privacy, tortious interference, intentional infliction of emotional distress and wrongful discharge.

**JURISDICTION AND VENUE**

1.      Jurisdiction over plaintiffs' claims is conferred on this Court pursuant to 29 U.S.C. § 1132, 28 U.S.C § 1331 and 28 U.S.C. § 1343(a)(4), and the plaintiffs request the Court to exercise supplemental jurisdiction over the plaintiff's pendent state claims pursuant to 28 U.S.C. section 1367. This is an action brought pursuant to section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. 1001, et seq., under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 et seq., the West Virginia Human Relations Act, Title 5-11-1 et seq., under the Family and Medical Leave Act of 1993, 29 U.S.C. Sections 2601 et seq., and state law causes of action. The Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties of the federal causes of action and supplemental jurisdiction over the state law causes of action.

2.      Venue is properly laid in this district pursuant to section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), in that the subject employee benefit plan is administered in this district, the breaches of duty herein alleged occurred in this district, and most plaintiffs reside in this district, and pursuant to 28 U.S.C. §1391(b), in that the causes of action arose in this district.

**PARTIES**

3.      Each of the above Plaintiffs were employees of defendants who were terminated for use of their health insurance, accused of fraud to the federal government and private insurers, denied medical leave of absence and had their rights violated by exposing their medical records. Many of the Plaintiffs were employed at CSX's Huntington Locomotive Shop and/or had their disciplinary hearing resulting in termination at 935 7th Avenue in Huntington, West Virginia.

4.      CSXT is a rail carrier engaged in interstate commerce. CSXT is incorporated under the laws of Virginia, does business in 23 states, including West Virginia at 935 7th Avenue, Huntington, West Virginia, and maintains its corporate headquarters at 500 Water Street, Jacksonville, Florida 32202. Upon information and belief, CSXT is a wholly owned subsidiary of CSX and shares common ownership and control.

5.      CSX is a rail carrier engaged in interstate commerce. It is incorporated under the laws of Virginia and maintains its principal place of business at 500 Water Street, Jacksonville, Florida 32202. CSX owns, manages, operates, and/or controls numerous subsidiaries, including CSXT.

6.      Dr. Heligman is the Chief Medical Officer of CSX and/or CSXT. Among other duties, he administers the Occupational Health Department for CSX and/or CSXT and maintains his office at 500 Water Street, Jacksonville, Florida 32202.

7.      Thoele is the Assistant Plant Superintendent for CSX and/or CSXT in Waycross, Georgia. Among other duties, he serves as an Investigating Hearing Officer for disciplinary proceedings at CSX and/or CSXT.

8.      Shogren is the Plant Superintendent of the Huntington Locomotive Shop for CSX and/or CSXT in Huntington, West Virginia. Among other duties, he serves at the Charging Manager for disciplinary proceedings at CSX and/or CSXT.

9.     Additional individual supervisors over the plaintiffs include Milton Storm, Dillon Doug Jones, Tom DeAngelo, Shawn Lusk, Elizabeth Creedon and Kenneth Ray Emerson.

10.     The Defendants, CSX Transportation, Inc., and CSX Corporation, hereinafter referred to as ("CSX"), is an international transportation company offering a variety of rail, container-shipping, intermodal, trucking and contract logistics services and located at 500 Water Street, Jacksonville, Florida 32202.

11.     Individual defendants, Craig S. Heligman, M.D., Gus Thoele, Curt Shogren, Milton Storm, Dillon Doug Jones, Tom DeAngelo, Shawn Lusk, Elizabeth Creedon and Kenneth Ray Emerson are managerial agents and sued in their individual capacities under ERISA, the Rehabilitation Act, West Virginia Human Relations Act, FMLA and state law causes of action.

## SUMMARY OF ACTION

### Justin Adkins – Electrician

12.     On or about June 21, 2017, Adkins sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

13.     Dr. Johnson evaluated Adkins, including his complaints of pain in his neck rating at an 8 out of 10. Dr. Johnson ordered x-rays and ordered Adkins off work.

14.     On or about June 21, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Adkins. Among other things, the form described Adkins injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Adkins needed to be off work until August 21, 2017.

15.     CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

4

16.     As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

17.     On or about July 31, 2017, Adkins sought treatment from an orthopedist, Dr. Luis E. Bolano, for the same injuries for which he was treating with Dr. Johnson. Dr. Bolano advised Adkins to continue with his current therapy (treating with Dr. Johnson) and to proceed with nonoperative treatment to include wearing a brace and activity modification. Dr. Bolano administered an injection into Adkins right shoulder, applied a brace to his elbow, and recommended a follow up in two months.

18.     On or about August 17, 2017, Dr. Johnson again faxed a COII form to the CSX Medical Department for Adkins. This COII provided an update on Adkins' injuries and treatment and estimated he would need to remain off work until October 17, 2017.

19.     On or about July 26, 2017, CSX and/or CSXT issued a notice to Adkins to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

20.     The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202". An amended charge letter was issued on or about July 28, 2017.

21.     A formal disciplinary investigation was held on August 24, 2017 at 935 7th Avenue in Huntington, West Virginia. Adkins was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer

5

and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

22.     The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

23.     On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Office of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

24.     Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

25.     Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

26.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Justin Adkins.

27.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

28.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Justin Adkins was again included on this list.

29.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

30.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Justin Adkins was not among those who were scheduled to be abolished or furloughed.

31.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

32.     On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

33.     On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Justin Adkins, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

34.     During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Adkins from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Adkins or his treatment other than what was contained on the COII.

35.     Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Adkins or any of the employees went to Drs. Johnson or Carey for any improper purpose.

36.     Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

37.     Dr. Heligman did not personally examine or treat Adkins or any of the other CSX/CSXT employees.

38.     Through his testimony at the disciplinary investigation, Shogren confirmed that Adkins was not part of the furlough/abolishment notice.

39.     During the disciplinary investigation, CSX/CSXT presented Adkins' personal and private  medical records to all in attendance, including the other charged employees.

8

40.     During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

41.     Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Adkins.

42.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

43.     During the disciplinary investigation, Dr. Heligman and Shogren testified that Adkins, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

44.     Dr. Heligman and Shogren also testified that Adkins, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

45.     As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

46.     According the CSX/CSXT, the purpose of the formal disciplinary investigation of Adkins and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Adkins investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

9

47.     By letter dated September 21, 2017, CSX/CSXT notified Adkins that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Justin Blake – Electrician**

48.     On or about July 5, 2017, Blake sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

49.     Dr. Carey evaluated Blake, including his complaints of pain in his neck, his upper/mid back, and in his right shoulder and arm. Dr. Carey ordered x-rays and ordered Blake off work.

50.     On or about July 5, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Blake. Among other things, the form described Blake injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Blake needed to be off work until September 3, 2017.

51.     CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

52.     As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

53.     On or about July 28, 2017, CSX and/or CSXT issued a notice to Blake to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place
> your responsibility, if any, in connection with information received

> on July 20, 2017 from the CSXT Chief Medical Officer that you
> were dishonest and attempted to defraud the Company and/or
> benefits providers when you, as well as more than 50 other craft
> employees, submitted potentially fraudulent documentation, and all
> circumstances related thereto.

54.     The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued

from "500 Water Street, Jacksonville, Florida 32202".

55.     A formal disciplinary investigation was held on August 24, 2017 in Huntington,

West Virginia. Blake was joined in the investigation by other CSX/CSXT employees who were

being similarly charged. Thoele served as the hearing officer and Shogren served as the charging

manager. Dr. Heligman was present as a witness for the Company.

56.     The formal disciplinary investigation revealed that Dr. Heligman had decided,

without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey

or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental

insurance providers.

57.     On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential

Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of

Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer

than is medically appropriate." He further stated that "the timing of these alleged injuries … is

highly suspicious and suggestive of fraudulent practices on the part of both employees and these

two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the

Kentucky Board of Chiropractic Examiners.

11

58.     Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

59.     Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

60.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General did not include Justin Blake.

61.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees. Justin Blake was not included on this list.

62.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Justin Blake was included on this list.

63.     The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

64.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Justin Blake was among those who were scheduled to be furloughed.

65.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

66.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

67.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Justin Blake, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

68.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Blake from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Blake or his treatment other than what was contained on the COII.

69.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Blake or any of the employees went to Drs. Johnson or Carey for any improper purpose.

70.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

13

71.    Dr. Heligman did not personally examine or treat Blake or any of the other CSX/CSXT employees.

72.    During the disciplinary investigation, CSX/CSXT presented Blake' personal and private medical records to all in attendance, including the other charged employees.

73.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

74.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Blake.

75.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

76.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Blake, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

77.    Dr. Heligman and Shogren also testified that Blake, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

78.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

79.     According the CSX/CSXT, the purpose of the formal disciplinary investigation of Blake and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Blake investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

80.     By letter dated September 21, 2017, CSX/CSXT notified Blake that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Edwin Glowacki – Electrician**

81.     On or about June 19, 2017, Glowacki sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty while shoveling landscaping stones.

82.     Dr. Johnson evaluated Glowacki, including his complaints of pain in his lower back and hip areas. Dr. Johnson ordered x-rays and ordered Glowacki off work.

83.     On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Glowacki. Among other things, the form described Glowacki injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Glowacki needed to be off work until August 19, 2017.

84.     CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

85.     As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

86.     On or about July 27, 2017, Glowacki sought treatment from the Veteran's Hospital for injuries for which he was treating with Dr. Johnson. The VA issued work restrictions for 4 weeks with an anticipated release date of August 27, 2017.

87.     On or about August 20, 2017, Dr. Johnson issued a written letter that Glowacki's recovery had worsened and continued to restrict him from returning to work.

88.     On or about July 26, 2017, CSX and/or CSXT issued a notice to Glowacki to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

89.     The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

90.     A formal disciplinary investigation was held on August 24, 2017 in Huntington, West Virginia. Glowacki was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

91.     The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

92.     On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of

Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

93.     Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

94.     Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

95.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Edwin Glowacki.

96.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

97.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Edwin Glowacki was again included on this list.

98.     The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

99.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Edwin Glowacki was among those who were scheduled to be abolished or furloughed.

100.     During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

101.     On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

102.     30.     On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Edwin Glowacki, to advise them that:

>   the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

103.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Glowacki from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Glowacki or his treatment other than what was contained on the COII.

104.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Glowacki or any of the employees went to Drs. Johnson or Carey for any improper purpose.

105.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

106.    Dr. Heligman did not personally examine or treat Glowacki or any of the other CSX/CSXT employees.

107.    During the disciplinary investigation, CSX/CSXT presented Glowacki's personal and private medical records to all in attendance, including the other charged employees.

108.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

109.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Glowacki.

110.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

111.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Glowacki, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

112.    Dr. Heligman and Shogren also testified that Glowacki, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

113.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

114.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Glowacki and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Glowacki investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

115.    By letter dated September 21, 2017, CSX/CSXT notified Glowacki that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

116.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Eric Jordan – Electrician**

117.    On or about July 20, 2017, Jordan sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

118.    Dr. Carey evaluated Jordan, prescribed a course of treatment, and ordered Jordan off work until September 25, 2017.

119.    On or about July 20, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Jordan. Among other things, the form described Jordan injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Jordan needed to be off work until September 25, 2017.

120.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

121.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

122.    On or about July 26, 2017, CSX and/or CSXT issued a notice to Jordan to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 21, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

123.    The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202". An amended notice was issued on or about July 28, 2017.

124.    A formal disciplinary investigation was held on August 24, 2017 in Huntington, West Virginia. Jordan was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

21

125.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

126.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

127.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

128.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

129.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Eric Jordan.

130.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

131.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Eric Jordan was again included on this list.

132.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

133.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Eric Jordan was not among those to be furloughed.

134.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

135.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

136.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Eric Jordan, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

137.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Jordan from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Jordan or his treatment other than what was contained on the COII.

138.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Jordan or any of the employees went to Drs. Johnson or Carey for any improper purpose.

139.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

140.    Dr. Heligman did not personally examine or treat Jordan or any of the other CSX/CSXT employees.

141.    Through his testimony at the disciplinary investigation, Shogren confirmed that Jordan was not part of the furlough/abolishment notice.

142.    During the disciplinary investigation, CSX/CSXT presented Jordan's personal and private medical records to all in attendance, including the other charged employees.

143.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

144.     Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Jordan.

145.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

146.     During the disciplinary investigation, Dr. Heligman and Shogren testified that Jordan, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

147.     Dr. Heligman and Shogren also testified that Jordan, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

148.     As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

149.     According the CSX/CSXT, the purpose of the formal disciplinary investigation of Jordan and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Jordan investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

150.     By letter dated September 21, 2017, CSX/CSXT notified Jordan that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics

Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Kevin Palmer – Electrician**

151.    On or about July 6, 2017, Palmer sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

152.    Dr. Johnson evaluated Palmer, including his complaints of pain in his neck diagnosing a cervical sprain, cervicocranal syndrome and muscle spasms. Dr. Johnson ordered x-rays and ordered Palmer off work.

153.    On or about July 6, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Palmer. Among other things, the form described Palmer injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Palmer needed to be off work until September 6, 2017.

154.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

155.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

156.    On or about July 31, 2017, Palmer sought treatment from an orthopedist, Dr. Luis E. Bolano, for injuries to his right shoulder and wrist. Dr. Bolano advised Palmer to continue with his current therapy (treating with Dr. Johnson) and to proceed with nonoperative treatment to include wearing a brace and activity modification.

157.   Palmer continued under the care of Dr. Johnson consistent with the treatment plan.

158.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Palmer to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

159.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

160.   A formal disciplinary investigation was held on August 24, 2017 in Huntington, West Virginia. Palmer was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

161.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

162.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is

highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

163.     Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

164.     Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

165.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Kevin Palmer.

166.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

167.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Kevin Palmer was again included on this list.

168.     The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

28

169.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Kevin Palmer <u>was</u> <u>not</u> among those who were scheduled to be abolished or furloughed.

170.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

171.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

172.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Kevin Palmer, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

173.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Palmer from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Palmer or his treatment other than what was contained on the COII.

174.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Palmer or any of the employees went to Drs. Johnson or Carey for any improper purpose.

175.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

176.    Dr. Heligman did not personally examine or treat Palmer or any of the other CSX/CSXT employees.

177.    Through his testimony at the disciplinary investigation, Shogren confirmed that Palmer was not part of the furlough/abolishment notice.

178.    During the disciplinary investigation, CSX/CSXT presented Palmer's personal and private medical records to all in attendance, including the other charged employees.

179.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

180.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Palmer.

181.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

182.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Palmer, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

183.   Dr. Heligman and Shogren also testified that Palmer, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

184.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

185.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Palmer and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Palmer investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

186.   By letter dated September 22, 2017, CSX/CSXT notified Palmer that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

187.   Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Samuel Preston – Electrician**

188.    On or about June 13, 2017, Preston sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

31

189.    Dr. Johnson evaluated Preston, including his complaints of pain in his neck and shoulder pain. Dr. Johnson ordered x-rays and ordered Preston off work.

190.    On or about June 13, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Preston. Among other things, the form described Preston's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Preston needed to be off work until August 13, 2017.

191.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

192.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

193.    On or about August 8, 2017, Dr. Johnson again faxed a COII form to the CSX Medical Department for Preston. This COII provided an update on Preston' injuries and treatment and estimated he would need to remain off work until October 9, 2017.

194.    On or about July 26, 2017, CSX and/or CSXT issued a notice to Preston to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

195.    A formal disciplinary investigation was held on August 24, 2017 in Huntington, West Virginia. Preston was joined in the investigation by other CSX/CSXT employees who were

being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

196.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

197.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries ... is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

198.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

199.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

200.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Samuel Preston.

201.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

202.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Samuel Preston was again included on this list.

203.     The disciplinary investigation further revealed that the Respondents believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

204.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Samuel Preston was among those who were scheduled to be abolished or furloughed.

205.     During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

206.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

207.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Samuel Preston, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

208.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Preston from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Preston or his treatment other than what was contained on the COII.

209.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Preston or any of the employees went to Drs. Johnson or Carey for any improper purpose.

210.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

211.    Dr. Heligman did not personally examine or treat Preston or any of the other CSX/CSXT employees.

212.    Through his testimony at the disciplinary investigation, Shogren confirmed that Preston was not part of the furlough/abolishment notice.

213.    During the disciplinary investigation, CSX/CSXT presented Preston's personal and private medical records to all in attendance, including the other charged employees.

35

214.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

215.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Preston.

216.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

217.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Preston, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

218.    Dr. Heligman and Shogren also testified that Preston, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

219.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

220.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Preston and the others was to "develop the facts and place ... responsibility, if any" yet more than a month before the Preston investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

36

221.    By letter dated September 21, 2017, CSX/CSXT notified Preston that he was dismissed from employment for violation of "CSX Operating Rule I 04.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

222.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Dennis Sargent – Electrician**

223.    On or about June 19, 2017, Sargent sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

224.    Dr. Johnson evaluated Sargent, including his complaints of lower back and hip pain as a result of stepping in a hole in his yard and falling. Dr. Johnson ordered x-rays from Our Lady of Bellefonte hospital and ordered Sargent off work.

225.    On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Sargent. Among other things, the form described Sargent injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Sargent needed to be off work until August 19, 2017.

226.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

227.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

228.     On or about August 3, 2017, Dr. Johnson again faxed a COII form to the CSX

Medical Department for Sargent. This COII provided an update on Sargent' injuries and

treatment and estimated he would need to remain off work until October 3, 2017.

229.     On or about July 26, 2017, CSX and/or CSXT issued a notice to Sargent to attend

a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place
> your responsibility, if any, in connection with information received
> on July 14, 2017 from the CSXT Chief Medical Officer that you
> were dishonest and attempted to defraud the Company and/or
> benefits providers when you, as well as more than 50 other craft
> employees, submitted potentially fraudulent documentation, and all
> circumstances related thereto.

230.     The letter was signed by "J. Yates, CMO Engineering & Strategy"

and issued from "500 Water Street, Jacksonville, Florida 32202".

231.     A formal disciplinary investigation was held on August 24, 2017 in Huntington,

West Virginia. Sargent was joined in the investigation by other CSX/CSXT employees who were

being similarly charged. Thoele served as the hearing officer and Shogren served as the charging

manager. Dr. Heligman was present as a witness for the Company.

232.     The formal disciplinary investigation revealed that Dr. Heligman had decided,

without any evidence, that any and all CSX/CSXT employees who had been treated by Dr.

Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental

insurance providers.

233.     On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential

Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of

Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer

38

than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

234.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

235.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

236.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Dennis Sargent.

237.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

238.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Dennis Sargent was again included on this list.

239.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

240.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Dennis Sargent last worked on June 14, 2017, was scheduled for his regular rest days on June 15 and 16th and then furloughed. Except for his dismissal, he would have since been recalled to work.

241.     During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

242.     On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

243.     On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Dennis Sargent, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

244.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Sargent from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Sargent or his treatment other than what was contained on the COII.

245.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Sargent or any of the employees went to Drs. Johnson or Carey for any improper purpose.

246.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

247.    Dr. Heligman did not personally examine or treat Sargent or any of the other CSX/CSXT employees.

248.    During the disciplinary investigation, CSX/CSXT presented Sargent's personal and private medical records to all in attendance, including the other charged employees.

249.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

250.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Sargent.

251.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

252.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Sargent, and the other charged employees, violated CSX/CSXT Employee Operating Rule

41

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

253.     Dr. Heligman and Shogren also testified that Sargent, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

254.     As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

255.     According the CSX/CSXT, the purpose of the formal disciplinary investigation of Sargent and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Sargent investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

256.     By letter dated September 21, 2017, CSX/CSXT notified Sargent that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

257.     Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Travis Thornsberry – Electrician**

258.     On or about March 1, 2017, Thornsberry sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

259.    Dr. Johnson evaluated Thornsberry, including his complaints of pain in his back and hip. Dr. Johnson ordered x-rays and ordered Thornsberry off work.

260.    On or about July 27, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Thornsberry. Among other things, the form described Thornsberry's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Thornsberry needed to be off work until September 24, 2017.

261.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

262.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

263.    Thornsberry treated with Dr. Johnson since March 1, 2017.

264.    On or about July 26, 2017, CSX and/or CSXT issued a notice to Thornsberry to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

265.    The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

266.    A formal disciplinary investigation was held on August 24, 2017 in Huntington, West Virginia. Thornsberry was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

43

267.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

268.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

269.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

270.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

271.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Travis Thornsberry.

272.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

273.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Travis Thornsberry was again included on this list.

274.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

275.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Thornsberry was not among those to be furloughed.

276.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

277.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

278.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Travis Thornsberry, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

279.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Thornsberry from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Thornsberry or his treatment other than what was contained on the COII.

280.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Thornsberry or any of the employees went to Drs. Johnson or Carey for any improper purpose.

281.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

282.    Dr. Heligman did not personally examine or treat Thornsberry or any of the other CSX/CSXT employees.

283.    Through his testimony at the disciplinary investigation, Shogren confirmed that Thornsberry was not part of the furlough/abolishment notice.

284.    During the disciplinary investigation, CSX/CSXT presented Thornsberry's personal and private medical records to all in attendance, including the other charged employees.

285.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

46

286. Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Thornsberry.

287. Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

288. During the disciplinary investigation, Dr. Heligman and Shogren testified that Thornsberry, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

289. Dr. Heligman and Shogren also testified that Thornsberry, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

290. As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

291. According the CSX/CSXT, the purpose of the formal disciplinary investigation of Thornsberry and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Thornsberry investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

292. By letter dated September 21, 2017, CSX/CSXT notified Thornsberry that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics

47

Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

293.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Michael Williams – Electrician**

294.    On or about June 16, 2017, Williams sought and received medical treatment from Daniel J. Carey, II, D.C. at Carey Chiropractic and Rehabilitation, ("Dr. Carey") in Proctorville, OH for injuries sustained while off-duty..

295.    Dr. Carey evaluated Williams, including his complaints of pain in his chest and rib and prescribed a course of treatment.

296.    On or about June 16, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Williams. Among other things, the form described Williams's injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Williams needed to be off work on short-term disability.

297.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

298.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

299.    On or about July 26, 2017, CSX and/or CSXT issued a notice to Williams to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or

benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

300.   The letter was signed by "J. Yates, CMO Engineering & Strategy"

and issued from "500 Water Street, Jacksonville, Florida 32202".

301.   A formal disciplinary investigation was held on October 5, 2017 in Huntington, West Virginia resulting in termination. Williams was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

302.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson  ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

303.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

304.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

305.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

306.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Michael Williams.

307.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

308.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Michael Williams was again included on this list.

309.    The disciplinary investigation further revealed that the Respondents believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

310.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Michael Williams was among those who were scheduled to be abolished or furloughed but would have been called back but for his termination.

311.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

312.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Carey and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

313.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Michael Williams, to advise them that:

> the CSX Medical Department is no longer accepting any medical
> documentation completed by Shannon Carey, DC, or Daniel Carey
> II, DC. If you continue to have a need to be off of work for a
> medical reason or wish to return to work from a medical leave,
> please provide updated medical documentation from your primary
> care or treating physician, other than the two referenced above.

314.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Williams from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Williams or his treatment other than what was contained on the COII.

315.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Williams or any of the employees went to Drs. Carey or Carey for any improper purpose.

316.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

317.    Dr. Heligman did not personally examine or treat Williams or any of the other CSX/CSXT employees.

318.    Through his testimony at the disciplinary investigation, Shogren confirmed that Williams was not part of the furlough/abolishment notice.

319.    During the disciplinary investigation, CSX/CSXT presented Williams' personal and private medical records to all in attendance, including the other charged employees.

320.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

321.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Williams.

322.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

323.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Williams, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

324.    Dr. Heligman and Shogren also testified that Williams, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

325.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren

testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

326.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Williams and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Williams investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

327.    By letter dated November 2, 2017, CSX/CSXT notified Williams that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

328.    Upon information and belief, Drs. Carey and Carey were exonerated of any wrongdoing by their licensing authorities.

**John Baker - Boilermaker**

329.    On or about June 19, 2017, and on dates subsequent thereto, Baker sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

330.    Dr. Johnson evaluated Baker, prescribed a course of treatment, and ordered Baker off work until August 19, 2017.

331.    On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Baker and estimated that Baker needed to be off work until August 19, 2017.

332.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

333.     As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

334.     On or about July 25, 2017, CSX and/or CSXT issued a notice to Baker to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202.

335.     A formal disciplinary investigation was conducted on August 9, 2017 in Huntington, West Virginia. Baker was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

336.     The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

337.     On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

338.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

339.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

340.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included John Baker.

341.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

342.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. John Baker was again included on this list.

343.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

344.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. John Baker was among those who were scheduled to be furloughed.

345.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Baker, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

346.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

347.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including John Baker, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

348.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Baker from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Baker or his treatment other than what was contained on the notification of treatment. Baker presented a report from Dr. Johnson which included Dr. Johnson's diagnosis and treatment plan for Baker.

349.    During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Baker attempted to commit fraud or not.

350.    Through his testimony, Dr. Heligman confirmed that he had no proof that Baker or any of the employees went to Drs. Johnson or Carey for any improper purpose.

351.    Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

352.    Dr. Heligman did not personally examine or treat Baker or any of the other CSX/CSXT employees.

353.    During the disciplinary investigation, CSX/CSXT presented Baker's personal and private medical records to all in attendance, including the other charged employees.

354.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

355.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Baker.

356.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

357.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Baker, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

358.    Dr. Heligman and Shogren also testified that Baker, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

359.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

360.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Baker and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Baker investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

361.    By letter dated September 5, 2017, CSX/CSXT notified Baker that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**James Blain - Boilermaker**

362.    On or about June 19, 2017, and on dates subsequent thereto, Blain sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

363.    Dr. Johnson evaluated Blain, prescribed a course of treatment, and ordered Blain off work until August 19, 2017.

364.    On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Blain and estimated that Blain needed to be off work until August 19, 2017.

365.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

366.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

367.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Blain to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202.

368. A formal disciplinary investigation was conducted on August 9, 2017 in Huntington, West Virginia. Blain was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

369. The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

370. On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

371. Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

60

372.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

373.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included James Blain.

374.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

375.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. James Blain was again included on this list.

376.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

377.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. James Blain was among those who were scheduled to be furloughed.

378.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Blain, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

379.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

380.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including James Blain, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

381.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Blain from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Blain or his treatment other than what was contained on the notification of treatment. Blain presented a report from Dr. Johnson which included Dr. Johnson's diagnosis and treatment plan for Blain.

382.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Blain attempted to commit fraud or not.

383.   Through his testimony, Dr. Heligman confirmed that he had no proof that Blain or any of the employees went to Drs. Johnson or Carey for any improper purpose.

384.    Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

385.    Dr. Heligman did not personally examine or treat Blain or any of the other CSX/CSXT employees.

386.    During the disciplinary investigation, CSX/CSXT presented Blain's personal and private medical records to all in attendance, including the other charged employees.

387.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

388.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Blain.

389.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

390.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Blain, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

391.    Dr. Heligman and Shogren also testified that Blain, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

392.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

393.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Blain and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Blain investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

394.    By letter dated September 5, 2017, CSX/CSXT notified Blain that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Devery Brown - Boilermaker**

395.    On or about June 22, 2017, Brown sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

396.    Dr. Johnson evaluated Brown, prescribed a course of treatment, and ordered Brown off work until August 22, 2017.

397.    On or about June 22, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Brown. Among other things, the form described Brown injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Brown needed to be off work until August 22, 2017.

398.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

399.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

400.   On or about July 25, 2017, CSX and/or CSXT issued a notice to Brown to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202". An amended notice was issued on or about July 27, 2017.

401.   A formal disciplinary investigation was held on August 23, 2017 in Huntington, West Virginia. Brown was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

402.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

403.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

404.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

405.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

406.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Devery Brown.

407.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

408.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter

included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Devery Brown was again included on this list.

409. The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

410. Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Devery Brown <u>was not</u> among those to be furloughed.

411. During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

412. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

413. On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Devery Brown, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

67

414.     During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Brown from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Brown or his treatment other than what was contained on the COII.

415.     Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Brown or any of the employees went to Drs. Johnson or Carey for any improper purpose.

416.     Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

417.     Dr. Heligman did not personally examine or treat Brown or any of the other CSX/CSXT employees.

418.     During the disciplinary investigation, CSX/CSXT presented Brown's personal and private  medical records to all in attendance, including the other charged employees.

419.     During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

420.     Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Brown.

421.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

422.     During the disciplinary investigation, Dr. Heligman and Shogren testified that Brown, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

423.    Dr. Heligman and Shogren also testified that Brown, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

424.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

425.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Brown and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Brown investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

426.    By letter dated September 21, 2017, CSX/CSXT notified Brown that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**James Deal - Boilermaker**

427.    On or about July 7, 2017, and on dates subsequent thereto, Deal sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

428.    Dr. Carey evaluated Deal, prescribed a course of treatment, and ordered Deal off work until September 3, 2017.

429.    On or about July 7, 2017, Dr. Carey faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") that he was treating Deal and estimated that Deal needed to be off work until September 4, 2017.

430.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

431.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

432.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Deal to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202.

433.    A formal disciplinary investigation was conducted on August 9, 2017 in Huntington, West Virginia. Deal was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

434.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

435.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

436.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

437.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

438.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included James Deal.

439.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

440.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. James Deal was again included on this list.

441.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

442.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. James Deal <u>was not</u> among those who were scheduled to be furloughed.

443.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Deal, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

444.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

445. On or about September 1, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including James Deal, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

446. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Deal from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Deal or his treatment other than what was contained on the notification of treatment.

447. During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Deal attempted to commit fraud or not.

448. Through his testimony, Dr. Heligman confirmed that he had no proof that Deal or any of the employees went to Drs. Johnson or Carey for any improper purpose.

449. Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

450. Dr. Heligman did not personally examine or treat Deal or any of the other CSX/CSXT employees.

451. During the disciplinary investigation, CSX/CSXT presented Deal's personal and private medical records to all in attendance, including the other charged employees.

452. During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

453.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Deal.

454.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

455.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Deal, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

456.    Dr. Heligman and Shogren also testified that Deal, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

457.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

458.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Deal and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Deal investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

459.    By letter dated September 5, 2017, CSX/CSXT notified Deal that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics

Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Jonathan Jeffers - Boilermaker**

460.    On or about June 19, 2017, and on dates subsequent thereto, Jeffers sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

461.    Dr. Johnson evaluated Jeffers, prescribed a course of treatment, and ordered Jeffers off work until August 19, 2017.

462.    On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Jeffers and estimated that Jeffers needed to be off work until August 19, 2017.

463.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

464.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

465.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Jeffers to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202."

466.    A formal disciplinary investigation was conducted on August 9, 2017 in Huntington, West Virginia. Jeffers was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

467.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

468.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

469.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

470.     Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

471.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Jonathan Jeffers.

472.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

473.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Jonathan Jeffers was again included on this list.

474.     The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

475.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Jonathan Jeffers was among those who were scheduled to be furloughed.

476.     During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Jeffers, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

477.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

478.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Jonathan Jeffers, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

479.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Jeffers from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Jeffers or his treatment other than what was contained on the notification of treatment.

480.    During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Jeffers attempted to commit fraud or not.

481.    Through his testimony, Dr. Heligman confirmed that he had no proof that Jeffers or any of the employees went to Drs. Johnson or Carey for any improper purpose.

482.    Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

483.  Dr. Heligman did not personally examine or treat Jeffers or any of the other CSX/CSXT employees.

484.  During the disciplinary investigation, CSX/CSXT presented Jeffers' personal and private medical records to all in attendance, including the other charged employees.

485.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

486.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Jeffers.

487.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

488.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Jeffers, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

489.  Dr. Heligman and Shogren also testified that Jeffers, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

490.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

491.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Jeffers and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Jeffers investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

492.    By letter dated September 5, 2017, CSX/CSXT notified Jeffers that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Robert Mosteller – Boilermaker**

493.    On or about June 19, 2016, Mosteller sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained to his back and neck while off-duty.

494.    Dr. Johnson evaluated Mosteller and made the decision to take him off work and ordered cervical x-rays to further investigate the extent of his injuries.

495.    Mosteller was ultimately diagnosed with sprain of the cervical ligaments, cervicocranial syndrome, headache, and muscle spasms of the back and was provided treatment accordingly.

496.    On or about June 20, 2017 Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Mosteller. Among other things, the form described Mosteller's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Mosteller needed to be off work until August 19, 2017.

497.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

498.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

499.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Mosteller to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

500.    A formal disciplinary investigation was held on August 9, 2017 in Huntington, West Virginia. Mosteller was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

501.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

502.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our

81

employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

503.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

504.    The list of employees named in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Mosteller.

505.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

506.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

507.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Mosteller was again included on this list.

508.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

509.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Mosteller was among those to be furloughed.

510.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

511.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

512.    Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

513.    During the disciplinary investigation, the COII prepared for Claimant by Dr. Johnson was introduced as an exhibit.  Dr. Heligman admitted that he had no other information regarding the injury to Mosteller or his treatment other than what was contained on the COII.

514.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Mosteller or any of the employees went to Drs. Johnson or Carey for any improper purpose.

515.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

516.    Dr. Heligman did not personally examine or treat Mosteller or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

517.    During the disciplinary investigation, CSX/CSXT presented Mosteller's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

518.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

519.    Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Mosteller.

520.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

521.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Mosteller, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

522.    Dr. Heligman and Shogren also testified that Mosteller, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

523.    According to CSX/CSXT, the purpose of the formal disciplinary investigation of Mosteller and the others was to "develop the facts and place … responsibility, if any" yet more than a month before Mosteller investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

524.    By letter dated September 15, 2017, CSX/CSXT notified Mosteller that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

525.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Michael Potter - Boilermaker**

526.    On or about March 20, 2017, Potter sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

527.    Dr. Johnson evaluated Potter, including his complaints of pain in his neck. Dr. Johnson ordered x-rays revealing a cervical strain and ordered Potter off work.

528.    On or about July 6, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Potter. Among other things, the

form described Potter injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Potter needed to be off work until September 6, 2017.

529.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

530.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

531.    On or about July 26, 2017, CSX and/or CSXT issued a notice to Potter to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

532.    A formal disciplinary investigation was held on August 23, 2017 in Huntington, West Virginia. Potter was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

533.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

534.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

535.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

536.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

537.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Potter.

538.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

539.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Potter was again included on this list.

540.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

541.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017.

542.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

543.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

544.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Potter, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel

> Carey II, DC. If you continue to have a need to be off of work for a
> medical reason or wish to return to work from a medical leave,
> please provide updated medical documentation from your primary
> care or treating physician, other than the two referenced above.

545.     During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Potter from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Potter or his treatment other than what was contained on the COII.

546.     Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Potter or any of the employees went to Drs. Johnson or Carey for any improper purpose.

547.     Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

548.     Dr. Heligman did not personally examine or treat Potter or any of the other CSX/CSXT employees.

549.     During the disciplinary investigation, CSX/CSXT presented Potter's personal and private medical records to all in attendance, including the other charged employees.

550.     During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

551.     Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Potter.

552.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

553.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Potter, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

554.    Dr. Heligman and Shogren also testified that Potter, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

555.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

556.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Potter and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Potter investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

557.    By letter dated September 21, 2017, CSX/CSXT notified Potter that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

558.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Jesse Wallace – Boilermaker**

559.    On or about June 19, 2017, and on dates subsequent thereto, Wallace sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

560.    Dr. Johnson evaluated Wallace, prescribed a course of treatment, and ordered Wallace off work until August 19, 2017.

561.    On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") that he was treating Wallace and estimated that Wallace needed to be off work until August 19, 2017.

562.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

563.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

564.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Wallace to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202.

565.    A formal disciplinary investigation was conducted on August 9, 2017 in Huntington, West Virginia. Wallace was joined in the investigation by other CSX/CSXT

employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

566.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

567.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

568.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

569.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

570.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Jesse Wallace.

571.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

572.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Jesse Wallace was again included on this list.

573.     The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

574.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Jesse Wallace was among those who were scheduled to be furloughed.

575.     During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees,

including Wallace, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

576.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

577.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Jesse Wallace, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

578.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Wallace from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Wallace or his treatment other than what was contained on the notification of treatment. Wallace presented a report from Dr. Johnson which included Dr. Johnson's diagnosis and treatment plan for Wallace.

579.    During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Wallace attempted to commit fraud or not.

580.    Through his testimony, Dr. Heligman confirmed that he had no proof that Wallace or any of the employees went to Drs. Johnson or Carey for any improper purpose.

581.    Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

582.   Dr. Heligman did not personally examine or treat Wallace or any of the other CSX/CSXT employees.

583.   During the disciplinary investigation, CSX/CSXT presented Wallace's personal and private medical records to all in attendance, including the other charged employees.

584.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

585.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Wallace.

586.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

587.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Wallace, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

588.   Dr. Heligman and Shogren also testified that Wallace, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

589.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

590.     According the CSX/CSXT, the purpose of the formal disciplinary investigation of Wallace and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Wallace investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

591.     By letter dated September 5, 2017, CSX/CSXT notified Wallace that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Timothy Witt - Boilermaker**

592.     On or about June 21, 2017, and dates prior and subsequent thereto,  Witt sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

593.     Dr. Carey evaluated Witt, prescribed a course of treatment, and ordered Witt off work until August 21, 2017.

594.     On or about June 21, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Witt. Among other things, the form described Witt injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Witt needed to be off work until August 21, 2017.

595.     CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

596.     As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

597.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Witt to attend a

formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place
> your responsibility, if any, in connection with information received
> on July 14, 2017 from the CSXT Chief Medical Officer that you
> were dishonest and attempted to defraud the Company and/or
> benefits providers when you, as well as more than 50 other craft
> employees, submitted potentially fraudulent documentation, and all
> circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water

Street, Jacksonville, Florida 32202". An amended notice was issued on or about July 28, 2017

and again on or about August 9, 2017.

598.    A formal disciplinary investigation was held on August 23, 2017 in Huntington,

West Virginia. Witt was joined in the investigation by other CSX/CSXT employees who were

being similarly charged. Thoele served as the hearing officer and Shogren served as the charging

manager. Dr. Heligman was present as a witness for the Company.

599.    The formal disciplinary investigation revealed that Dr. Heligman had decided,

without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey

or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental

insurance providers.

600.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential

Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of

Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer

than is medically appropriate." He further stated that "the timing of these alleged injuries … is

highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

601.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

602.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

603.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Timothy Witt.

604.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

605.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Timothy Witt was again included on this list.

606.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

98

607.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Timothy Witt <u>was not</u> among those to be furloughed.

608.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

609.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

610.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Timothy Witt, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

611.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Witt from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Witt or his treatment other than what was contained on the COII.

612.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Witt or any of the employees went to Drs. Johnson or Carey for any improper purpose.

613.     Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

614.     Dr. Heligman did not personally examine or treat Witt or any of the other CSX/CSXT employees.

615.     During the disciplinary investigation, CSX/CSXT presented Witt's personal and private medical records to all in attendance, including the other charged employees.

616.     During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

617.     Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Witt.

618.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

619.     During the disciplinary investigation, Dr. Heligman and Shogren testified that Witt, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

620.     Dr. Heligman and Shogren also testified that Witt, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

621.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

622.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Witt and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Witt investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

623.    By letter dated September 21, 2017, CSX/CSXT notified Witt that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Bobby Akers – Carman**

624.    On or about September 12, 2016, and on dates subsequent thereto, Akers sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

625.    Dr. Johnson evaluated Akers, including his complaints of back injuries. Dr. Johnson prescribed a course of treatment, ordered x-rays, and ordered Akers off work until July 6, 2017.

626.    On or about July 6, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Akers. Among other things, the form described Akers injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Akers needed to be off work until September 6, 2017.

627.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

628.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

629.    On or about July 28, 2017, CSX and/or CSXT issued a notice to Akers to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about August 8, 2017.

630.    A formal disciplinary investigation was held on August 10, 2017 in Huntington, West Virginia. Akers was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

631.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

632.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries ... is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

633.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

634.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

635.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Bobby Akers.

636.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

637.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter

included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Bobby Akers was again included on this list.

638.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

639.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Bobby Akers was not among those who were scheduled to be furloughed.

640.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

641.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

642.   On or about September 8, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Bobby Akers, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave,

104

please provide updated medical documentation from your primary
care or treating physician, other than the two referenced above.

643.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the
COII of Akers from Dr. Johnson. Dr. Heligman admitted that he had no other information
regarding the injury to Akers or his treatment other than what was contained on the COII.

644.   During the disciplinary investigation, Akers produced a report from Dr. Johnson
which detailed his diagnoses and treatment plan of Akers and which confirmed that Akers was
still not able to return to work.

645.   Through his testimony, Dr. Heligman confirmed that he had no proof that Akers
or any of the employees went to Drs. Johnson or Carey for any improper purpose.

646.   Through his testimony, Dr. Heligman testified that the decision for an employee
to be held out of service for an illness or an injury is one to be made between the employee-
patient and the treating physician.

647.   Dr. Heligman did not personally examine or treat Akers or any of the other
CSX/CSXT employees.

648.   During the disciplinary investigation, CSX/CSXT presented Akers' personal and
private medical records to all in attendance, including the other charged employees.

649.   During the disciplinary investigation, CSX/CSXT presented the personal and
private medical records of dozens of other employees, including those not charged in the
investigation, to all in attendance.

650.   Through his testimony in the disciplinary investigation, Shogren admitted to
having been provided by Dr. Heligman some 96 pages of private medical documentation of
CSX/CSXT employees, including Akers.

105

651.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

652.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Akers, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

653.    Dr. Heligman and Shogren also testified that Akers, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

654.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

655.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Akers and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Akers investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

656.    By letter dated September 5, 2017, CSX/CSXT notified Akers that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Gerald Barber – Carman**

657.    On or about March 10, 2016, and on dates subsequent thereto, Barber sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

658.    Dr. Johnson evaluated Barber, including his complaints of back and hip pain. Dr. Johnson prescribed a course of treatment, ordered x-rays, and ordered Barber off work until July 5, 2017.

659.    On or about July 5, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Barber. Among other things, the form described Barber injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Barber needed to be off work until September 5, 2017.

660.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

661.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

662.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Barber to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 28, 2017 and a postponement notice on August 8, 2017.

663.    A formal disciplinary investigation was held on August 9, 2017 in Russell, Kentucky. Barber was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

664.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

665.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

666.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General]

to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

667.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

668.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Gerald Barber.

669.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

670.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Gerald Barber was again included on this list.

671.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

672.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Gerald Barber was not among those who were scheduled to be furloughed.

673.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of

the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Barber, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

674.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

675.    On or about September 7, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Gerald Barber, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

676.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Barber from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Barber or his treatment other than what was contained on the COII.

677.    During the disciplinary investigation, Barber produced a report from Dr. Johnson which detailed his diagnoses and treatment plan of Barber and which confirmed that Barber was still not able to return to work.

678.    Through his testimony, Dr. Heligman confirmed that he had no proof that Barber or any of the employees went to Drs. Johnson or Carey for any improper purpose.

110

679.    Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

680.    Dr. Heligman did not personally examine or treat Barber or any of the other CSX/CSXT employees.

681.    During the disciplinary investigation, CSX/CSXT presented Barber's personal and private medical records to all in attendance, including the other charged employees.

682.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

683.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Barber.

684.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

685.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Barber, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

686.    Dr. Heligman and Shogren also testified that Barber, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

687.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

688.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Barber and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Barber investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

689.    By letter dated September 15, 2017, CSX/CSXT notified Barber that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**John Bills – Carman**

690.    On or about June 19, 2017, and on dates subsequent thereto, Bills sought and received medical treatment from Daniel J. Carey, II, D.C. ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

691.    Dr. Carey evaluated Bills, including his complaints of back pain. Dr. Carey prescribed a course of treatment, ordered x-rays, and ordered Bills off work until August 27, 2017.

692.    On or about June 26, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Bills. Among other things, the form described Bills injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Bills needed to be off work until August 27, 2017.

693.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

694.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

695.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Bills to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 26, 2017 and again on July 28, 2017.

696.    A formal disciplinary investigation was held on August 7, 2017 in Russell, Kentucky. Bills was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

697.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson, D.C. ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

698.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

699.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

700.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

701.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included John Bills.

702.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

703.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter

included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. John Bills was again included on this list.

704. The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

705. Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. John Bills was not among those who were scheduled to be furloughed.

706. During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Bills, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

707. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

708. On or about September 7, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including John Bills, to advise them that:

> the CSX Medical Department is no longer accepting any medical
> documentation completed by Shannon Johnson, DC, or Daniel
> Carey II, DC. If you continue to have a need to be off of work for a
> medical reason or wish to return to work from a medical leave,
> please provide updated medical documentation from your primary
> care or treating physician, other than the two referenced above.

709.     During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Bills from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Bills or his treatment other than what was contained on the COII.

710.     During the disciplinary investigation, Bills produced a report from Dr. Carey which detailed his diagnoses and treatment plan of Bills and which confirmed that Bills was still not able to return to work.

711.     Through his testimony, Dr. Heligman confirmed that he had no proof that Bills or any of the employees went to Drs. Johnson or Carey for any improper purpose.

712.     Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

713.     Dr. Heligman did not personally examine or treat Bills or any of the other CSX/CSXT employees.

714.     During the disciplinary investigation, CSX/CSXT presented Bills' personal and private medical records to all in attendance, including the other charged employees.

715.     During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

116

716.     Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Bills.

717.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

718.     During the disciplinary investigation, Dr. Heligman and Shogren testified that Bills, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

719.     Dr. Heligman and Shogren also testified that Bills, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

720.     As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

721.     According the CSX/CSXT, the purpose of the formal disciplinary investigation of Bills and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Bills investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

722.     By letter dated September 6, 2017, CSX/CSXT notified Bills that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics

Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Michael Clark – Carman**

723.    On or about June 22, 2017, and on dates subsequent thereto, Clark sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

724.    Dr. Johnson evaluated Clark, including his complaints of back and hip pain. Dr. Johnson prescribed a course of treatment, ordered x-rays, and ordered Clark off work until August 22, 2017.

725.    On or about June 22, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Clark. Among other things, the form described Clark injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Clark needed to be off work until August 22, 2017.

726.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

727.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

728.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Clark to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft

employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 28, 2017 and a postponement notice on August 8, 2017.

729.    A formal disciplinary investigation was held on August 21, 2017 in Russell, Kentucky. Clark was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

730.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

731.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

732.     Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

733.     Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

734.     The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Michael Clark.

735.     On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

736.     On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Michael Clark was again included on this list.

737.     The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

738.     Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Michael Clark <u>was not</u> among those who were scheduled to be furloughed.

739.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Clark, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

740.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

741.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Michael Clark, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

742.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Clark from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Clark or his treatment other than what was contained on the COII.

743.    During the disciplinary investigation, Clark produced a report from Dr. Johnson which detailed his diagnoses and treatment plan of Clark and which confirmed that Clark was still not able to return to work.

121

744.    Through his testimony, Dr. Heligman confirmed that he had no proof that Clark or any of the employees went to Drs. Johnson or Carey for any improper purpose.

745.    Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

746.    Dr. Heligman did not personally examine or treat Clark or any of the other CSX/CSXT employees.

747.    During the disciplinary investigation, CSX/CSXT presented Clark's personal and private medical records to all in attendance, including the other charged employees.

748.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

749.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Clark.

750.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

751.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Clark, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

752.    Dr. Heligman and Shogren also testified that Clark, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

753.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

754.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Clark and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Clark investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

755.    By letter dated September 15, 2017, CSX/CSXT notified Clark that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Randall Craycraft – Carman**

756.    On or about June 7, 2017, and on dates subsequent thereto, Craycraft sought and received medical treatment from Daniel J. Carey, II, D.C. ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

757.    Dr. Carey evaluated Craycraft, including his complaints of back pain. Dr. Carey prescribed a course of treatment, ordered x-rays, and ordered Craycraft off work until August 20, 2017.

758.    On or about June 20, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Craycraft. Among other things, the form described Craycraft injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Craycraft needed to be off work until August 20, 2017.

759.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

760.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

761.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Craycraft to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 27, 2017 and again on July 28, 2017.

762.    A formal disciplinary investigation was held on August 7, 2017 in Russell, Kentucky. Craycraft was joined in the investigation by three other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

763.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson, D.C. ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

764.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

765.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

766.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

767.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Randall Craycraft.

768.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

769.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Randall Craycraft was again included on this list.

770.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

771.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Randall Craycraft was not among those who were scheduled to be furloughed.

772.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Craycraft, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

773. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

774. On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Randall Craycraft, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

775. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Craycraft from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Craycraft or his treatment other than what was contained on the COII.

776. During the disciplinary investigation, Craycraft produced a report from Dr. Carey which detailed his diagnoses and treatment plan of Craycraft and which confirmed that Craycraft was still not able to return to work.

777. Through his testimony, Dr. Heligman confirmed that he had no proof that Craycraft or any of the employees went to Drs. Johnson or Carey for any improper purpose.

778. Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

779. Dr. Heligman did not personally examine or treat Craycraft or any of the other CSX/CSXT employees.

780. During the disciplinary investigation, CSX/CSXT presented Craycraft's personal and private medical records to all in attendance, including the other charged employees.

781.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

782.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Craycraft.

783.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

784.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Craycraft, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

785.    Dr. Heligman and Shogren also testified that Craycraft, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

786.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

787.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Craycraft and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Craycraft investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

788.    By letter dated September 6, 2017, CSX/CSXT notified Craycraft that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**John Frasure – Carman**

789.    On or about May 25, 2017, Frasure sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries to his back while off-duty.

790.    Dr. Johnson evaluated Frasure, including his complaints of back pain rating an 8 out of 10.  Dr. Johnson ordered that he have x-rays taken of his back and ordered him off work.

791.    On or about May 30, 2017 Frasure had back x-rays taken at Our Lady of Bellefonte Hospital which revealed the presence of "multilevel mild degenerative changes."

792.    Frasure also followed up with his primary care physician who made the decision not to prescribe steroid or pain medication due to the possibility that such medications could adversely affect Frasure's Crohn's disease.

793.    Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Frasure. Among other things, the form described Frasure's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Frasure needed to be off work from May 25, 2017 until July 25, 2017.

794.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

795.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

796.    On or about July 28, 2017, CSX and/or CSXT issued a notice to Frasure to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 20, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

797.    A formal disciplinary investigation was held on August 7, 2017 in Russell, Kentucky. Frasure was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

798.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

799.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

800.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

801.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

802.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

803.    The list of employees included in Dr. Heligman's July 21, 2017 letter to the RRB Inspector General included Frasure.

804.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Frasure was again included on this list.

805.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

806.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, Frasure was neither employed at the Huntington mechanical shop nor was he subject to the furloughs.

807.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

808.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

809.    Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

810.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Frasure from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Frasure or his treatment other than what was contained on the COII.

132

811.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Frasure or any of the employees went to Drs. Johnson or Carey for any improper purpose.

812.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

813.    Dr. Heligman did not personally examine or treat Frasure or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

814.    During the disciplinary investigation, CSX/CSXT presented Frasure's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

815.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

816.    Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Frasure.

817.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

818.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Frasure, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

819.    Dr. Heligman and Shogren also testified that Frasure, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

820.    According to CSX/CSXT, the purpose of the formal disciplinary investigation of Frasure and the others was to "develop the facts and place … responsibility, if any" yet nearly a month before Frasure's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

821.    By letter dated September 6, 2017, CSX/CSXT notified Frasure that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

822.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Joshua Hall – Carman**

823.    On or about July 6, 2017, Hall sought and received medical treatment from Daniel J. Carey II, D.C., ("Dr. Carey") at Carey Chiropractic in Russell, Kentucky for injuries to his while off-duty.

824.    Dr. Carey evaluated Hall, including his complaints of pain in his knee and diagnosed him with a sprain/strain.  Hall was treated with therapy and exercise and ordered off work.

825.     On or about June 6, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Hall. Among other things, the form described Hall's injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Hall needed to be off work until September 3, 2017.

826.     CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

827.     As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

828.     On or about July 25, 2017, CSX and/or CSXT issued a notice to Hall to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

829.     A formal disciplinary investigation was held on August 7, 2017 in Russell, Kentucky. Hall was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

830.     The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey

or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

831.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

832.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

833.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

834.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Hall.

835.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

136

836.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Hall was again included on this list.

837.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

838.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, Hall was neither employed at the Huntington mechanical shop nor was he subject to the furloughs.

839.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

840.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

841.    Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

842.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Hall from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Hall or his treatment other than what was contained on the COII.

843.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Hall or any of the employees went to Drs. Johnson or Carey for any improper purpose.

844.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

845.   Dr. Heligman did not personally examine or treat Hall or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

846.   During the disciplinary investigation, CSX/CSXT presented Hall's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

847.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

848.     Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Hall.

849.     Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

850.     During the disciplinary investigation, Dr. Heligman and Shogren testified that Hall, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

851.     Dr. Heligman and Shogren also testified that Hall, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

852.     According to CSX/CSXT, the purpose of the formal disciplinary investigation of Hall and the others was to "develop the facts and place … responsibility, if any" yet nearly a month before Hall's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

853.     By letter dated September 6, 2017, CSX/CSXT notified Hall that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

854.     Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Sammy Maddix – Carman**

855.    On or about June 19, 2017, Maddix sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries to his right lower back, hip, and buttocks sustained while off-duty.

856.    Dr. Johnson evaluated Maddix, including his complaints of back pain.  Dr. Johnson ordered that Maddix have x-rays taken of his back and ordered him off work.  After reviewing the x-ray reports, Dr. Johnson diagnosed Maddix with Lumbosacral sprain and Myospasms.

857.    On or about June 20, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Maddix. Among other things, the form described Maddix's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Maddix needed to be off work until August 19, 2017.

858.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

859.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

860.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Maddix to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

861.    A formal disciplinary investigation was held on August 10, 2017 in Huntington, West Virginia. Maddix was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

862.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

863.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

864.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General]

141

to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

865.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Maddix.

866.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

867.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

868.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Maddix was again included on this list.

869.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

870.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, Maddix was not among those scheduled to be abolished or furloughed.

871.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of

the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

872.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

873.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Maddix, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

874.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Maddix from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Maddix or his treatment other than what was contained on the COII.

875.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Maddix or any of the employees went to Drs. Johnson or Carey for any improper purpose.

876.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

143

877. Dr. Heligman did not personally examine or treat Maddix or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

878. During the disciplinary investigation, CSX/CSXT presented Maddix's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

879. During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

880. Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Maddix.

881. Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

882. During the disciplinary investigation, Dr. Heligman and Shogren testified that Maddix, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

883. Dr. Heligman and Shogren also testified that Maddix, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

884. According to CSX/CSXT, the purpose of the formal disciplinary investigation of Maddix and the others was to "develop the facts and place … responsibility, if any" yet nearly a

month before Maddix's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

885.    By letter dated September 5, 2017, CSX/CSXT notified Maddix that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

886.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Zack Potter – Carman**

887.    On or about July 11, 2017, Potter sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

888.    Dr. Johnson evaluated Potter, including his complaints of pain in his pelvis and back spasms. Dr. Johnson ordered x-rays and ordered Potter off work.

889.    On or about July 11, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Potter. Among other things, the form described Potter injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Potter needed to be off work until September 11, 2017.

890.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

891.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

892.     On or about July 25, 2017, CSX and/or CSXT issued a notice to Potter to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

893.     The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

894.     A formal disciplinary investigation was held on August 19, 2017. Potter was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

895.     The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

896.     On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

146

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

897. Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

898. Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

899. The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Zach Potter.

900. On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

901. On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Zach Potter was again included on this list.

902. The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

903.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Potter <u>was not</u> among those to be furloughed.

904.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

905.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

906.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Potter, to advise them that the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

907.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Potter from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Potter or his treatment other than what was contained on the COII.

908.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Potter or any of the employees went to Drs. Johnson or Carey for any improper purpose.

909.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

910.   Dr. Heligman did not personally examine or treat Potter or any of the other CSX/CSXT employees.

911.   Through his testimony at the disciplinary investigation, Shogren confirmed that Potter was not part of the furlough/abolishment notice.

912.   During the disciplinary investigation, CSX/CSXT presented Potter's personal and private medical records to all in attendance, including the other charged employees.

913.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

914.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Potter.

915.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

916.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Potter, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

917.    Dr. Heligman and Shogren also testified that Potter, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

918.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

919.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Potter and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Potter investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

920.    By letter dated September 15, 2017, CSX/CSXT notified Potter that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

921.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**James Stinnett – Carman**

922.    On or about June 22, 2017, Stinnett sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

923.    Dr. Johnson evaluated Stinnett, including his complaints of pain in his neck, cervicocranial syndrome, headaches and muscle spasms. Dr. Johnson ordered x-rays and ordered Stinnett off work.

924.    On or about June 22, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Stinnett. Among other things, the form described Stinnett injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Stinnett needed to be off work until August 22, 2017.

925.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

926.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

927.    On or about July 26, 2017, CSX and/or CSXT issued a notice to Stinnett to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

928.    The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

929.    A formal disciplinary investigation was held on August 10, 2017 in Huntington, West Virginia. Stinnett was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

930.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

931.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

932.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

933.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

934.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Stinnett.

935.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

936.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Stinnett was again included on this list.

937.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

938.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Stinnett was not among those to be furloughed.

939.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

940.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

941.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Stinnett, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

942.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Stinnett from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Stinnett or his treatment other than what was contained on the COII.

943.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Stinnett or any of the employees went to Drs. Johnson or Carey for any improper purpose.

944.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

945.   Dr. Heligman did not personally examine or treat Stinnett or any of the other CSX/CSXT employees.

946.   Through his testimony at the disciplinary investigation, Shogren confirmed that Stinnett was not part of the furlough/abolishment notice.

947.   During the disciplinary investigation, CSX/CSXT presented Stinnett's personal and private  medical records to all in attendance, including the other charged employees.

948.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

949.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Stinnett.

950.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

951.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Stinnett, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

952.    Dr. Heligman and Shogren also testified that Stinnett, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

953.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

954.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Stinnett and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Stinnett investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

955.    By letter dated September 5, 2017, CSX/CSXT notified Stinnett that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics

Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

956.    Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Todd Thayer – Carman**

957.    On or about June 20, 2017, Thayer sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic and Rehabilitation for injuries sustained while off-duty.

958.    Dr. Carey evaluated Thayer, including his complaints of back pain. Dr. Carey ordered x-rays and ordered Thayer off work.

959.    On or about June 20, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Thayer. Among other things, the form described Thayer injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Thayer needed to be off work until August 21, 2017.

960.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

961.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

962.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Thayer to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or

benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

963.    The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

964.    A formal disciplinary investigation was held on August 24, 2017 in Huntington, West Virginia. Thayer was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

965.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

966.    On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

967.    Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General]

to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

968.    Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

969.    The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Thayer.

970.    On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

971.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Thayer was again included on this list.

972.    The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

973.    Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Thayer was among those to be furloughed.

974.    During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that

he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

975.    On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

976.    On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Thayer, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Carey, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

977.    During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Thayer from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Thayer or his treatment other than what was contained on the COII.

978.    Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Thayer or any of the employees went to Drs. Carey or Johnson for any improper purpose.

979.    Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

980.    Dr. Heligman did not personally examine or treat Thayer or any of the other CSX/CSXT employees.

981.    Through his testimony at the disciplinary investigation, Shogren confirmed that Thayer was not part of the furlough/abolishment notice.

982.    During the disciplinary investigation, CSX/CSXT presented Thayer's personal and private  medical records to all in attendance, including the other charged employees.

983.    During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

984.    Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Thayer.

985.    Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

986.    During the disciplinary investigation, Dr. Heligman and Shogren testified that Thayer, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

987.    Dr. Heligman and Shogren also testified that Thayer, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

988.    As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

989.    According the CSX/CSXT, the purpose of the formal disciplinary investigation of Thayer and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Thayer investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

990.    By letter dated September 21, 2017, CSX/CSXT notified Thayer that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

991.    Upon information and belief, Drs. Carey and Johnson were exonerated of any wrongdoing by their licensing authorities.

**Deanna Lanham - Clerk**

992.    On or about July 7, 2017, and on dates subsequent thereto, Lanham sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

993.    Dr. Carey evaluated Lanham, prescribed a course of treatment, and ordered Lanham off work until September 3, 2017.

994.    On or about July 7, 2017, Dr. Carey faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") that he was treating Lanham and estimated that Lanham needed to be off work until September 4, 2017.

995.    CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

996.    As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

997.    On or about July 25, 2017, CSX and/or CSXT issued a notice to Lanham to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "B.P. Gessell, Supply Chain Manager" and issued from "22nd St. and 6th Ave., Huntington, WV 25702." An amended notice was sent on or about July 31, 2017.

998.    A formal disciplinary investigation was conducted on August 8, 2017 in Huntington, West Virginia. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

999.    The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1000.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer

than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1001.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1002.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1003.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Deanna Lanham.

1004.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1005.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Deanna Lanham was again included on this list.

1006.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1007. Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Deanna Lanham was not among those who were scheduled to be furloughed.

1008. During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Lanham, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1009. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1010. On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Deanna Lanham, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1011.  During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Lanham from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Lanham or his treatment other than what was contained on the notification of treatment.

1012.  During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Lanham attempted to commit fraud or not.

1013.  Through his testimony, Dr. Heligman confirmed that he had no proof that Lanham or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1014.  Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1015.  Dr. Heligman did not personally examine or treat Lanham or any of the other CSX/CSXT employees.

1016.  During the disciplinary investigation, CSX/CSXT presented Lanham's personal and private medical records to all in attendance, including the other charged employees.

1017.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1018.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Lanham.

1019.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1020.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Lanham, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1021.   Dr. Heligman and Shogren also testified that Lanham, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1022.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1023.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Lanham and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Lanham investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1024.   By letter dated August 25, 2017, CSX/CSXT notified Lanham that she was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "K. James, Jr., Dir Supply Chain Mgmt, P & SC Division, 500 Water Street, Jacksonville, Florida 32202."

**Michael Campbell – Communications Maintainer**

1025.   On or about May 31, 2017, and on dates subsequent thereto, Campbell sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained off-duty.

1026. Dr. Johnson evaluated Campbell, prescribed a course of treatment, and ordered Campbell off work until July 26, 2017.

1027. On or about July 26, 2017, Dr. Johnson faxed to the CSX Medical Department a Certification of Ongoing Illness or Injury ("COII") that he was treating Campbell and estimated that Campbell needed to be off work until September 26, 2017.

1028. CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1029. As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1030. On or about July 31, 2017, CSX and/or CSXT issued a notice to Campbell to attend a formal disciplinary investigation. The notice stated:

> The purpose of this formal investigation is to determine the facts and place your responsibility, if any, in connection with an incident that occurred … with information received from the CSXT Chief Medical Officer on July 14, 2017, that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1031. The letter was signed by "D. Jones, Manager C&S Louisville."

1032. A formal disciplinary investigation was held on August 15, 2017 in Russell, Kentucky. Storm served as the hearing officer and Jones served as the charging manager. Dr. Heligman was present by phone as a witness for the Company.

1033. The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a

167

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers. It further revealed that the charging officer, Mr. Jones, did not believe that Campbell was being dishonest when he applied for time off.

1034.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1035.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1036.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1037.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General did not include Michael Campbell.

1038.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1039.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Michael Campbell was included on this list.

1040.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1041.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Michael Campbell was not among those who were scheduled to be furloughed.

1042.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Campbell, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1043.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1044.  On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Michael Campbell, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1045.  During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Campbell from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Campbell or his treatment other than what was contained on the COII. Campbell also produced additional documentation from Dr. Johnson and other medical providers to substantiate his treatment.

1046.  During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Campbell attempted to commit fraud or not.

1047.  Through his testimony, Dr. Heligman confirmed that he had no proof that Campbell or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1048.  Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1049.  Dr. Heligman did not personally examine or treat Campbell or any of the other CSX/CSXT employees.

1050.  During the disciplinary investigation, CSX/CSXT presented Campbell's personal and private medical records to all in attendance, including the other charged employees.

1051.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1052.  Through his testimony in the disciplinary investigation, Jones admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Campbell.

1053.  Jones further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1054.  During the disciplinary investigation, Dr. Heligman and Jones testified that Campbell, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1055.  Dr. Heligman and Jones also testified that Campbell, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1056.  As the charging manager, it is Jones's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Jones testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1057.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Campbell and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Campbell investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1058.  By letter dated September 13, 2017, CSX/CSXT notified Campbell that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy."

**Tony Abdon – Conductor**

1059.  On or about May 1, 2017, and on dates subsequent thereto, Abdon sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1060.  Dr. Johnson evaluated Abdon, prescribed a course of treatment, and ordered Abdon off work until July 1, 2017.

1061.  On or about May 1, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Abdon and estimated that Abdon needed to be off work until July 1, 2017.

1062.  CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1063.  As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1064.  On or about July 21, 2017, CSX and/or CSXT issued a notice to Abdon to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "Andrew D. Daly" and issued on the letterhead of "R.F. Campbell, Chief Dispatcher, Florence Division, 3019 Warrington Street, Jacksonville, FL 32254."

1065.   A formal disciplinary investigation was conducted on August 4, 2017 in Russell, Kentucky. DeAngelo served as the hearing officer and Lusk served as the charging manager. Dr. Heligman was present via telephone as a witness for the Company.

1066.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1067. On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1068.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1069.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1070.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Tony Abdon.

1071.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1072.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Tony Abdon was again included on this list.

1073.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1074.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Tony Abdon was not among those who were scheduled to be furloughed.

1075.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Abdon, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1076.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1077.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Tony Abdon, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1078.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Abdon from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Abdon or his treatment other than what was contained on the notification of treatment. Abdon presented a report from Dr. Johnson which included Dr. Johnson's diagnosis and treatment plan for Abdon.

1079.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Abdon attempted to commit fraud or not.

1080.   Through his testimony, Dr. Heligman confirmed that he had no proof that Abdon or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1081. Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1082. Dr. Heligman did not personally examine or treat Abdon or any of the other CSX/CSXT employees.

1083. During the disciplinary investigation, CSX/CSXT presented Abdon's personal and private medical records to all in attendance, including the other charged employees.

1084. During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1085. Through his testimony in the disciplinary investigation, Lusk admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Abdon.

1086. Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1087. During the disciplinary investigation, Dr. Heligman testified that Abdon, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1088. Dr. Heligman also testified that Abdon, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1089.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Abdon and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Abdon investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1090.   By letter dated August 31, 2017, CSX/CSXT notified Abdon that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "S. Kuhner, 112 South Ramsey Street, Charlotte, NC 28208."

**Chad Little – Engineer**

1091.   On or about November 9, 2016, Little first sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1092.   Dr. Johnson evaluated Little and made the decision to take him off work and ordered x-rays to be taken to further investigate his injuries.

1093.   Little was ultimately diagnosed with sprain of the lumbar ligaments and muscle spasms and was provided treatment accordingly returning to Dr. Johnson approximately twice a week.

1094.   While under the care of Dr. Johnson for his back and unable to work, on or about December 25, 2016, Little suffered a heart attack requiring hospitalization and surgery.

1095.   As Little recovered from the heart attack, he experienced worsening pain in his back.

1096.   Due to both his heart and back conditions, Little continued to remain off work while he sought regular treatment for both.

1097.   On or about July 6, 2017 Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Little. Among other things, the form described Little's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Little needed additional time off work until September 5, 2017.

1098.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.   Where the underlying medical condition exists for a significant period of time, CSX requires medical providers to continuously submit updated COII forms.

1099.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1100.   On or about July 21, 2017, while still receiving regular medical treatment CSX and/or CSXT issued a notice to Little to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "A.D. Daly, Supt Train Operations" and issued from "1700 167th Street Chicago Command Center, Calumet City, IL 60409." An amended notice was sent on or about July 24, 2017.

1101.   A formal disciplinary investigation was held on August 4, 2017 in Russell, Kentucky.   DeAngelo served as the hearing officer and Lusk served as the charging manager. Dr. Heligman was present via telephone as a witness for the Company.

1102.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1103.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1104.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1105.   The list of employees named in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Little.

1106.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1107.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

1108.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Little was again included on this list.

1109.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1110.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, Little was not among those who were scheduled to be abolished or furloughed. and had not actively worked since 2010 due to medical issues.

1111.   During the disciplinary investigation, Dr. Heligman stated that he was not aware of Little's heart attack nor did he review the medical records submitted on Little's behalf to CSX/CSXT for this issue.

1112.   During the investigation, Dr. Heligman, with little elaboration, merely expressed his belief that, although he had not reviewed Little's medical records or examined him personally, that his condition did not justify the amount of time he had been ordered off work.

180

1113.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1114.   Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1115.   During the disciplinary investigation, the COII prepared for Little by Dr. Johnson was introduced as an exhibit.  Dr. Heligman admitted that he had no other information regarding the injury to Little or his treatment other than what was contained on the COII.

1116.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Little or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1117.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1118.   Dr. Heligman did not personally examine or treat Little or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1119.   During the disciplinary investigation, CSX/CSXT presented Little's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

1120. During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

1121. Through his testimony in the disciplinary investigation, Lusk admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Little.

1122. During the disciplinary investigation, Dr. Heligman testified that Little, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1123. Dr. Heligman also testified that Little, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1124. According to CSX/CSXT, the purpose of the formal disciplinary investigation of Little and the others was to "develop the facts and place … responsibility, if any" yet nearly a month before Little's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1125. By letter dated September 1, 2017, CSX/CSXT notified Little that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "N.M. Male, General Superintendent, 1200 Don Hutson Blvd., Louisville, KY 40219."

1126. Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Brandon Adkins – Fireman/Oiler**

1127.   On or about April 21, 2017, and dates subsequent thereto, Adkins sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

1128.   Dr. Carey evaluated Adkins, prescribed a course of treatment, ordered x-rays and ordered Adkins off work.

1129.   On or about June 21, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Adkins. Among other things, the form described Adkins injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Adkins needed to be off work from April 21, 2017 to August 20, 2017.

1130.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1131.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1132.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Adkins to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

An amended notice was issued on or about July 24, 2017.

1133.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1134.   A formal disciplinary investigation was held on August 8, 2017 in Huntington, West Virginia. Adkins was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1135.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1136.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1137.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1138.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1139.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Brandon Adkins.

1140.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1141.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Brandon Adkins was again included on this list.

1142.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1143.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Brandon Adkins was not among those who were scheduled to be furloughed.

1144.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1145.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1146.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Brandon Adkins, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1147.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Adkins from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Adkins or his treatment other than what was contained on the COII.

1148.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Adkins or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1149.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1150.   Dr. Heligman did not personally examine or treat Adkins or any of the other CSX/CSXT employees.

1151.   During the disciplinary investigation, CSX/CSXT presented Adkins' personal and private  medical records to all in attendance, including the other charged employees.

1152. During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1153. Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Adkins.

1154. Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1155. During the disciplinary investigation, Dr. Heligman testified that Adkins, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1156. Dr. Heligman also testified that Adkins, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1157. As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1158. According the CSX/CSXT, the purpose of the formal disciplinary investigation of Adkins and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Adkins investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1159. By letter dated September 6, 2017, CSX/CSXT notified Adkins that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Jacqueline Marshall – Fireman/Oiler**

1160. On or about June 21, 2017, and on dates subsequent thereto, Marshall sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1161. Dr. Johnson evaluated Marshall, prescribed a course of treatment, and estimated that she would be able to return to work unrestricted on August 21, 2017.

1162. On or about June 21, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") that he was treating Marshall and estimated that Marshall would be able to return to work unrestricted on August 21, 2017.

1163. CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1164. As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1165. On or about July 21, 2017, CSX and/or CSXT issued a notice to Marshall to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft

employees, submitted potentially fraudulent documentation, and all
circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water
Street, Jacksonville, FL 32202." An amended notice was issued on or about July 24, 2017.

1166.   A formal disciplinary investigation was conducted on August 8, 2017 in Russell,
Kentucky. Thoele served as the hearing officer and Shogren served as the charging manager. Dr.
Heligman was present as a witness for the Company.

1167.   The formal disciplinary investigation revealed that Dr. Heligman had decided,
without any evidence, that any and all CSX/CSXT employees who had been treated by Dr.
Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a
concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental
insurance providers.

1168.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential
Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of
Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our
employees from work inappropriately" and keeping such employees of work for "much longer
than is medically appropriate." He further stated that "the timing of these alleged injuries … is
highly suspicious and suggestive of fraudulent practices on the part of both employees and these
two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark
Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the
Kentucky Board of Chiropractic Examiners.

1169.   Attached to the letter, Dr. Heligman included a list of some 52 employees he
claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General]

189

to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1170.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1171.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Jacqueline Marshall.

1172.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1173.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Jacqueline Marshall was again included on this list.

1174.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1175.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Jacqueline Marshall was not among those who were scheduled to be furloughed.

1176.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of

the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Marshall, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1177. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1178. On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Jacqueline Marshall, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1179. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Marshall from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Marshall or her treatment other than what was contained on the notification of treatment.

1180. During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Marshall attempted to commit fraud or not.

1181. Through his testimony, Dr. Heligman confirmed that he had no proof that Marshall or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1182.   Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1183.   Dr. Heligman did not personally examine or treat Marshall or any of the other CSX/CSXT employees.

1184.   During the disciplinary investigation, CSX/CSXT presented Marshall's personal and private medical records to all in attendance, including the other charged employees.

1185.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1186.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Marshall.

1187.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1188.   During the disciplinary investigation, Dr. Heligman testified that Marshall, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1189.   Dr. Heligman also testified that Marshall, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1190.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Marshall and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Marshall investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1191.   By letter dated September 6, 2017, CSX/CSXT notified Marshall that she was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "Brian Barr, VP Mechanical" and issued from "500 Water Street, Jacksonville, FL 32202."

**Homer Maynard – Fireman/Oiler**

1192.   On or about July 5, 2017, and on dates subsequent and prior thereto, Maynard sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1193.   Dr. Johnson evaluated Maynard, prescribed a course of treatment, and stated that he should remain off work through July 5, 2017.

1194.   On or about July 5, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Maynard and estimated that Maynard should remain off work through July 5, 2017.

1195.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1196.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1197.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Maynard to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, FL 32202."

1198.   A formal disciplinary investigation was conducted on August 8, 2017 in Russell, Kentucky. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1199.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1200.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1201.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1202.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1203.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Homer Maynard.

1204.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1205.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Homer Maynard was again included on this list.

1206.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1207.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close

of business on June 23, 2017. Homer Maynard <u>was not</u> among those who were scheduled to be furloughed.

1208.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Maynard, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1209.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1210.   On or about August 30, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Homer Maynard, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1211.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Maynard from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Maynard or his treatment other than what was contained on the notification of treatment.

1212.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Maynard attempted to commit fraud or not.

1213.   Through his testimony, Dr. Heligman confirmed that he had no proof that Maynard or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1214.   Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1215.   Dr. Heligman did not personally examine or treat Maynard or any of the other CSX/CSXT employees.

1216.   During the disciplinary investigation, CSX/CSXT presented Maynard's personal and private medical records to all in attendance, including the other charged employees.

1217.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1218.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Maynard.

1219.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1220.   During the disciplinary investigation, Dr. Heligman testified that Maynard, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1221.  Dr. Heligman also testified that Maynard, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1222.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Maynard and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Maynard investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1223.  By letter dated September 6, 2017, CSX/CSXT notified Maynard that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "Brian Barr, VP Mechanical" and issued from "500 Water Street, Jacksonville, FL 32202."

**Scott Morrison -- Boilermaker**

1224.  On or about July 19, 2017, and dates prior and subsequent thereto,  Morrison sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1225.  Dr. Johnson evaluated Morrison, prescribed a course of treatment, and ordered Morrison off work until September 19, 2017.

1226.  On or about July 19, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Morrison. Among other things, the form described Morrison injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Morrison needed to be off work until September 19, 2017.

1227.  CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

198

1228.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1229.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Morrison to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 21, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202". An amended notice was issued on or about July 28, 2017.

1230.   A formal disciplinary investigation was held on August 23, 2017 in Huntington, West Virginia. Morrison was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1231.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1232.  On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1233.  Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1234.  Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1235.  The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Scott Morrison.

1236.  On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1237.  On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Scott Morrison was again included on this list.

1238.  The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1239.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Scott Morrison was not among those to be furloughed.

1240.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1241.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1242.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Scott Morrison, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1243.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Morrison from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Morrison or his treatment other than what was contained on the COII.

201

1244.  Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Morrison or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1245.  Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1246.  Dr. Heligman did not personally examine or treat Morrison or any of the other CSX/CSXT employees.

1247.  During the disciplinary investigation, CSX/CSXT presented Morrison's personal and private medical records to all in attendance, including the other charged employees.

1248.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1249.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Morrison.

1250.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1251.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Morrison, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1252.  Dr. Heligman and Shogren also testified that Morrison, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1253.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1254.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Morrison and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Morrison investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1255.  By letter dated September 21, 2017, CSX/CSXT notified Morrison that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Jeremy Napier – Fireman/Oiler**

1256.  On or about June 21, 2017, and on dates subsequent thereto, Napier sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1257.  Dr. Johnson evaluated Napier, prescribed a course of treatment, and ordered Napier off work until August 21, 2017.

1258.   On or about June 21, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") form that he was treating Napier and estimated that Napier needed to be off work until August 21, 2017.

1259.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1260.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1261.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Napier to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1262.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 24, 2017.

1263.   A formal disciplinary investigation was opened on August 7, 2017 and then reconvened on August 8, 2017 in Huntington, West Virginia. Napier was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1264.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1265.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1266.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1267.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1268.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Jeremy Napier.

1269.  On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

1270.  On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Jeremy Napier was again included on this list.

1271.  The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1272.  Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Jeremy Napier <u>was not</u> among those who were scheduled to be furloughed.

1273.  During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Napier, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

206

1274.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1275.   On or about August 23, 2017, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Jeremy Napier, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1276.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Napier from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Napier or his treatment other than what was contained on the COII.

1277.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Napier attempted to commit fraud or not.

1278.   Through his testimony, Dr. Heligman confirmed that he had no proof that Napier or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1279.   Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1280.   Dr. Heligman did not personally examine or treat Napier or any of the other CSX/CSXT employees.

1281.   During the disciplinary investigation, CSX/CSXT presented Napier's personal and private medical records to all in attendance, including the other charged employees.

1282.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1283.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Napier.

1284.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1285.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Napier, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1286.  Dr. Heligman and Shogren also testified that Napier, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1287.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1288.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Napier and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Napier investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1289. By letter dated September 5, 2017, CSX/CSXT notified Napier that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Shawn Patterson - Fireman/Oiler**

1290. On or about July 11, 2017, and on dates subsequent thereto, Patterson sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1291. Dr. Johnson evaluated Patterson, prescribed a course of treatment, and ordered Patterson off work until September 11, 2017.

1292. On or about July 11, 2017, Dr. Johnson faxed to the CSX Medical Department a notice that he was treating Patterson and estimated that Patterson needed to be off work until September 11, 2017.

1293. CSX and/or CSXT requires that such forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1294. As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1295. On or about July 21, 2017, CSX and/or CSXT issued a notice to Patterson to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft

employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1296.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 24, 2017.

1297.   A formal disciplinary investigation was held on August 8, 2017 in Huntington, West Virginia. Patterson was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1298.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1299.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1300.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1301.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1302.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Shawn Patterson.

1303.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1304.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Shawn Patterson was again included on this list.

1305.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1306.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Shawn Patterson was not among those who were scheduled to be furloughed.

1307.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Patterson, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1308.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1309.   On or about August 30, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Shawn Patterson, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1310.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the notification of treatment of Patterson from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Patterson or his treatment other than what was contained on the notification of treatment.

1311.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Patterson attempted to commit fraud or not.

212

1312.   Through his testimony, Dr. Heligman confirmed that he had no proof that Patterson or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1313.   Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1314.   Dr. Heligman did not personally examine or treat Patterson or any of the other CSX/CSXT employees.

1315.   During the disciplinary investigation, CSX/CSXT presented Patterson's personal and private medical records to all in attendance, including the other charged employees.

1316.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1317.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Patterson.

1318.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1319.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Patterson, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1320.  Dr. Heligman and Shogren also testified that Patterson, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1321.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1322.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Patterson and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Patterson investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1323.  By letter dated September 5, 2017, CSX/CSXT notified Patterson that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Matthew Woods – Machine Operator**

1324.  On or about June 20, 2017, Woods sustained a work related injury when his work vehicle was struck by a CSX/CSXT train within a CSX/CSXT yard in Greenup, Kentucky.

1325.  Woods, in good faith, notified CSX/CSXT of his work related injury on or about June 20, 2017 and completed and submitted to CSX/CSXT an "Employee's Injury and/or Illness Report" ("Injury Report").

1326.  Woods sought and received medical treatment for his work related injury and notified CSX/CSXT of the same on his June 20th Injury Report.

1327.   On June 20, 2017, and dates subsequent thereto, Woods followed the treatment plan of his treating physicians.

1328.   On or about June 20, 2017, Woods, in good faith, notified CSX and/or CSXT of a hazardous safety or security condition that caused or contributed to his on-duty injury.

1329.   By letter dated June 29, 2017, CSX and/or CSXT issued a notice to Woods to attend a formal disciplinary investigation. The notice stated:

> The purpose of this formal investigation is to determine the facts and place your responsibility, if any, in connection with an incident that occurred at approximately 1330 hours, on June 20, 2017 at or near milepost CA 526, in the vicinity of Russell Yard. While driving CSX vehicle #91257, you fouled the crossing on the lead track as the Y10320 was traveling west over the crossing, resulting in the CSX vehicle you were operating being struck by the Y10320, and all circumstances related thereto.

1330.   By letter dated July 5, 2017, CSX and/or CSXT issued an amended notice to attend a formal disciplinary investigation.  The notice was further amended by letter dated July 7, 2017.

1331.   On or about June 27 and 28, 2017, Woods sought and received treatment for his work related injuries from chiropractor Dr. Fischer. Dr. Fischer placed Woods on restrictions and referred him to Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky.

1332.   On or about July 6, 2017, and dates subsequent thereto Woods sought and received medical treatment from Dr. Johnson.

1333.   Dr. Johnson evaluated Woods, prescribed a course of treatment, and ordered Woods off work until September 6, 2017.

1334.  On or about July 6, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") form that he was treating Woods and estimated that Woods needed to be off work until September 6, 2017.

1335.  CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1336.  As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1337.  On or about July 21, 2017, CSX and/or CSXT issued a notice to Woods to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1338.  A formal disciplinary investigation for the June 20, 2017 incident was opened  on July 26, 2017 and then reconvened on August 24, 2017 ("Injury Investigation"). Creedon served as the hearing officer and Emerson served as the charging manager.

1339.  A formal disciplinary investigation for the dishonesty and fraud allegations per the July 21, 2017 charge letter was opened on August 10, 2017 and then reconvened on August 14, 2017. Creedon served as the hearing officer, Emerson served as the charging manager, Dr. Heligman testified via phone.

1340.  The disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted

effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1341.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1342.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1343.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1344.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Matthew Woods.

1345.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1346.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Matthew Woods was again included on this list.

1347.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1348.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Matthew Woods was not among those who were scheduled to be furloughed.

1349.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Woods, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1350.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1351.  On or about August 23, 2017, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Matthew Woods, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1352.  During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Woods from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Woods or his treatment other than what was contained on the COII.

1353.  During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Woods attempted to commit fraud or not.

1354.  Through his testimony, Dr. Heligman confirmed that he had no proof that Woods or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1355.  Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1356.  Dr. Heligman did not personally examine or treat Woods or any of the other CSX/CSXT employees.

1357.  During the Medical Treatment Investigation, CSX/CSXT presented Woods' personal and private medical records to all in attendance, including the other charged employees.

1358.  During the Medical Treatment Investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1359.   Through his testimony in the Medical Treatment Investigation, Emerson admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Woods.

1360.   Emerson further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General.

1361.   During the disciplinary investigation, Dr. Heligman and Emerson testified that Woods, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1362.   Dr. Heligman and Emerson also testified that Woods, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1363.   As the charging manager, it is Emerson's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Emerson testified that he did no investigation whatsoever into the alleged wrongdoing by Woods and the other charged employees.

1364.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Woods and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Woods investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1365.   By letter dated September 1, 2017, CSX/CSXT notified Woods that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy" as a result of the Medical Treatment Investigation.

220

1366.  By letter dated September 13, 2017, CSX/CSXT notified Woods that he was dismissed from employment for violation of "CSX Transportation Operating Rules 100.1, 700.1, 700.3, and 706.1" as a result of the Injury Investigation.

**John Carpenter – Machinist**

1367.  On or about June 19, 2017, Carpenter sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1368.  Dr. Johnson evaluated Carpenter, including his complaints of back pain.  Dr. Johnson ordered that Carpenter have x-rays taken and ordered him off work.  Dr. Johnson diagnosed Carpenter with sprain of the lumbar/pelvis, sprain of the right knee, and back spasms, and provided treatment accordingly.

1369.  Following his initial appointment with Dr. Johnson, Carpenter sought the care of a an orthopedic surgeon who opined that he could have a torn meniscus and provided a prescription for anti-inflammatory medication.

1370.  On or about June 20, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Carpenter. Among other things, the form described Carpenter's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Carpenter needed to be off work until August 19, 2017.

1371.  CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1372.  As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

221

1373.   Through his course of treatment, Dr. Johnson sent a subsequent COII for Carpenter on or about August 16, 2017 reflecting that Carpenter's condition required additional time off work and provided an estimated return to work date of September 18, 2017.

1374.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Carpenter to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".  An amended notice was sent on or about July 28, 2017.

1375.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Carpenter was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1376.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1377.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1378.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1379.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Carpenter.

1380.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1381.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1382.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Carpenter was again included on this list.

1383.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1384. Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, notwithstanding Carpenter's termination, he would have only been subject to furlough until January 1, 2018.

1385. During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1386. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1387. On or about September 22, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Carpenter, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1388. During the disciplinary investigation, the COII prepared for Carpenter by Dr. Johnson was introduced as an exhibit. Dr. Heligman admitted that he had no other information regarding the injury to Carpenter or his treatment other than what was contained on the COII.

1389.  Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Carpenter or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1390.  Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1391.  Dr. Heligman did not personally examine or treat Carpenter or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1392.  During the disciplinary investigation, CSX/CSXT presented Carpenter's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

1393.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

1394.  Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Carpenter.

1395.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1396.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Carpenter, and the other charged employees, violated CSX/CSXT Employee Operating Rule

225

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1397.  Dr. Heligman and Shogren also testified that Carpenter, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1398.  According to CSX/CSXT, the purpose of the formal disciplinary investigation of Carpenter and the others was to "develop the facts and place … responsibility, if any" yet nearly a month before Carpenter's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1399.  By letter dated September 21, 2017, CSX/CSXT notified Carpenter that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1400.  Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Quincy Christian – Machinist**

1401.  On or about June 21, 2017, and on dates subsequent thereto, Christian sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

1402.  Dr. Carey evaluated Christian, including his complaints of back and shoulder injuries. Dr. Carey prescribed a course of treatment, ordered x-rays, and ordered Christian off work.

1403.   On or about June 26, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Christian. Among other things, the form described Christian injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Christian needed to be off work until August 21, 2017.

1404.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1405.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1406.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Christian to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1407.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 28, 2017.

1408.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Christian was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1409.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey

227

or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1410.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1411.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1412.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1413.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Quincy Christian (though his last name was misspelled as "Chastain," he was identified by his first name, middle initial, and employee number).

1414.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

1415.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Quincy Christian was again included on this list (though his last name was misspelled as "Chastain," he was identified by his first name, middle initial, and employee number).

1416.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1417.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Quincy Christian was among those who were scheduled to be furloughed.

1418.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees,

including Christian, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1419.  On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1420.  On or about August 25, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Quincy Christian, to advise them that:

> he CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1421.  During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Christian from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Christian or his treatment other than what was contained on the COII.

1422.  During the disciplinary investigation, Christian produced a report from Dr. Carey which detailed his diagnoses and treatment plan of Christian and which confirmed that Christian was still not able to return to work.

1423.  Through his testimony, Dr. Heligman confirmed that he had no proof that Christian or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1424.  Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1425.  Dr. Heligman did not personally examine or treat Christian or any of the other CSX/CSXT employees.

1426.   During the disciplinary investigation, CSX/CSXT presented Christian's personal and private medical records to all in attendance, including the other charged employees.

1427.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1428.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Christian.

1429.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1430.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Christian, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1431.   Dr. Heligman and Shogren also testified that Christian, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1432.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1433.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Christian and the others was to "develop the facts and place … responsibility, if any" yet more

than a month before the Christian investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1434. By letter dated September 21, 2017, CSX/CSXT notified Christian that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Gregory Hamm – Machinist**

1435. On or about June 19, 2017, and on dates subsequent thereto, Hamm sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1436. Dr. Johnson evaluated Hamm, including his complaints of back and knee injuries. Dr. Johnson prescribed a course of treatment and ordered Hamm off work.

1437. On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Hamm. Among other things, the form described Hamm's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Hamm needed to be off work until August 19, 2017.

1438. CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1439. As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1440. On or about July 26, 2017, CSX and/or CSXT issued a notice to Hamm to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1441.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 28, 2017.

1442.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Hamm was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1443.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey, II, D.C. ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1444.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

233

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1445. Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1446. Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1447. The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Gregory Hamm.

1448. On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1449. On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Gregory Hamm was again included on this list.

1450. The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1451. Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close

of business on June 23, 2017. Gregory Hamm was among those who were scheduled to be furloughed.

1452. During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Hamm, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1453. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1454. On or about August 25, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Gregory Hamm, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1455. During the disciplinary investigation, Dr. Heligman introduced as exhibits the COIIs of Hamm from Dr. Johnson dated July 16, 2016 and August 16, 2017. In the August 16, 2017 COII, Dr. Johnson estimated that Hamm needed to be off work until October 16, 2017. Dr. Heligman admitted that he had no other information regarding the injury to Hamm or his treatment other than what was contained on the COIIs.

1456.  During the disciplinary investigation, Hamm produced records of x-rays taken at Our Lady of Bellefonte Hospital as ordered by Dr. Johnson.

1457.  Through his testimony, Dr. Heligman confirmed that he had no proof that Hamm or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1458.  Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1459.  Dr. Heligman did not personally examine or treat Hamm or any of the other CSX/CSXT employees.

1460.  During the disciplinary investigation, CSX/CSXT presented Hamm's personal and private medical records to all in attendance, including the other charged employees.

1461.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1462.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Hamm.

1463.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1464.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Hamm, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

236

1465.  Dr. Heligman and Shogren also testified that Hamm, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1466.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1467.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Hamm and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Hamm investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1468.  By letter dated September 21, 2017, CSX/CSXT notified Hamm that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Ethan Mullins – Machinist**

1469.  On or about June 21, 2017, Mullins sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1470.  Dr. Johnson evaluated Mullins, including his complaints of back pain.  Dr. Johnson ordered that Mullins have x-rays taken of his back and ordered him off work.  Dr. Johnson diagnosed Mullins with sprain of the lumbar/pelvis and muscle spasms.  Dr. Johnson provided treatment accordingly including visits approximately twice a week.

1471.   On or about June 22, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Mullins. Among other things, the form described Mullins's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Mullins needed to be off work until August 21, 2017.

1472.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1473.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1474.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Mullins to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".  An amended notice was sent on or about July 28, 2017.

1475.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Mullins was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1476.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a

"concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1477.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1478.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1479.   The list of employees named in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Mullins.

1480.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1481.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1482.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Mullins was again included on this list.

1483.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1484.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, notwithstanding Mullins' termination, he would have only been subject to furlough until January 1, 2018 at which time he was scheduled to begin a five year period of guaranteed work.

1485.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1486.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1487.  Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1488.  During the disciplinary investigation, the COII prepared for Mullins by Dr. Johnson was introduced as an exhibit.  Dr. Heligman admitted that he had no other information regarding the injury to Mullins or his treatment other than what was contained on the COII.

1489.  Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Mullins or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1490.  Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1491.  Dr. Heligman did not personally examine or treat Mullins or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1492.  During the disciplinary investigation, CSX/CSXT presented Mullins' personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

1493.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

1494.   Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Mullins.

1495.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1496.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Mullins, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1497.   Dr. Heligman and Shogren also testified that Mullins, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1498.   According to CSX/CSXT, the purpose of the formal disciplinary investigation of Mullins and the others was to "develop the facts and place … responsibility, if any" yet more than a month before Mullins' investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1499.   By letter dated September 21, 2017, CSX/CSXT notified Mullins that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1500.   Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Michael Owens – Machinist**

1501.   On or about June 26, 2017, and on dates subsequent thereto, Owens sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

1502.   Dr. Carey evaluated Owens, prescribed a course of treatment, and ordered Owens off work until October 28, 2017.

1503.   On or about June 26, 2017, Dr. Carey faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Owens. Among other things, the form described Owens injuries, Dr. Carey's diagnosis and treatment plan, and estimated that Owens needed to be off work until October 28, 2017.

1504.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1505.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1506.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Owens to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1507.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 28, 2017.

1508.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Owens was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1509.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1510.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1511.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1512.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1513.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Michael Owens.

1514.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1515.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Michael Owens was again included on this list.

1516.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1517.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Michael Owens was not among those who were scheduled to be furloughed.

1518.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Owens, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1519. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1520. On or about August 25, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Michael Owens, to advise them that:

> he CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1521. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Owens from Dr. Carey. Dr. Heligman admitted that he had no other information regarding the injury to Owens or his treatment other than what was contained on the COII.

1522. During the disciplinary investigation, Owens produced a report from Dr. Carey which detailed his diagnoses and treatment plan of Owens and which confirmed that Owens was still not able to return to work.

1523. Through his testimony, Dr. Heligman confirmed that he had no proof that Owens or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1524. Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1525.  Dr. Heligman did not personally examine or treat Owens or any of the other CSX/CSXT employees.

1526.  During the disciplinary investigation, CSX/CSXT presented Owens's personal and private medical records to all in attendance, including the other charged employees.

1527.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1528.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Owens.

1529.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1530.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Owens, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1531.  Dr. Heligman and Shogren also testified that Owens, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1532.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1533.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Owens and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Owens investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1534.   By letter dated September 21, 2017, CSX/CSXT notified Owens that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Jonathan Rowe - Machinist**

1535.   On or about July 14, 2017, and on dates subsequent thereto, Rowe sought and received medical treatment from Daniel J. Carey, II, D.C., ("Dr. Carey") at Carey Chiropractic in Proctorville, Ohio for injuries sustained while off-duty.

1536.   Dr. Carey evaluated Rowe, prescribed a course of treatment, and ordered Rowe off work until September 18, 2017.

1537.   On or about July 14, 2017, Dr. Carey faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII") that he was treating Rowe and estimated that Rowe needed to be off work until September 18, 2017.

1538.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1539.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1540.   On or about September 25, 2017, CSX and/or CSXT issued a notice to Rowe to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on September 20, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, FL 32202."

1541.   A formal disciplinary investigation was conducted on October 5, 2017 in Huntington, West Virginia. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1542.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Carey or another chiropractor in the area, Dr. Shannon M. Johnson ("Dr. Johnson"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1543.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1544.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1545.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1546.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1547.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters.

1548.   On or about September 20, 2017, Dr. Heligman sent yet another letter to the RRB Inspector General in which he requested that the Inspector General add Jonathan Rowe "to the list of of your cases to be investigated" based on Rowe having treated with Dr. Carey.

1549.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1550. Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Jonathan Rowe <u>was not</u> among those who were scheduled to be furloughed.

1551. During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Rowe, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1552. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1553. On or about September 26, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Jonathan Rowe, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1554. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Rowe from Dr. Carey. Dr. Heligman admitted that he had no other information

regarding the injury to Rowe or his treatment other than what was contained on the notification of treatment.

1555.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Rowe attempted to commit fraud or not.

1556.   Through his testimony, Dr. Heligman confirmed that he had no proof that Rowe or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1557.   Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1558.   Dr. Heligman did not personally examine or treat Rowe or any of the other CSX/CSXT employees.

1559.   During the disciplinary investigation, CSX/CSXT presented Rowe's personal and private medical records to all in attendance, including the other charged employees.

1560.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1561.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Rowe.

1562.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1563.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Rowe, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1564.  Dr. Heligman and Shogren also testified that Rowe, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1565.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1566.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Rowe and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Rowe investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1567.  By letter dated October 27, 2017, CSX/CSXT notified Rowe that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "Brian Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Danny Stewart – Machinist**

1568.  On or about July 10, 2017, Stewart sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1569.  Dr. Johnson evaluated Stewart, including his complaints of lumbar pain and back spasms. Dr. Johnson ordered x-rays and ordered Stewart off work.

1570.   On or about July 10, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Stewart. Among other things, the form described Stewart injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Stewart needed to be off work until September 12, 2017.

1571.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1572.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1573.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Stewart to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1574.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1575.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Stewart was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1576.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a

254

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1577.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1578.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1579.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1580.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Stewart.

1581.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1582.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Stewart was again included on this list.

1583.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1584.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Stewart was not among those to be furloughed.

1585.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1586.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1587.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Stewart, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel

256

> Carey II, DC. If you continue to have a need to be off of work for a
> medical reason or wish to return to work from a medical leave,
> please provide updated medical documentation from your primary
> care or treating physician, other than the two referenced above.

1588.  During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Stewart from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Stewart or his treatment other than what was contained on the COII.

1589.  Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Stewart or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1590.  Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1591.  Dr. Heligman did not personally examine or treat Stewart or any of the other CSX/CSXT employees.

1592.  During the disciplinary investigation, CSX/CSXT presented Stewart's personal and private medical records to all in attendance, including the other charged employees.

1593.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1594.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Stewart.

1595.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1596.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Stewart, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1597.  Dr. Heligman and Shogren also testified that Stewart, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1598.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1599.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Stewart and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Stewart investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1600.  By letter dated September 21, 2017, CSX/CSXT notified Stewart that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1601.  Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Lloyd Williams – Machinist**

1602.   On or about July 5, 2017, and on dates prior and subsequent thereto, Williams sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1603.   Dr. Johnson evaluated Williams, prescribed a course of treatment, and ordered Williams off work until September 5, 2017.

1604.   On or about July 5, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Williams. Among other things, the form described Williams injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Williams needed to be off work until September 5, 2017.

1605.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1606.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1607.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Williams to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1608.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about August 9, 2017.

1609.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Williams was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1610.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey, II ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1611.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1612.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1613.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1614.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Lloyd Williams.

1615.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1616.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Lloyd Williams was again included on this list.

1617.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1618.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Lloyd Williams was not among those who were scheduled to be furloughed.

1619.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Williams, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1620. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1621. On or about August 25, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Lloyd Williams, to advise them that:

> he CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1622. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Williams from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Williams or his treatment other than what was contained on the COII.

1623. Through his testimony, Dr. Heligman confirmed that he had no proof that Williams or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1624. Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1625. Dr. Heligman did not personally examine or treat Williams or any of the other CSX/CSXT employees.

1626.   During the disciplinary investigation, CSX/CSXT presented Williams's personal and private medical records to all in attendance, including the other charged employees.

1627.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1628.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Williams.

1629.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1630.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Williams, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1631.   Dr. Heligman and Shogren also testified that Williams, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1632.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1633.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Williams and the others was to "develop the facts and place … responsibility, if any" yet more

than a month before the Williams investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1634. By letter dated September 21, 2017, CSX/CSXT notified Williams that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**David Manis – Painter**

1635. On or about July 11, 2017, Manis sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1636. Dr. Johnson evaluated Manis, including his complaints of back pain. Dr. Johnson ordered that Manis have x-rays taken of his back and ordered him off work. The x-ray reports revealed "multilevel mild borderline moderate degenerative disc disease and mild to moderate lower lumbar spine facet DJD present." Dr. Johnson diagnosed Manis with Lumbosacral sprain, thoracic sprain, and Myospasms and provided treatment accordingly.

1637. On or about July 12, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Manis. Among other things, the form described Manis' injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Manis needed to be off work until September 11, 2017.

1638. CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1639.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1640.   On or about July 25, 2017, CSX and/or CSXT issued a notice to Manis to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1641.   A formal disciplinary investigation was held on August 10, 2017 in Huntington, West Virginia. Manis was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1642.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1643. On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer

than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1644.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1645.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1646.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1647.   The list of employees included in Dr. Heligman's July 21, 2017 letter to the RRB Inspector General included Manis.

1648.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Manis was again included on this list.

1649.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in

order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1650.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, notwithstanding Manis' medical leave, he was otherwise qualified to work and would not have been furloughed.

1651.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1652.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1653.   Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1654.   During the disciplinary investigation, the COII prepared for Manis by Dr. Johnson was introduced as an exhibit.  Dr. Heligman admitted that he had no other information regarding the injury to Manis or his treatment other than what was contained on the COII.

1655. Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Manis or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1656. Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1657. Dr. Heligman did not personally examine or treat Manis or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1658. During the disciplinary investigation, CSX/CSXT presented Manis' personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

1659. During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

1660. Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Manis.

1661. Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1662. During the disciplinary investigation, Dr. Heligman and Shogren testified that Manis, and the other charged employees, violated CSX/CSXT Employee Operating Rule

104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1663.   Dr. Heligman and Shogren also testified that Manis, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1664.   According to CSX/CSXT, the purpose of the formal disciplinary investigation of Manis and the others was to "develop the facts and place … responsibility, if any" yet nearly a month before Manis' investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1665.   By letter dated September 5, 2017, CSX/CSXT notified Manis that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1666.   Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Joshua Ferguson – Sheet Metal Worker**

1667.   On or about July 12 , 2017, Ferguson sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1668.   Dr. Johnson evaluated Ferguson, including his complaints of pain in his neck and back.  Dr. Johnson diagnosed Ferguson with cervical sprain, cervicobrachial syndrome, sprain of the right shoulder, and muscle spasms.   Ferguson was treated with spinal manipulations, therapeutic exercise, and passive modalities was ordered off work.

1669.   On or about July 13, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Ferguson. Among other things, the form described Ferguson's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Ferguson needed to be off work until September 12, 2017.

1670.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1671.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1672.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Ferguson to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1673.   A formal disciplinary investigation was held on August 9, 2017 in Huntington, West Virginia. Ferguson was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1674.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr.

Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1675.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1676.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1677.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1678.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees including Ferguson.

1679.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter

included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Ferguson was again included on this list.

1680.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1681.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Ferguson <u>was</u> <u>not</u> among those who were scheduled to be abolished or furloughed.

1682.   Furthermore, at the time the furloughs were announced, Ferguson was part of a four-year contractual guarantee whereby he was guaranteed active employment and thus not subject to furlough through October 2017.

1683.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1684.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1685. Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1686. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Ferguson from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Ferguson or his treatment other than what was contained on the COII.

1687. Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Ferguson or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1688. Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1689. Dr. Heligman did not personally examine or treat Ferguson or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1690. During the disciplinary investigation, CSX/CSXT presented Ferguson's personal and private medical information contained on his COII to all in attendance, including the other charged employees.

1691. During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in the investigation, to all in attendance.

1692.   Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Ferguson.

1693.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1694.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Ferguson, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1695.   Dr. Heligman and Shogren also testified that Ferguson, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1696.   According to CSX/CSXT, the purpose of the formal disciplinary investigation of Ferguson and the others was to "develop the facts and place … responsibility, if any" yet more than a month before Ferguson's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1697.   By letter dated September 6, 2017, CSX/CSXT notified Ferguson that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1698.   Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Eric Speaks – Sheet Metal Worker**

1699.   On or about July 10, 2017, Speaks sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1700.   Dr. Johnson evaluated Speaks, including his complaints of pain in his shoulder, spine and pelvis. Dr. Johnson ordered x-rays and ordered Speaks off work.

1701.   On or about July 10, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Speaks. Among other things, the form described Speaks injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Speaks needed to be off work until September 11, 2017.

1702.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1703.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1704.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Speaks to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1705.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1706.   A formal disciplinary investigation was held on August 9, 2017 in Huntington, West Virginia. Speaks was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1707.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1708.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1709.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1710.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1711.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Speaks.

1712.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1713.    On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Speaks was again included on this list.

1714.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1715.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Speaks was not among those to be furloughed.

1716.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided

by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1717. On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1718. On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Speaks, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1719. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Speaks from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Speaks or his treatment other than what was contained on the COII.

1720. Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Speaks or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1721. Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1722. Dr. Heligman did not personally examine or treat Speaks or any of the other CSX/CSXT employees.

1723. Through his testimony at the disciplinary investigation, Shogren confirmed that Speaks was not part of the furlough/abolishment notice.

278

1724.   During the disciplinary investigation, CSX/CSXT presented Speaks' personal and private medical records to all in attendance, including the other charged employees.

1725.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1726.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Speaks.

1727.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1728.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Speaks, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1729.   Dr. Heligman and Shogren also testified that Speaks, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1730.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1731.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Speaks and the others was to "develop the facts and place … responsibility, if any" yet more than

a month before the Speaks investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1732. By letter dated September 6, 2017, CSX/CSXT notified Speaks that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1733. Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Donald Stephens – Sheet Metal Worker**

1734. On or about June 19, 2017, Stephens sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1735. Dr. Johnson evaluated Stephens, including his complaints of pain. Dr. Johnson ordered x-rays and ordered Stephens off work.

1736. On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Stephens. Among other things, the form described Stephens injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Stephens needed to be off work until August 19, 2017.

1737. CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1738. As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1739.   On or about July 24, 2017, CSX and/or CSXT issued a notice to Stephens to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1740.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1741.   A formal disciplinary investigation was held on August 9, 2017 in Huntington, West Virginia. Stephens was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1742.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1743.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1744.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRb Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1745.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1746.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Stephens.

1747.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1748.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Stephens was again included on this list.

1749.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1750.  Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017.

1751.  During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1752.  On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1753.  On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Stephens, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1754.  During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Stephens from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Stephens or his treatment other than what was contained on the COII.

1755.  Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Stephens or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1756.  Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1757.  Dr. Heligman did not personally examine or treat Stephens or any of the other CSX/CSXT employees.

1758.  Through his testimony at the disciplinary investigation, Shogren confirmed that Stephens was not part of the furlough/abolishment notice.

1759.  During the disciplinary investigation, CSX/CSXT presented Stephens' personal and private medical records to all in attendance, including the other charged employees.

1760.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1761.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Stephens.

1762.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1763.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Stephens, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1764.  Dr. Heligman and Shogren also testified that Stephens, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1765.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1766.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Stephens and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Stephens investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1767.  By letter dated September 6, 2017, CSX/CSXT notified Stephens that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1768.  Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Jason Barker – Utility Worker**

1769.  On or about June 19, 2017, and on dates subsequent thereto, Barker sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1770.  Dr. Johnson evaluated Barker, prescribed a course of treatment, and ordered Barker off work until August 19, 2017.

1771.   On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a notice that he was treating Barker and estimated that Barker needed to be off work until August 19, 2017.

1772.   CSX and/or CSXT requires that such forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1773.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1774.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Barker to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1775.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 24, 2017.

1776.   A formal disciplinary investigation was held on August 8, 2017 in Huntington, West Virginia. Barker was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1777.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a

concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1778.  On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1779.  Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1780.  Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1781.  The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Jason Barker.

1782.  On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

1783.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Jason Barker was again included on this list.

1784.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1785.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Jason Barker <u>was not</u> among those who were scheduled to be furloughed.

1786.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Barker, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1787.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1788. On or about September 8, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Jason Barker, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1789. During the disciplinary investigation, Dr. Heligman introduced as exhibits, the notification of treatment of Barker from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Barker or his treatment other than what was contained on the notification of treatment.

1790. During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Barker attempted to commit fraud or not.

1791. Through his testimony, Dr. Heligman confirmed that he had no proof that Barker or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1792. Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1793. Dr. Heligman did not personally examine or treat Barker or any of the other CSX/CSXT employees.

1794. During the disciplinary investigation, CSX/CSXT presented Barker' personal and private medical records to all in attendance, including the other charged employees.

1795. During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1796.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Barker.

1797.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1798.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Barker, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1799.   Dr. Heligman and Shogren also testified that Barker, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1800.   As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1801.   According the CSX/CSXT, the purpose of the formal disciplinary investigation of Barker and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Barker investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1802.   By letter dated September 5, 2017, CSX/CSXT notified Barker that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics

Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Chad Dowdy – Utility Worker**

1803.   On or about June 19, 2017, and on dates subsequent thereto, Dowdy sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1804.   Dr. Johnson evaluated Dowdy, prescribed a course of treatment, and ordered Dowdy off work until August 19, 2017.

1805.   On or about June 19, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Dowdy and estimated that Dowdy needed to be off work until August 19, 2017.

1806.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1807.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1808.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Dowdy to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1809.  The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 24, 2017.

1810.  A formal disciplinary investigation opened on August 7, 2017 and then reconvened on August 8, 2017 in Huntington, West Virginia. Dowdy was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1811.  The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1812.  On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1813.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1814.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1815.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Chad Dowdy.

1816.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1817.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Chad Dowdy was again included on this list.

1818.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1819.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Chad Dowdy was not among those who were scheduled to be furloughed.

1820.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Dowdy, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1821.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1822.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Chad Dowdy, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1823.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Dowdy from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Dowdy or his treatment other than what was contained on the notification of treatment. Dowdy presented a report from Dr. Johnson which included Dr. Johnson's diagnosis and treatment plan for Dowdy.

1824.   During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Dowdy attempted to commit fraud or not.

1825.   Through his testimony, Dr. Heligman confirmed that he had no proof that Dowdy or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1826.   Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1827.   Dr. Heligman did not personally examine or treat Dowdy or any of the other CSX/CSXT employees.

1828.   During the disciplinary investigation, CSX/CSXT presented Dowdy's personal and private medical records to all in attendance, including the other charged employees.

1829.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1830.   Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Dowdy.

1831.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1832.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Dowdy, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1833. Dr. Heligman and Shogren also testified that Dowdy, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1834. As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1835. According the CSX/CSXT, the purpose of the formal disciplinary investigation of Dowdy and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Dowdy investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1836. By letter dated September 5, 2017, CSX/CSXT notified Dowdy that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Jerry Flocker – Utility Worker**

1837. On or about June 19, 2017, Flocker sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1838. Dr. Johnson evaluated Flocker, including his complaints of pain in his back and knee. Dr. Johnson diagnosed Flocker with lumbar/pelvis sprain, knee sprain, and muscle spasms. Flocker was treated by Dr. Johnson and ordered off work.

1839.   On or about June 20, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Flocker. Among other things, the form described Flocker's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Flocker needed to be off work until August 19, 2017.

1840.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1841.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1842.   On or about July 21, 2017, CSX and/or CSXT issued a notice to Flocker to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202".

1843.   A formal disciplinary investigation was held on August 8, 2017 in Huntington, West Virginia. Flocker was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1844.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr.

Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a "concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1845.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1846.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1847.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1848.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Flocker.

1849.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

298

1850.  On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Flocker was again included on this list.

1851.  The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1852.  Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. Flocker was not among those who were scheduled to be abolished or furloughed.

1853.  During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1854.  On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1855.  Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1856.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Flocker from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Flocker or his treatment other than what was contained on the COII.

1857.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Flocker or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1858.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1859.   Dr. Heligman did not personally examine or treat Flocker or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1860.   During the disciplinary investigation, CSX/CSXT presented Flocker's personal and private medical information contained on his COII to all in attendance, including the other charged employees.

1861.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in the investigation, to all in attendance.

1862. Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Flocker.

1863. Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1864. During the disciplinary investigation, Dr. Heligman and Shogren testified that Flocker, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1865. Dr. Heligman and Shogren also testified that Flocker, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1866. According to CSX/CSXT, the purpose of the formal disciplinary investigation of Flocker and the others was to "develop the facts and place … responsibility, if any" yet more than a month before Flocker's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1867. By letter dated September 5, 2017, CSX/CSXT notified Flocker that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1868. Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Grover Kelley – Utility Worker**

1869.   On or about June 21, 2017, Kelley sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1870.   Dr. Johnson evaluated Kelley, including his complaints of pain in his neck and back.  Dr. Johnson diagnosed Kelley with cervicocranial syndrome, thoracic sprain, and muscle spasms.  Kelley was treated by Dr. Johnson and ordered off work.

1871.   On or about June 22, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Kelley. Among other things, the form described Kelley's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Kelley needed to be off work until August 21, 2017.

1872.   CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1873.   As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1874.   On or about July 19, 2017, Kelley returned to see Dr. Johnson and, upon being examined, was released to return to return to work with no restrictions effective immediately.

1875.   However, only two days later, on or about July 21, 2017, CSX and/or CSXT issued a notice to Kelley to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place
> your responsibility, if any, in connection with information received
> on July 14, 2017 from the CSXT Chief Medical Officer that you
> were dishonest and attempted to defraud the Company and/or
> benefits providers when you, as well as more than 50 other craft

employees, submitted potentially fraudulent documentation, and all
circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water

Street, Jacksonville, Florida 32202".

1876.   A formal disciplinary investigation was held on August 8, 2017 in Huntington,

West Virginia. Kelley was joined in the investigation by other CSX/CSXT employees who were

being similarly charged. Thoele served as the hearing officer and Shogren served as the charging

manager. Dr. Heligman was present as a witness for the Company.

1877.   The formal disciplinary investigation revealed that Dr. Heligman had decided,

without any evidence, that any and all CSX/CSXT employees who had been treated by Dr.

Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a

"concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and the insurance

providers."

1878.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential

Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of

Inspector General. In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our

employees from work inappropriately" and keeping such employees of work for "much longer

than is medically appropriate." He further stated that "the timing of these alleged injuries … is

highly suspicious and suggestive of fraudulent practices on the part of both employees and these

two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the

Kentucky Board of Chiropractic Examiners.

1879.   Attached to the letter, Dr. Heligman included a list of some 52 employees he

claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General]

to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1880.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1881.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General included Kelley.

1882.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud.  This list contained 11 more names of CSX/CSXT employees.

1883.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Kelley was again included on this list.

1884.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1885.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. While Kelley was among those scheduled to be furloughed, his return to work authorization signed by Dr. Johnson effectively restricted him from receiving any benefit from the furlough whatsoever.

1886.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1887.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1888.   Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1889.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Kelley from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Kelley or his treatment other than what was contained on the COII.

1890.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Kelley or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1891.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1892.   Dr. Heligman did not personally examine or treat Kelley or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1893.   During the disciplinary investigation, CSX/CSXT presented Kelley's personal and private medical information contained on his COII to all in attendance, including the other charged employees.

1894.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in the investigation, to all in attendance.

1895.   Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Kelley.

1896.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1897.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Kelley, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1898.   Dr. Heligman and Shogren also testified that Kelley, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1899.   According to CSX/CSXT, the purpose of the formal disciplinary investigation of Kelley and the others was to "develop the facts and place … responsibility, if any" yet more than

306

a month before Kelley's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1900.  By letter dated September 5, 2017, CSX/CSXT notified Kelley that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1901.  Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

**Clay Stiltner – Utility Worker**

1902.  On or about May 24, 2017, and on dates subsequent thereto, Stiltner sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1903.  Dr. Johnson evaluated Stiltner, prescribed a course of treatment, and ordered Stiltner off work until September 19, 2017.

1904.  On or about May 24, 2017, Dr. Johnson faxed to the CSX Medical Department a Certificate of Ongoing Illness or Injury ("COII")  that he was treating Stiltner and estimated that Stiltner needed to be off work until July 19, 2017.

1905.  CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1906.  As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1907.   On or about July 26, 2017, CSX and/or CSXT issued a notice to Stiltner to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 21, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

1908.   The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202. An Amended Notice was sent on or about July 28, 2017.

1909.   A formal disciplinary investigation was held on August 22, 2017 in Huntington, West Virginia. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1910.   The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged "in a concerted effort to defraud" CSX/CSXT, the Railroad Retirement Board, and supplemental insurance providers.

1911.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Johnson and Carey of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark

Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1912.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1913.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1914.   The list of employees included in Dr. Heligman's July 14, 2017 letter to the RRB Inspector General did not include Stiltner.

1915.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees, including that of Stiltner.

1916.   On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Stiltner was again included on this list.

1917.   The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1918.   Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close

309

of business on June 23, 2017. Stiltner <u>was not</u> among those who were scheduled to be furloughed.

1919.   During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation. He further testified that the documentation provided by the employees, including Stiltner, was not sufficient to "prove or disprove that an injury was present" yet he still claimed to have sufficient evidence to accuse the workers of committing fraud.

1920.   On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1921.   On or about August 23, 2017, Dr. Heligman sent letters to CSX/CSXT employees, including Stiltner, to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1922.   During the disciplinary investigation, Dr. Heligman introduced as exhibits, the COII of Stiltner from Dr. Johnson. Dr. Heligman admitted that he had no other information regarding the injury to Stiltner or his treatment other than what was contained on the notification of treatment. Stiltner presented a report from Dr. Johnson which included Dr. Johnson's diagnosis and treatment plan for Stiltner.

1923.  During the disciplinary investigation, Dr. Heligman stated that he had no idea whether Stiltner attempted to commit fraud or not.

1924.  Through his testimony, Dr. Heligman confirmed that he had no proof that Stiltner or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1925.  Through his testimony, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1926.  Dr. Heligman did not personally examine or treat Stiltner or any of the other CSX/CSXT employees.

1927.  During the disciplinary investigation, CSX/CSXT presented Stiltner's personal and private medical records to all in attendance, including the other charged employees.

1928.  During the disciplinary investigation, CSX/CSXT presented the personal and private medical records of dozens of other employees, including those not charged in the investigation, to all in attendance.

1929.  Through his testimony in the disciplinary investigation, Shogren admitted to having been provided by Dr. Heligman some 96 pages of private medical documentation of CSX/CSXT employees, including Stiltner.

1930.  Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1931.  During the disciplinary investigation, Dr. Heligman and Shogren testified that Stiltner, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1932.  Dr. Heligman and Shogren also testified that Stiltner, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1933.  As the charging manager, it is Shogren's responsibility to bring the charges against the charged employees and provide evidence to support such charges. But Shogren testified that he doesn't know the definition of conspiracy and that he doesn't know if the employees and/or their treating physicians conspired to commit any wrongdoing.

1934.  According the CSX/CSXT, the purpose of the formal disciplinary investigation of Stiltner and the others was to "develop the facts and place … responsibility, if any" yet more than a month before the Stiltner investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1935.  By letter dated September 21, 2017, CSX/CSXT notified Stiltner that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

**Dennis Hutchinson – Welder**

1936.  On or about July 12, 2017, and dates prior and subsequent thereto, Hutchinson sought and received medical treatment from Shannon M. Johnson, D.C., ("Dr. Johnson") at Johnson Chiropractic in Greenup, Kentucky for injuries sustained while off-duty.

1937.  Dr. Johnson evaluated Hutchinson, prescribed a course of treatment and ordered him off work until September 13, 2017.

1938.  On or about July 12, 2017, Dr. Johnson faxed to the CSX Medical Department a "Certification of Ongoing Illness or Injury" ("COII") form for Hutchinson. Among other things,

the form described Hutchinson's injuries, Dr. Johnson's diagnosis and treatment plan, and estimated that Hutchinson needed to be off work until September 13, 2017.

1939. CSX and/or CSXT requires that COII forms be submitted by treating physicians on behalf of employees who need to be off work due to injuries or illnesses.

1940. As a general rule, CSX and/or CSXT does not allow employees to work "light duty" or "restricted duty." Therefore, if an employee is physically impaired, his or her only option is to remain completely off work.

1941. On or about July 25, 2017, CSX and/or CSXT issued a notice to Hutchinson to attend a formal disciplinary investigation. The notice stated:

> The purpose of this investigation is to develop the facts and place your responsibility, if any, in connection with information received on July 14, 2017 from the CSXT Chief Medical Officer that you were dishonest and attempted to defraud the Company and/or benefits providers when you, as well as more than 50 other craft employees, submitted potentially fraudulent documentation, and all circumstances related thereto.

The letter was signed by "J. Yates, CMO Engineering & Strategy" and issued from "500 Water Street, Jacksonville, Florida 32202". Amended notices were sent on or about July 28, 2017 and August 8, 2017.

1942. A formal disciplinary investigation was held on August 21, 2017 in Russell, Kentucky. Hutchinson was joined in the investigation by other CSX/CSXT employees who were being similarly charged. Thoele served as the hearing officer and Shogren served as the charging manager. Dr. Heligman was present as a witness for the Company.

1943. The formal disciplinary investigation revealed that Dr. Heligman had decided, without any evidence, that any and all CSX/CSXT employees who had been treated by Dr. Johnson or another chiropractor in the area, Dr. Daniel J. Carey ("Dr. Carey"), had engaged in a

"concerted effort to defraud CSX/CSXT, the Railroad Retirement Board, and the insurance providers."

1944.   On or about July 14, 2017, Dr. Heligman sent a letter entitled "Potential Conspiracy to Defraud RRB Benefit Programs" to the Railroad Retirement Board Officer of Inspector General.  In the letter, Dr. Heligman accused Drs. Carey and Johnson of "removing our employees from work inappropriately" and keeping such employees of work for "much longer than is medically appropriate." He further stated that "the timing of these alleged injuries … is highly suspicious and suggestive of fraudulent practices on the part of both employees and these two providers." The letter was also sent to employee benefit providers Aetna, Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board and the Kentucky Board of Chiropractic Examiners.

1945.   Attached to the letter, Dr. Heligman included a list of some 52 employees he claimed to have committed fraud and he "strongly urge[d] [the RRB Office of Inspector General] to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."

1946.   Defrauding the RRB could lead to, among other things, criminal charges against the employees named by Dr. Heligman and/or a denial or forfeiture of their benefits.

1947.   On or about July 21, 2017, Dr. Heligman sent another letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This list contained 11 more names of CSX/CSXT employees.

1948.   The list of employees named in Dr. Heligman's July 21, 2017 letter to the RRB Inspector General included Hutchinson.

1949.  On or about July 28, 2017, Dr. Heligman sent a third letter to the RRB Inspector General with a list of "additional employees" to be investigated for potential fraud. This letter included a list of four new employees as well as a list of all employees previously identified in the July 14th and July 21st letters. Hutchinson was again included on this list.

1950.  The disciplinary investigation further revealed that the Defendants believed that more than 60 CSX/CSXT employees submitted COII forms from Drs. Johnson and Carey in order to obtain extended benefits because they were due to be furloughed and/or have their jobs abolished.

1951.  Job abolishment and furlough notices were issued by CSX/CSXT at the Huntington, WV mechanical shop on or about June 16, 2017 and were to take effect at the close of business on June 23, 2017. However, Hutchinson was not among those who were scheduled to be abolished or furloughed and had not actively worked since 2010 due to medical issues.

1952.  During the disciplinary investigation, Dr. Heligman testified that it is up to the employees to choose their treating physicians. He further testified that it is the responsibility of the employees to submit COII forms to the Medical Department. And Dr. Heligman stated that he did not doubt the injuries claimed by the employees or the validity of the documents provided by the doctors, but without evidence, that he doubted the motivation behind the submitted medical documentation.

1953.  On or about August 23, 2017, Dr. Heligman sent letters to Drs. Johnson and Carey to advise them that "CSX will no longer accept any medical documentation completed by your office on behalf of any CSX employee."

1954.  Dr. Heligman sent letters to those CSX/CSXT employees who had received, or were receiving treatment from Drs. Johnson or Carey to advise them that:

> the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

1955.   During the disciplinary investigation, the COII prepared for Claimant by Dr. Johnson was introduced as an exhibit.  Dr. Heligman admitted that he had no other information regarding the injury to Hutchinson or his treatment other than what was contained on the COII.

1956.   Through his testimony during the disciplinary investigation, Dr. Heligman confirmed that he had no proof that Hutchinson or any of the employees went to Drs. Johnson or Carey for any improper purpose.

1957.   Through his testimony during the disciplinary investigation, Dr. Heligman testified that the decision for an employee to be held out of service for an illness or an injury is one to be made between the employee-patient and the treating physician.

1958.   Dr. Heligman did not personally examine or treat Hutchinson or any of the other CSX/CSXT employees nor did he engage in any meaningful review of the employees' medical histories.

1959.   During the disciplinary investigation, CSX/CSXT presented Hutchinson's personal and private medical information contained on his COII and other documents to all in attendance, including the other charged employees.

1960.   During the disciplinary investigation, CSX/CSXT presented the personal and private medical information of dozens of other employees, including those not charged in this specific investigation, to all in attendance.

316

1961.   Through his testimony in the disciplinary investigation, Shogren admitted that Dr. Heligman had provided him with some 96 pages of private medical documentation of CSX/CSXT employees, including Hutchinson.

1962.   Shogren further testified that he received the July 14, 2017 letter from Heligman to the RRB Office of Inspector General on or about July 14, 2017.

1963.   During the disciplinary investigation, Dr. Heligman and Shogren testified that Hutchinson, and the other charged employees, violated CSX/CSXT Employee Operating Rule 104.2(a), which states: "Employee behavior must be respectful and courteous. Employees must not be any of the following: Dishonest."

1964.   Dr. Heligman and Shogren also testified that Hutchinson, and the other charged employees, violated the CSX/CSXT Code of Ethics, though it is not clear exactly how the Company claims the Code of Ethics was violated.

1965.   According to CSX/CSXT, the purpose of the formal disciplinary investigation of Hutchinson and the others was to "develop the facts and place … responsibility, if any" yet more than a month before Hutchinson's investigation, Dr. Heligman had already written to the RRB and other benefit providers to declare his belief that these employees had committed fraud.

1966.   By letter dated September 15, 2017, CSX/CSXT notified Hutchinson that he was dismissed from employment for violation of "CSX Operating Rule 104.2.a, and Code of Ethics Policy." The letter was signed and issued by "B. Barr, VP Mechanical, 500 Water Street, Jacksonville, Florida 32202."

1967.   Upon information and belief, Drs. Johnson and Carey were exonerated of any wrongdoing by their licensing authorities.

## COUNT I:
## ERISA SECTION 510 RETALIATION (29 U.S.C. SECTION 1001 et seq.)

1968.  Paragraphs (1)-(1967) are repeated and realleged the same as though pleaded in full.

1969.  Section 510 states that it shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against any participant or beneficiary for exercising any right to which he or she is entitled under the provisions of an employee benefit plan for the purpose interfering with the attainment of any right to which the participant may become entitled under the plan. ERISA authorizes enforcement of Section 510 under Section 502.

1970.  Defendants' termination of Plaintiffs was pretextual and purposefully interfered with the Plaintiffs' right to continued health benefits under defendants' employee benefit plan, sickness and/or disability and retirement under defendant's insurance and retirement plans, thereby causing Plaintiffs to lose substantial health insurance benefits, life insurance benefits, retirement benefits, wages and other fringe benefits of employment.

**COUNT II:**
**SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. 794 ET SEQ. : DISABILITY**
**DISCRIMINATION AND MEDICAL INQUIRY**

1971.  Paragraphs (1)-(1970) are repeated and realleged the same as though pleaded in full.

1972.  At all relevant times, Defendants have received federal financial assistance, thereby rendering Section 504 of the Rehabilitation Act applicable to its employment programs and activities.

1973.  The Rehabilitation Act incorporates Title I of the ADA which prohibits discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). The ban on discrimination expressly includes "fringe

318

benefits available by virtue of employment, whether or not administered" by the employer. 42 U.S.C. § 121 12(b); 29 C.F.R. § 1630.4(f).

1974.  Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the Rehabilitation Act and its implementing regulations by terminating employment based upon treatment for statutory disabilities and by disclosing Plaintiffs' overbroad medical history and/or medical records (including information wholly unrelated to the medical issues for which Defendants were purportedly evaluating medical treatment), 42 U.S.C. Section 12112(d)(3) and 29 C.F.R. Section 1630.14(b).

1975.  As a result of this conduct, Defendants have violated the Rehabilitation Act and caused Plaintiffs the loss of wages and other job benefits and emotional and other harm.

## COUNT III:
## WEST VIRGINIA HUMAN RELATIONS ACT, TITLE 5-11-1 et seq.: DISABILITY DISCRIMINATION, MEDICAL INQUIRY AND AIDING AND ABETTING

1976.  Paragraphs (1)-(1975) are repeated and realleged the same as though pleaded in full.

1977.  The West Virginia Human Relations Act prohibits an employer including individual liability of supervisors from discriminating against an individual with respect to compensation, hire, tenure, terms, conditions, and privileges of employment. Section 5-11-9.

1978.  Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the West Virginia Human Relations Act, Sections 5-11-1 et seq. by terminating employment based upon treatment for statutory disabilities and by disclosing Plaintiffs' overbroad medical history and/or medical records (including information wholly unrelated to the medical issues for which Defendants were purportedly evaluating medical treatment).

319

1979.  Defendants, and each of them, together violated the West Virginia Human Relations Act by conspiring with others to commit acts and activities the purpose of which was to harass, degrade, embarrass or to cause economic loss or to aid, abet persons to engage in unlawful discriminatory acts in violation of Section 5-11-9.

1980.  As a result of this conduct, Defendants have violated the West Virginia Human Relations Act and caused Plaintiffs the loss of wages and other job benefits and emotional and other harm.

**COUNT IV:**
**FAMILY AND MEDICAL LEAVE ACT OF 1993, 29 U.S.C. 2601 et seq.:**
**DENIAL OF BENEFITS AND INTERFERENCE**

1981.  Paragraphs (1)-(1980) are repeated and realleged the same as though pleaded in full.

1982.  Plaintiffs were eligible employees under the FMLA and had a serious medical condition as defined by the FMLA and implementing regulations. A serious health condition is defined as an illness, injury, impairment, or physical or mental condition that involves a period of incapacity requiring absence of more than three calendar days from work, school or other regular daily activities that also involves continuing treatment by a healthcare provide or any period of incapacity due to a chronic health condition.

1983.  Defendants were on notice of Plaintiffs' need for leave under the FMLA for their absences.

1984.  Defendants were aware of Plaintiffs' serious health condition before and after their need for medical leave of absence.

1985.  Defendants violated Plaintiffs' rights under the FMLA and willfully interfered with, restrained and denied their exercise of rights by denying benefits as provided by the FMLA and regulations.

1986.   As a result of this conduct, Defendants have caused Plaintiffs the loss of wages and other job benefits and out-of-pocket expenses.

1987.   Defendants both denied Plaintiffs the benefits of protection under the FMLA and interfered with their rights under the FMLA.

1988.   Defendants violated Plaintiffs' rights under the FMLA and willfully interfered with, restrained and denied their exercise of rights provided by the FMLA and its implementing regulations.

**COUNT V:**
**DEFAMATION**

1989.   Paragraphs (1)-(1988) are repeated and realleged the same as though pleaded in full.

1990.   Defendants acting in the course and scope of his employment with CSX, published certain defamatory written statements, of and concerning Plaintiffs, to various third-parties.  Such defamatory statements include, but are not limited to, false accusations that:

   a.   Plaintiffs "were reporting injuries while off duty and seeking out [medical] providers for the purpose of inappropriately seeking benefits to offset potential wage loss;"

   b.   Plaintiffs' conduct was "highly suspicious and suggestive of fraudulent practices;" and

   c.   Plaintiffs engaged in a "potential conspiracy to defraud RRB sickness and disability benefit programs."

1991.   The aforementioned statements, in addition to other statements made by Defendants, accuse Plaintiffs of federal crimes, tend to injure Plaintiffs in their personal and professional reputations, and are defamatory per se.

1992.   As stated hereinabove, Defendants' defamatory statements were published by CSX employees who, at all times relevant, were acting within the course and scope of their

employment and agency relationships.  As such, the wrongful conduct of such employees and agents is imputed to their principals and/or employer by the doctrines of agency and/or respondeat superior.

1993.  Defendants published these defamatory statements, of and concerning Plaintiffs, in written correspondence to, among others, the Railroad Retirement Board, Aetna Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board, and the Kentucky Board of Chiropractic Examiners.

1994.  By publishing the aforementioned statements, Defendants knew, or reasonably should have known, that the statements would cause harm to Plaintiffs.

1995.  The aforementioned statements are, and at all times material were, false and Defendants knew, or reasonably should have known, of the falsity.

1996.  Defendants made the aforementioned statements with actual malice or reckless disregard for Plaintiffs' rights and reputations and with the willful intent to injure Plaintiffs.

1997.  As a direct and proximate result of Defendants' publication of defamatory statements, Plaintiffs have suffered damages in an amount to be proven at trial.

1998.  Defendants conspired among themselves in publishing the false and defamatory statements and are jointly and severally liable to Plaintiffs for the damages sustained.

1999.  Defendants' defamatory statements were conscious, deliberate, intentional and/or reckless, justifying an award of punitive damages.

### COUNT VI:
### INVASION OF PRIVACY – PUBLIC DISCLOSURE OF PRIVATE FACTS

2000.  Paragraphs (1)-(1999) are repeated and realleged the same as though pleaded in full.

322

2001.  By its conduct, Defendants have knowingly and intentionally caused the public disclosure of private facts concerning Plaintiffs.

2002.  Defendants' public disclosure of Plaintiffs' social security numbers, private medical information, and other personal information constitute private, personal, and sensitive information, the disclosure of which was highly offensive and objectionable to reasonable persons of reasonable sensibilities.

2003.  Plaintiffs' private information published by Defendants did not constitute information of legitimate public concern nor was their disclosure protected by any privilege.

2004.  Defendants knew or reasonably should have known that Plaintiffs had a reasonable expectation of privacy and that disclosing personal and private information to other CSX employees, the Railroad Retirement Board, Aetna Inc., Highmark Blue Cross Blue Shield, United Health Care, the Ohio State Chiropractic Board, and the Kentucky Board of Chiropractic Examiners, and others, without Plaintiffs' knowledge or consent, constituted a violation of Plaintiffs' right to privacy.

2005.  As stated hereinabove, Plaintiffs' private information was publically disclosed by CSX employees who, at all times relevant, were acting within the course and scope of their employment and agency relationships.  As such, the wrongful conduct of such employees and agents is imputed to their principals and/or employer by the doctrines of agency and/or respondeat superior.

2006.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in an amount to be proven at trial.

2007.  Defendants conspired among themselves in publishing Plaintiffs' private information and are jointly and severally liable to Plaintiffs for the damages sustained

2008.  Defendants' conduct as described herein was conscious, deliberate, intentional and/or reckless, justifying an award of punitive damages.

### COUNT VII:
### TORTIOUS INTERFERENCE

2009.  Paragraphs (1)-(2008) are repeated and realleged the same as though pleaded in full.

2010.  Plaintiffs had a contractual or business relationship or expectancy with their medical providers.

2011.  Plaintiffs had a contractual or business relationship or expectancy with their benefit providers.

2012.  Defendants intentionally acted to interfere with Plaintiffs' relationship or expectancy with their medical providers and/or benefits providers.

2013.  Defendants' interference caused harm to the Plaintiffs as alleged herein.

2014.  Plaintiffs suffered damages as a result.

2015.  Defendants conspired amongst themselves to commit tortious interference as alleged herein.

2016.  Defendants are jointly and severally liable to Plaintiffs for the damages caused their tortious interference.

### COUNT VIII:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

2017.  Paragraphs (1)-(2016) are repeated and realleged the same as though pleaded in full.

2018.  Defendants actions, as alleged herein, are atrocious, utterly intolerable in a civilized community, and are so extreme and outrageous as to exceed all possible bounds of decency.

2019. Defendants acted with intent to inflict emotional distress on Plaintiffs or acted recklessly when it was certain or substantially certain such distress would result from Defendants conduct.

2020. The actions of defendants caused the Plaintiffs to suffer emotional distress.

2021. The emotional distress suffered by the Plaintiffs was so severe that no reasonable person could be expected to endure it.

2022. Defendants conspired amongst themselves to commit intentional interference of emotional distress as alleged herein.

2023. Defendants are jointly and severally liable to Plaintiffs for the damages caused their intentional interference of emotional distress.

### COUNT IX:
### WRONGFUL DISCHARGE

2024. Paragraphs (1)-(2023) are repeated and realleged the same as though pleaded in full.

2025. Under West Virginia law an employee has a cause of action for wrongful discharge in violation of public policy.

2026. Railroad companies, and CSX in particular, conduct substantial business in West Virginia, employing its citizens and entitling them to certain rights under state and federal laws, rules and regulations as set forth in this Complaint.

2027. Such federal and state laws, rules and regulations set forth clear public policies. Additionally, the following state and federal laws, rules, and regulations set forth clear public policies: 49 U.S.C. §§ 20101, 20109; 29 C.F.R. Part 1982 *et seq*.; 45 U.S.C. § 351 *et seq*.; 45 U.S.C. § 231 *et seq*.; 31 U.S.C. § 3801 *et seq*.; 20 C.F.R. Part 355 *et seq*.; W. Va. C.S.R. § 150-8-8; W. Va. Code § 21-3-1 *et seq*.

2028.   The dismissals of the Plaintiffs here jeopardizes the public policies set forth in the federal and state laws, rules and regulations cited herein.

2029.   The dismissals of the Plaintiffs here was motivated by conduct related to the public policies set forth in the federal and state laws, rules and regulations cited herein.

2030.   Defendants lacked overriding legitimate business justification for the dismissals of the Plaintiffs.

2031.   Defendants conspired amongst themselves to terminate the employment of the Plaintiffs in violation of West Virginia law.

2032.   Defendants are jointly and severally liable to Plaintiffs for the damages caused their wrongful discharge.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand: (1) judgment against defendants jointly and severally in an amount to make them whole for all damages suffered by them as a result of defendants' violations of ERISA, the Rehabilitation Act, WVHRA, FMLA, and state causes of action including, but not limited to, damages for back pay and benefits, front pay, compensatory damages, punitive damages, out of pocket expenses, liquidated damages, contributions to fringe benefits including pension and retirement, offset for tax consequences of a judgment and all other damages recoverable under the above laws plus prejudgment and other interest; (2) that this Court enjoin defendants from further violating the above laws; (3) that this Court order defendants to reinstate Plaintiffs to the positions they had been awarded when defendant unlawfully terminated  their employment with all seniority and benefits they would have otherwise accrued had defendants not violated the above laws; (4) that this Court award Plaintiffs

expert witness fees, attorneys' fees and the cost of bringing this action and, (5) that this Court grant all other relief to Plaintiffs for injunctive and declaratory relief under law and equity.

**A JURY TRIAL IS DEMANDED.**          DATED**:** May 16, 2018.

Respectfully submitted,

/s/ Gregory G. Paul
Gregory G. Paul
WV Bar #8129
Morgan & Paul, PLLC
100 First Avenue, Suite 1010
Pittsburgh, PA 15222
Tel: (844) 374-7200
Fax: (888) 822-9421
gregpaul@morganpaul.com

Kenneth R. Reed
Kenneth R. Reed, Attorney PSC
241 Elm Street
Ludlow, KY 41016
Tel: (859) 331-4443
Fax: (859) 291-2226
kenreedatty@gmail.com
Applicant for *Pro Hac Vice*

Jeff R. Dingwall
Eight & Sand
550 West B Street
Fourth Floor
San Diego, CA 92101
Tel: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com
*Pro Hac Vice*

C. Kiel Garella
Garella Law, P.C.
409 East Boulevard
Charlotte, NC 28303
Tel: (980) 321-7934
Fax: (704) 990-6734
kiel@gljustice.com
Applicant for *Pro Hac Vice*

327