IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

          Plaintiffs,

v.                                          CIVIL ACTION NO. 3:18-0321

CSX TRANSPORTATION, INC., et al.,

          Defendants.

## ORDER

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment, ECF No. 368, and Defendants' Motion for Summary Judgment, ECF No. 360. For the reasoning provided herein, Plaintiffs' Motion is **DENIED, in part,** and Defendants' Motion is **GRANTED, in part**.[1] Plaintiffs' defamation claim is **DISMISSED**.

### I.  BACKGROUND

Each of the 56 Plaintiffs in this case were employees of CSX. Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate of Illness and Injury ("COII")[2] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back,

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. Additionally, Plaintiffs' Motion for Partial Summary Judgment addresses both their defamation and FMLA claims. The Court finds that a single order addressing all of the arguments would be unwieldy and unpractical. Accordingly, the Court will issue separate orders on the individual counts.

[2] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

Dr. Craig Heligman, MD is the Chief Medical Officer for CSXT. Defendants aver that he became suspicious of the Plaintiffs and their chiropractors after he "noticed the number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem. 2*. Dr. Heligman penned a letter to the Railroad Retirement Board ("RRB") encouraging it to start an investigation.

Dr. Heligman's letter reads as follows:

I writing to inform you of my concern about the practices of two chiropractic physicians that provide services to CSX employees in the Huntington, WV area. They have both provided services in the region for a long time, and we have received numerous documents from them in the course of our normal review of medical fitness for duty issues related to our employees. In the past, we had suspicions that the providers were removing our employees from work inappropriately and potentially in relationship to business changes in the region that may have resulted in furloughs or reduced work hours. It was thought that the employees were reporting injuries while off duty and seeking out these providers for the purpose of inappropriately seeking benefits to offset potential wage losses.

In my professional medical opinion, both of these providers continued to keep employees off work for much longer than is medically appropriate. These conditions would be considered minor musculoskeletal injuries that generally would resolve without any treatment, without more than a few weeks away from work, or with no more than a couple of weeks of chiropractic care. Therefore, their practices are also highly suspicious for excessive and inappropriate treatment. Although we had suspicions, we were not able to identify patterns that were clearly fraudulent. Recently, we had a significant change in business in the area with facility closures and work reductions. Concurrent with the announcing of these business changes, we received doctor's notes withholding over fifty employees from work between June 19 and July 12, 2017. The list of employees has been expanding daily. In my opinion, the timing of these alleged injuries and the volume of cases that spiked just at this time is highly suspicious and suggestive of fraudulent practices on the part of both the employees and these two providers. I have attached a list of the employees who have submitted notes in the time period identified. Some are extensions of cases started several months to a year earlier,

> some have no prior events in our records, and a few had recently been cleared to work by these providers but coincidentally had recurrences at the time the business changes were announced. However, all forms were submitted within the same short time period.
>
> I strongly urge you to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors. I will also be notifying the appropriate licensing boards and health insurance companies so that they may initiate their own investigations.

*July 14, 2017 Letter*, ECF No. 370-2.[3]

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. Plaintiffs' defamation count is based solely on Dr. Heligman's letters.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

---

[3] Copies of this letter were also sent to the Plaintiffs' benefits providers (Aetna, Inc; Highmark Blue Cross Blue Shield; and United Health Care) and to the chiropractic boards of Ohio and Kentucky.

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

Defamation is "[a] false written or oral statement that damages another's reputation." *Pritt v. Republican Nat'l Comm.*, 557 S.E.2d 853, 861 n.12 (W. Va. 2001). "The essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." 2 Syl. pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (W. Va. 1983). In this case, the Court finds that Plaintiffs' defamation claims fail because Dr. Heligman's letters do not contain defamatory statements and because the Defendants are entitled to qualified privilege.

**A. The Heligman Letters Do Not Contain Defamatory Statements**

Defamatory statements tend to "reflect shame, contumely, and disgrace" upon the subject. *See* Syl. pt. 1, *Sprouse v. Clay Commc'n, Inc.*, 211 S.E.2d 674, 679 (W. Va. 1975). A statement may be described as defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Crump*, 320 S.E.2d at 77 (citing Restatement (Second) of Torts § 559 (1977)). "[A] court should not consider words or elements in isolation, but should view them in the context of the whole article." *Id.* at 87 (quoting *Rinsley v. Brandt*, 700 F.2d 1304, 1310 (10th Cir. 1983)).

Plaintiffs allege that the Heligman letters are defamatory *per se*, *see Pls.' Br.* 15, that is that they contain "statement[s] that [are] defamatory in and of [themselves]" and that the statements are "not capable of an innocent meaning," *Pritt*, 557 S.E.2d at 857 n.4. Defamation *per se* is limited to "imputations of a crime of moral turpitude, imputations of loathsome disease, imputations of sexual misconduct by a woman, and imputations which affect a business, trade, profession or office." *Mauck v. City of Martinsburg*, 280 S.E.2d 216, 219 n.3 (W. Va. 1981).

The Supreme Court of Appeals of West Virginia has expressly held that "[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection." Syl. pt. 4, *Maynard v. Daily Gazette Co.*, 447 S.E.2d 293 (W. Va. 1994); Syl. pt. 3, *Hupp v. Sasser*, 490 S.E.2d 880 (W. Va. 1997). In making this assessment, the reviewing court must decide whether the allegedly defamatory statement could be construed as a statement of fact or opinion. *Pritt*, 557 S.E.2d at 861; Syl. pt. 7, *Long v Egnor*, 346 S.E.2d 778, 780 (W. Va. 1986).

Upon review, the Court finds only two sentences in Dr. Heligman's letters could be read to be directly related to the Plaintiffs:

(1) "In my opinion, the timing of these alleged injuries and the volume of cases that spiked just at this time is highly suspicious and suggestive of fraudulent practices on the part of both the employees and these two providers."

(2) "I strongly urge you to fully investigate all of these cases for potential conspiracy to defraud RRB sickness and disability benefit programs by our employees and their chiropractors."[4]

*July 14, 2017 Letter*.

---

[4] Plaintiffs argue that "[i]n this letter, Dr. Heligman conveyed his 'professional medical opinion' that Plaintiffs sought medical treatment for 'longer than is medically appropriate'. . .." *Pls.' Br.* 13. This sentence reads "Plaintiffs" into a sentence that is clearly aimed at the chiropractors. The complete sentence in Dr. Heligman's letter reads: "In my professional medical opinion, both of these providers continued to keep employees off work for much longer than is medically appropriate." *July 14, 2017 Letter*. Plaintiffs cannot rely on this statement to support their claim for defamation because the statement is not about them.
Additionally, Plaintiffs assert that Dr. Heligman's conclusion that Plaintiffs' medical conditions "would generally resolve without any treatment, without more than a few weeks away from work or with no more than a couple weeks of chiropractic care." *Pls.' Br.* 14. Again, the Court finds that this is not an actionable statement, because it is not about the Plaintiffs, but is rather an assessment from a medical professional that injuries of this type typically do not require extensive time away from work.

The Court finds that these statements are opinions that are protected by the First Amendment. The crux of the Plaintiffs' claim is that Dr. Heligman published wrongful statements that Plaintiffs' injury reports were dishonest and fraudulent. However, Dr. Heligman's letter stops short of claiming fraud. Rather, when read within the context of the entire letter, he clearly expresses the opinion that the facts surrounding the injury reports are suspicious and should be investigated. The letter itself is couched as a professional "opinion," and the letter clearly states that CSXT was "not able to identify patterns that were clearly fraudulent." *July 14, 2017 Letter*. Further, the letter plainly states the facts Dr. Heligman based his suspicions and opinions upon. As such, the Court concludes that Dr. Heligman's statements are pure opinions and are not provably false assertions.[5]

Moreover, even if Dr. Heligman's statements were verifiable, the Court finds that that they still qualify as protected opinions because the letter "can best be understood from its language and context to represent the personal view of the author . . . who made it." *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987) (holding that a verifiable statement still qualifies as an "opinion" if "a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly").

---

[5] The Court recognizes that another court has come to a different conclusion after reviewing the very same letter. *See Carey v. CSX Transp., Inc.*, No. CV 18-79-HRW, 2019 WL 181120 (E.D. Ky. Jan. 11, 2019). In *Carey*, the Court concluded that "The basis for Dr. Heligman's allegations of excessive treatment and fraud were based on nothing more than his own unsupported conclusions. Dr. Heligman never evaluated the respective employees, never requested that they be examined by another doctor, never reviewed their medical records, and never spoke with either Plaintiff." *Id.* at *4. The Court found that Dr. Heligman's statements about the chiropractors could be proven false, and therefore that they were defamatory and not merely statements of opinion. While this Court respectfully comes to a different conclusion, it notes that *Carey* dealt with the defamation action brought by chiropractors who treated the Plaintiffs in this case and that Court's opinion largely addressed statements this Court has already concluded were not directed at the Plaintiffs in this case.

Finally, notwithstanding the Court's conclusion that the statements are not defamatory in nature, the Plaintiffs' defamation claim still fails because the communication was privileged, as addressed below.

**B. The Defendants Are Entitled to Qualified Privilege**

West Virginia recognizes a qualified privilege as a defense to defamation claims. *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219, 227 (W. Va. 1994); *Crump*, 320 S.E.2d at 77–78. In *Crump*, the West Virginia Supreme Court of Appeals stated:

> Qualified privileges are based upon a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public.... A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter ... [A] bad motive will defeat a qualified privilege defense ...

*Crump*, 320 S.E.2d at 78 (internal citations omitted). "In essence, then, a defendant's conduct is subject to a qualified privilege when he acts to protect or advance his own legitimate interests, the legitimate interests of others or the legitimate interests of the public." *Dzinglski*, 445 S.E.2d at 227

The Court finds that Defendants are entitled to qualified privilege because Dr. Heligman made the statements in good faith, was acting with a legitimate interest, and limited publication to third parties who had a legitimate interest in the conduct of the employees and chiropractors.

There is no evidence that Dr. Heligman acted in bad faith. His letter only recommends the recipients start their own investigations based on his own concerns or suspicions. Dr. Heligman never asserts that Plaintiffs committed fraud. He merely states that he is "highly suspicious" of Plaintiffs' injury reports and urges an investigation. In fact, he admits that "[a]lthough we had suspicions, we were not able to identify patterns that were clearly fraudulent." *July 14, 2017 Letter*.

Next, it is clear that Dr. Heligman had a legitimate interest in the subject matter of the statements, as he was the chief medical officer for CSXT and the recipient of the COII forms. He had an interest in ensuring that employees were not fraudulently taking leave from work.

Finally, he published the letter only to parties with a legitimate interest in the subject matter: the RRB, chiropractic boards, and the Plaintiffs' insurance agencies. While the Plaintiffs argue that Defendants had no interest in reporting the suspected fraud to the RRB, insurance providers, or the Kentucky and Ohio Chiropractic Boards, *see Pls.' Reply in Supp of Mot. for Partial Summ. J.* 9–10, ECF No. 410, the Court disagrees for two reasons. First, the Plaintiffs have pointed to no legal authority for the proposition that the publisher's interest must be the same as that of the recipients. Second, to the extent that the communication must "affect a sufficiently important interest of the publisher," *see Mauck*, 280 S.E.2d at 221, the Court finds that reporting the suspicious activity was in the Defendants' business interest. Defendants had received an influx of COII forms completed by their employees and these two chiropractors. Dr. Heligman was concerned that they were acting fraudulently, based on the surrounding circumstances, but had no actual proof. Therefore, he notified individuals who were in a position to conduct investigations that could ultimately protect the Defendants' interests.

Additionally, to the extent Plaintiffs argue that Defendants forfeited their qualified immunity by republishing the letter to uninterested persons at the Plaintiffs' individual hearings, *see Pls.' Br.* 19, the Court finds that publication of the letters at the investigative hearings was similarly privileged. The parties present (the Plaintiffs, union representatives, and other interested CSXT employees) had a legitimate interest in the subject matter of the letters, as each of the persons present at the hearings was involved in the investigation into Plaintiffs' allegedly wrongful conduct.

While a "bad motive" can defeat qualified privilege, *Crump*, 320 S.E.2d at 78, Plaintiffs' have failed to specifically identify or produce any evidence of one. Dr. Heligman's letter explained exactly what concerned him and why: the timing and volume of the reports, the nature of the injuries and time off, and the practitioners involved. Plaintiffs do not contest these facts. Plaintiffs have failed to produce even a material question of fact as to whether Dr. Heligman acted with a bad motive.

Accordingly, the Court finds that Defendants are entitled to qualified privilege for the statements made by Dr. Heligman during the course of the investigation into the conduct of the CSXT employees and their treating chiropractors. Defendants had a legitimate interest in investigating what they believed to be suspicious activity, and their communications did not exceed the privilege they enjoyed. This finding is consistent with decisions of West Virginia courts that have concluded that employers enjoy a qualified privilege when it comes to statements made during employer investigations into perceived wrongdoing. *See Dzinglski*, 445 S.E.2d at 227; *Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 27–28 (W. Va. 2002).

## IV. CONCLUSION

Accordingly, the Court **GRANTS, in part,** Defendants' Motion for Summary Judgment and **DENIES, in part,** Plaintiffs' Motion for Partial Summary Judgment. Plaintiffs' defamation claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: July 30, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE