IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JUSTIN ADKINS, et al.,

                Plaintiffs,

v.                                              CIVIL ACTION NO.  3:18-0321

CSX TRANSPORTATION, INC., et al.,

                Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 360. Defendants filed a "Memorandum of Law in Support of Defendants' Motion for Summary Judgment as to Plaintiffs' Tortious Interference Claim" ("*Defs.' Mem.*"). ECF No. 367. Plaintiffs filed a response in opposition ("*Pls.' Resp.*"), ECF No. 395, and Defendants filed a reply memorandum ("*Defs.' Reply*"), ECF No. 412. This issue is now ripe for consideration, and for the reasoning provided herein, Defendants' Motion is **GRANTED**, **in part**, and Plaintiffs' tortious interference claim is **DISMISSED**.[1]

### I.  BACKGROUND

Each of the 56 Plaintiffs in this case were employees of CSX Transportation ("CSXT"). Between May and July of 2017, all of the Plaintiffs visited one of two chiropractors—Shannon M. Johnson, D.C. ("Dr. Johnson") or Daniel J. Carey, II, D.C. ("Dr. Carey"). *COII*, ECF No. 378 at 2–78. The chiropractors placed all of the Plaintiffs on medical restrictions and signed a Certificate

---

[1] Because of the unusually large size of the Plaintiff class in this case, Defendants have filed one "master" motion for summary judgment and multiple individual memoranda as to each of the counts they seek a ruling upon. The Court finds that a single order addressing all of the arguments would be unwieldy and impractical. Accordingly, the Court will issue separate orders on the individual counts.

of Illness and Injury ("COII")[2] for each of them. *Id.* All of the COII listed soft-tissue injuries to the back, neck, or shoulder, and all but one of the injuries complained of occurred when the Plaintiffs were off duty. *Id.* Each of the COII indicated that the Plaintiffs should remain off work for eight or more weeks. *Id.*

Dr. Craig Heligman, MD is the Chief Medical Officer for CSXT. Defendants aver that he became suspicious of the Plaintiffs and their chiropractors after he "noticed the number of COIIs submitted within weeks of each other from the same two providers, and their close similarity." *Defs.' Mem.* 2. Dr. Heligman penned a letter to the Railroad Retirement Board ("RRB") encouraging it to start an investigation. *July 14, 2017 Letter*, ECF No. 370-2. That letter was forwarded to Plaintiffs' medical benefits providers (Aetna, Inc; Highmark Blue Cross Blue Shield; and United Health Care), the Ohio State Chiropractic Board, and the Kentucky Board of Chiropractic Examiners. *Id.*

On August 25, 2017, Dr. Heligman wrote a second letter to Plaintiffs informing them that "the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey, II, DC." *August 25, 2017 Letter*, ECF No 360-2.

On February 2, 2018, Plaintiffs filed a lawsuit alleging that the Defendants were liable for violating federal and state laws and for committing multiple torts. *See* ECF No. 1. The now operative Third Amended Complaint includes the following counts: (1) the Employment Retirement Income Security Act of 1974, (2) the Rehabilitation Act, (3) the West Virginia Human Relations Act, (4) the Family and Medical Leave Act of 1993, (5) defamation, (6) invasion of

---

[2] A COII is the form CSXT requires an employee's medical provider to complete before an employee can be taken off work for an illness or injury. *Defs.' Mem.* 2. The form includes basic identifying information about the employee and has places for the medical professional to document his or her findings, diagnoses, treatment plan, the employee's duration of care with the provider, and the time frame in which the employee is unable to work.

privacy (public disclosure of private facts), (7) tortious interference, (8) intentional infliction of emotional distress, (9) wrongful discharge, and (10) the Federal Railroad Safety Act. This Order specifically addresses Plaintiffs' claim of tortious interference.

## II. LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

To state a prima facie case for tortious interference, a plaintiff must demonstrate:

(1) existence of a contractual or business relationship or expectancy;
(2) an intentional act of interference by a party outside that relationship or expectancy;
(3) proof that the interference caused the harm sustained; and
(4) damages.

Syl. pt. 2, *Torbett v. Wheeling Dollar Sav. & Tr. Co.*, 314 S.E.2d 166, 167 (W. Va. 1983).

> If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

*Id.*

Plaintiffs allege that the Defendants intentionally interfered with the contractual or business relationships they had with their medical providers, Drs. Carey and Johnson, and their medical benefits providers. *See Third Am. Compl.*, ¶¶ 2322–29; *Pls' Resp.* 6–7, ECF No. 395. Plaintiffs' tortious interference claim is based on the two letters sent by Dr. Heligman. The first was a July 14, 2017 letter to the RRB (which was later forwarded to Plaintiffs' medical benefit providers), in which Dr. Heligman urged the recipient to investigate the Plaintiffs' cases for potential fraud. *July 14, 2017 Letter*. Plaintiffs assert that this letter interfered with Plaintiffs' benefits. *Pls.' Resp.* 7.

The second letter was addressed to Plaintiffs, and it read, in pertinent part:

> The purpose of this correspondence is to advise you that the CSX Medical Department is no longer accepting any medical documentation completed by Shannon Johnson, DC, or Daniel Carey, II, DC. If you continue to have a need to be off of work for a medical reason or wish to return to work from a medical leave, please provide updated medical documentation from your primary care or treating physician, other than the two referenced above.

*July 25, 2017 Letter*. Plaintiffs contend that this letter interfered with Plaintiffs' contractual and doctor-patient relationships with their chiropractors. *Pls.' Resp.* 7.

Defendants argue that summary judgment is appropriate on this claim because Plaintiffs have "failed[ed] to identify intentional conduct of Defendants which induced Plaintiffs to break any contract or business relationship with Plaintiffs' chiropractors or benefit providers." *Defs.' Mem.* 6. They specifically argue that "each Plaintiff's own testimony demonstrates that he or she

was able to continue treatment with the chiropractors and each continued to receive medical benefits until Plaintiffs' employment with CSXT was terminated." *Id.* Additionally, Defendants submit that they are entitled to qualified privilege, because "Plaintiffs' claim is based on actions that were taken by Defendants in furtherance of CSXT's legitimate interest in preventing fraud." *Id.*

The Court agrees with Defendants and concludes (1) Plaintiffs have failed to produce any evidence that they were prevented from going to see Drs. Carey or Johnson, or that their benefits providers refused to pay out benefits while they were still employed, and (2) Defendants are shielded from liability because they acted in furtherance of their legitimate business interest of investigating and preventing potential fraud by their employees.

Deposition testimony provided by the Defendants shows that while the Plaintiffs felt like the Defendants tried to interfere with their doctor-patient relationships, they were not prevented from continuing to see their doctors. *See Demonstrative Ex. 4,* ECF No. 360-64 (listing deposition testimony of each Plaintiff regarding tortious interference). Similarly, Plaintiffs' testimony shows that their insurance companies continued to pay for treatment up until the time they were terminated. *Id.* Plaintiffs failed to rebut this testimony.

In fact, the only evidence Plaintiffs produced to suggest Defendants interfered with Plaintiffs' contractual relationships was limited to three brief deposition excerpts from individual Plaintiffs. These excerpts suggest that these Plaintiffs felt they could no longer see their doctors of choice and/or that they believed their insurance would not cover their visits if they continued to see the chiropractors. *See Pls.' Resp.* 8 (citing *Mosteller Dep.* 84, ECF No. 370-38; *Mullins Dep.* 79, ECF No. 370-39; *Owens Dep.* 91–92, ECF No. 370-41). Not only do these statements fail to show any intentional interference on behalf of the Defendants, but Plaintiffs' Counsel's careful

quotations can only be described as blatant and intentional misrepresentations of Mr. Mosteller, Mr. Mullins, and Mr. Owens's testimony.

Counsel's out-of-context citation to Mr. Mosteller's testimony reads, "I guess any ---- anything from Dr. Johnson, which in other words was kind of trying to push you away from your doctor." *Pls.' Resp.* 7 (citing *Mosteller Dep.* 84).[3] Upon review, however, Mr. Mosteller went on to testify that he was not personally affected by the letter because he continued to see Dr. Johnson until he was terminated, and his insurance continued to pay for those appointments. *Mosteller Dep.* 85.[4]

Next, Counsel cites to Mr. Mullins's deposition in which he testified that Defendants

> thought they could infringe on my benefits by choosing who I see, and CSX really don't have the authority to do that. . . . I feel like they set forth who I can see and who I can't. And it's my understanding, it's my right to see the doctor of my choosing within the network.

*Mullins Dep.* 79. However, immediately before this statement Mullins testified:

> . . . they intentionally tried to make me seek treatment elsewhere, which in full disclosure, I would have been fine seeking treatment elsewhere because at the end of the day it don't matter what healthcare provider I'm using. It's not about the healthcare provider, it's about the injury. And regardless I'm not fraudulent, so I'll use any provider I need to.
> However, during the time they wanted me to switch providers, I was already released. So they --- it didn't personally affect me at the time.

*Id.*

---

[3] Prior to making this statement, Mr. Mosteller was asked what CSX did to attempt to interfere with his relationship with Dr. Johnson. Mr. Mosteller then answered, "The letter that I received, and I'm sure you probably have there, that said that they would no longer be accepting I guess any --- anything from Dr. Johnson, which in other words was kind of trying to push you away from your doctor."

[4]   Q. How did that affect you?
    Attorney Dingwall: Object to the form.
    A. Me personally, it did not affect me. I continued to see Dr. Johnson until I was released.
    Q. Did your insurance pay for those appointments?
    A. Yes.

Finally, Counsel cites to the deposition of Mr. Owens, who, when asked when asked what he thought intentional interference with his medical or benefit providers meant, testified:

> I guess that means that you couldn't go to the doctor of your choice.
> . . .
> Yes, but my benefits wouldn't continue unless I seeked another doctor.
> . . .
> If you don't have sick leave documents, all that would stop. They weren't accepting the documents from Dr. Carey anymore. So if I wanted to receive medical treatment from Dr. Carey, it wouldn't have been accepted. My benefits would have been stopped.

*Owens Dep.* 91–92. Once again, this quotation entirely distorts Mr. Owens's testimony. In reality, Plaintiffs' carefully placed ellipses omit Mr. Owens's admissions that he continued to see Dr. Carey and that his insurance carrier continued to cover those visits. *Id.*[5]

Thus, when Plaintiffs' only evidence of injury is viewed in context, it does more to harm Plaintiffs' claim than to help it. Without evidence of actual interference or damages, Plaintiffs' claim cannot continue.

Additionally, the Court finds that even if Plaintiffs had produced evidence that Defendants interfered with their contractual or business relationships, Defendants' conduct was privileged. Plaintiffs have presented no argument suggesting that Defendants were acting outside of the scope of their employment or outside of their interest in protecting CSXT from potential fraud and employee misconduct. Instead, Plaintiffs assert that Defendants' claim of privilege is defeated by "bad motive." *See Pls.' Resp.* 11–13.

---

[5] Q. I know we keep saying the same thing back and forth to each other. You continued to see Dr. Carey. Right?
A. Right.
Q. And your insurance continued to cover visits with Dr. Carey. Right?
A. Yes, but my benefits wouldn't continue unless I seeked another doctor. So to me that got something to do with it.

While it is undeniable that a bad motive will overcome a claim of qualified privilege, *see* Syl. pt. 4, *Dzinglski v. Weirton Steel corp.*, 445 S.E.2d 219, 221 (W. Va. 1994), Plaintiffs fail to identify what the individual Defendants' bad motives were and suggests that Defendant CSXT "acted with a bad motive to terminate [Plaintiffs] to save money on fringe benefits." *Pls.' Resp.* 13. To support the latter allegation, Plaintiffs point to the testimony of a CSX corporate representative who testified that "CSX has to pay an exorbitant amount of fringe benefits towards the employees' health and welfare benefits." *Dreher Dep.* 28, ECF No. 395-10. Once again, this testimony is taken out of context. This portion of Ms. Dreher's testimony simply described the consequences to CSXT of employees fraudulently obtaining health and welfare benefits, and it cannot be reasonably read as an admission that CSXT investigated the employees only to cut back on fringe benefit expenses.[6]

Regardless, even if Defendant CSXT did have a bad motive, the Court agrees with the Defendants that "a party cannot be liable for interference with a contract if that party has a financial interest in the contract." *Wood Cnty. Airport Auth. v. Crown Airways, Inc.*, 919 F. Supp. 960, 968 (S.D.W. Va. 1996). Here, CSXT was the source of Plaintiffs' medical benefits. Consequently, even

---

[6] This excerpt of Ms. Dreher's testimony comes from her response to questions about her role in the charging and investigative process. When asked what type of information she gathered, she testified, "From the Union Benefits Administrator, the amount of health and welfare benefits that an employee would receive if they mark off sick. And from our Finance Department, the fringe benefit piece of how much CSX pays toward union employee's health and welfare benefits." When asked if that information was "relevant to the decision to charge an employee with a rule violation," she testified that "[i]t just shows the magnitude of the fraud," and that it is relevant to develop the full facts of the charge." *Dreher Dep.* 27. When asked to clarify what she meant by "develop the full facts of the charge," she testified:
> In the Collective Bargaining Agreement and Railway Labor Act, we have to develop full record to prove a charge against employee. And so we charge the employee with dishonesty and with fraud and the Code of Ethics fraud that you mentioned earlier.
> It shows that they – they were dishonest in trying to attempt to have a financial gain with their actions. And their actions of marking off for an extended period of absence shows that they would receive extended health and welfare benefits for nearly one year and eight months longer than what they should. *And as a result of that is CSX has to pay an exorbitant amount of fringe benefits towards the employees' health and welfare benefits.*

*Id.* at 27–28 (emphasis added).

if CSXT is not entitled to qualified privilege, it still cannot be held liable for tortious interference with Plaintiffs' benefits.

## IV. CONCLUSION

Accordingly, the Court **GRANTS**, **in part**, Defendants' Motion for Summary Judgment. Plaintiffs' tortious interference claim is **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: August 2, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE