IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---oOo---

JUSTIN ADKINS, et al.,

                Plaintiffs,

vs.                            No. 3:18-CV-00321

CSX TRANSPORTATION, INC.,
et al.,

                Defendants.
_____/

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

THURSDAY, AUGUST 5, 2021, 1:30 P.M.

---oOo---

For the Plaintiffs:    MORGAN & PAUL
                        100 First Avenue, Suite 1010
                        Pittsburgh, Pennsylvania  15222
                        BY:  GREGORY G. PAUL

                        UNDERWOOD & PROCTOR LAW OFFICES
                        923 Third Avenue
                        Huntington, West Virginia  25701
                        BY:  JOHN PATRICK L. STEPHENS

                  (Appearances continued next page...)

Reported by:    KATHY L. SWINHART, CSR
                Official Court Reporter
                (304) 528-2244

1                    APPEARANCES (Continued)

2

     For the Plaintiffs (Cont'd):
3
                     KENNETH R. REED, ESQ.
4                    241 Elm Street
                     Ludlow, Kentucky  41016
5

6    For the Defendants:

7                    NELSON MULLINS RILEY & SCARBOROUGH
                     Post Office Box 1856
8                    Huntington, West Virginia  25719-1856
                     BY:  MELISSA FOSTER BIRD
9
                     MCGUIRE WOODS
10                   800 East Canal Street
                     Richmond, Virginia  23219
11                   BY:  DAVIS MICHAEL WALSH
                     and  SAMUEL LEWIS TARRY, JR.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

HUNTINGTON, WEST VIRGINIA

THURSDAY, AUGUST 5, 2021, 1:28 P.M.

---o0o---

1    THE COURT:  Good afternoon.

2    MR. PAUL:  Good afternoon, Your Honor.

3    MS. BIRD:  Good afternoon.

4    MR. STEPHENS:  Good afternoon, Your Honor.

5    THE COURT:  Are we ready to proceed?

6    MS. BIRD:  Yes, sir.

7    THE COURT:  All right.  So I wanted to hear argument
on the remaining dispositive motions.  I recall the defense
has several.  The plaintiff has one motion for partial summary
judgment, part of which has been ruled upon but not all of
which, so I wanted the chance for counsel to come in and
argue.

It strikes me that, first, it makes sense to take up
those claims that have as a matter of their elements the
balance shifting test that is common to all of us.  My
recollection is that that would include the Family Medical
Leave Act retaliation claim, and then the claims that the
plaintiffs brought under ERISA, the state Human Rights Act and
the Rehabilitation Act.

So I'd like your argument from both sides about those
first, and then we'll shift to -- after that, I think we still
have the Family Medical Leave Act interference claim and then

2

1      the Rail Safety Act claim.

2            And as far as I'm concerned, as long as you use a

3      microphone, you can remain at counsel table, but you need to

4      use the microphone so that my court reporter can hear

5      everything.  All right?

6            MS. BIRD:  Is there any order by which you would like

7      to hear those, Your Honor?  Only because we're splitting the

8      FMLA motion and the other three, ERISA, West Virginia Human

9      Rights Act and Rehabilitation Act.  Would you rather hear the

10     FMLA first?

11           THE COURT:  No, I think I'd actually rather hear the

12     FMLA retaliation claim, ERISA, Rehab Act and Human Rights Act

13     because I think all those have that common foundation of the

14     balance shifting where, it seems to me, the principal argument

15     is over whether there is evidence of pretext and whether the

16     plaintiff has evidence to overcome that.  So --

17           MS. BIRD:  Agreed, Your Honor.

18           Go ahead and start.

19           MR. WALSH:  Your Honor, Davis Walsh for the

20     defendants.  I'm going to address the FMLA retaliation --

21           THE COURT:  All right.

22           MR. WALSH:  I'll address both the FMLA, but I will

23     address retaliation first and then concede the floor.

24           I think you've already hit on the key legal issue,

25     which is pretext.  You know, I think that the parties in terms

1       of retaliation --

2               THE COURT:  Is your microphone on?

3               MR. WALSH:  It is.

4               If it's easier, I could go to the --

5               THE COURT:  Well -- or you might just speak up a

6       little bit.  The microphones are not great in here.

7               MR. WALSH:  Let me make it a little bit easier.

8               THE COURT:  All right.

9               MS. BIRD:  And the court reporter's life easier

10      because she's the most important person, right?

11              MR. WALSH:  Is this better, Your Honor?

12              THE COURT:  Yes, it is.

13              MR. WALSH:  Okay.  Great.  It must be something with

14      my microphone.

15              You've already hit on the key legal issue.  We are at

16      a point, I think, where the parties agree on the fundamentals,

17      and we come down to pretext.

18              In the plaintiffs' brief, they cited three reasons to

19      claim that there were pretext, and in the reply, our response

20      was simply that those are non sequiturs.

21              The first one is that Dr. Heligman used the term

22      subconscious or unconscious in his deposition describing the

23      fraud.  This is a situation of the plaintiffs picking out a

24      word but ignoring what Dr. Heligman said in full.

25              What he explained, maybe not as a lawyer would have

4

1    explained those terms, is that what he was saying is that they

2    didn't -- he's not claiming that they went into the

3    examination room and said, hey, Doc, I want to get off of

4    work, can you give me a note?  But they went into the

5    examination room -- they went to the chiropractors who are

6    most known to be likely to give out-of-work information

7    regardless of what the actual injury was, but to instead base

8    that off of what the plaintiff told them the injury was.

9           So instead of -- in essence, if we wanted to give this

10   sort of a criminal law analogy, and I'm not saying there's a

11   crime being committed, but as an analogy, there is still

12   fraudulent intent from what Dr. Heligman said.  But the words

13   weren't spoken, hey, I want you to do this thing that you're

14   not supposed to do, actually out loud.

15          I also would point out that I'm not exactly sure how

16   this is evidence of pretext.  Because the pretext argument

17   that the plaintiffs need to make, and frankly have not made,

18   is that CSX's reason for dismissing or charging the plaintiffs

19   that they were -- that they were involved in this submission

20   of fraudulent COIIs is that -- that the actual reason was for

21   them seeking Family Medical Leave Act leave.  And there is

22   simply nothing in the record where the plaintiffs have pointed

23   to that that's the real reason that the plaintiffs were

24   dismissed, was the attempting to seek leave.

25          You know, I think we cited to the Kariotis case out of

1    the Seventh Circuit, and I think in the preamble of that, the

2    Seventh Circuit does a good job explaining that in that case,

3    the plaintiff had claimed similar claims -- she claimed Title

4    VII discrimination, I think age discrimination, and FMLA

5    discrimination, for that matter.  And the Seventh Circuit

6    said, well, it's possible that she was discriminated in each

7    of those ways, but that you need to show the reason she was

8    fired was actually about taking the Family Medical Leave Act

9    leave, and I don't believe the plaintiffs have shown that.

10        THE COURT:  In that case, as I recall, the employer

11   claimed that it was essentially the act of seeking the leave

12   on an improper basis that was its reason for taking that

13   adverse action.

14        MR. WALSH:  Right, I believe -- yes, that is correct.

15        And then among -- and again, the FMLA is not a strict

16   liability statute.  I think at times the plaintiffs' brief

17   attempts to say the fact that they were fired after seeking

18   leave means that there was a retaliation or means that there

19   was interference.  The FMLA is not a strict liability statute

20   as that case points out.  The fact that she sought the leave

21   improperly provided the basis on which she was eventually

22   dismissed.

23        So looking back at the pretext, I frankly am lost at

24   how Dr. Heligman's statement somehow or another shows that she

25   was actually fired because she -- or, excuse me, not she --

1    that the plaintiffs were actually fired because they sought

2    Family Medical Leave Act leave.

3         And the second reason that the plaintiffs cited in

4    their brief is that Dr. Heligman's letters to the RRB predated

5    the investigative hearings.  Now, there are a number of

6    factual reasons why the letters predated the investigative

7    hearings, namely those letters are what kicked off the

8    actual -- the further investigation into the particular

9    issues.  But fundamentally I come back to the same point, I

10   don't see how that shows pretext, that somehow or another what

11   really was happening is they were fired for seeking Family

12   Medical Leave Act leave.

13        THE COURT:  Well, I guess in fairness to plaintiffs --

14   of course, plaintiffs' counsel will speak on behalf of the

15   plaintiffs.  But my understanding is their argument is that

16   when you look at Dr. Heligman's letter and then the speed

17   within which CSX took action sending out these discharge

18   notices and all that, and that it was all based upon sort of

19   speculation and supposition, that Dr. Heligman's letter and

20   all CSX knew at the time it was sending these firing notices

21   was that, well, you've got these so-called suspicious

22   circumstances of a number of people filing -- I forget the --

23   I know the acronym, I forget the name of the document that's

24   the leave statement that the doctors have to sign.

25        That there was, I guess one way to characterize it, a

7

1    rush to judgment based upon inadequate considerations, and

2    that that's what plaintiffs claim rings false about the

3    reasons for the action, and that it -- that this action

4    occurred so quickly after these notices were filed by the

5    employees, that that's what supports the inference of a

6    discriminatory intent.

7           MR. WALSH:  And I think I would -- I have two points

8    that we want to make on that.

9           One is, looking at the case law for inadequate

10   investigation or rush to judgment, assuming that occurred,

11   which we would dispute, do not overcome -- or are

12   insufficient.  If you look at the Seventh Circuit decision in

13   Scruggs, or some of the other case law we cited in the brief,

14   that the adequacy of the investigation doesn't undermine the

15   belief that the defendant had or the employer had.

16          I think that the other important consideration here is

17   that looking at the whole process factually, the letters were

18   step one.  Okay.  The letters to the RRB were step one.  Then

19   there were charge letters.  The plaintiffs were given the

20   opportunity under the collective bargaining agreement to have

21   a full hearing, which they had, to appeal that hearing and

22   then ultimately go to the public law board.

23          Of the remaining plaintiffs, the public law board --

24   except one, the public law board upheld that CSX had proven

25   fraud.  And the one plaintiff who remains, the public law

8

1   board frankly found that he had committed the fraud or they --

2   CSX had proved that, but there was some mitigation.  So they

3   re -- put him back on service, just not with back pay.

4          So I think that while the plaintiffs want to focus on

5   step one, looking at the entire factual picture and the entire

6   record, there simply shows a consistency in CSX's belief of

7   what happened, which was ultimately beared out not only

8   through the collective bargaining agreement process, but also

9   through the public law board upholding that.

10         So, again, this is simply not -- the consistency, I

11  think, would weigh in favor of it not being pretextual.  In

12  fact, I think the consistency shows that what was suspected

13  was beared out through the longer investigation and ultimately

14  through the public law board.

15         The last thing that the plaintiffs cited in their

16  brief in terms of pretext is claiming that Dr. Heligman had

17  testified on one hand he was not interfering with the

18  doctor-patient relationship, and on the other hand in his

19  deposition he criticized the doctor -- the chiropractor's

20  care.  I go back to I'm not entirely sure why that shows

21  pretext.

22         You're talking about a deposition where he says that

23  he's not interfering with the doctor-patient relationship, and

24  Your Honor has already ruled on that issue to some extent in

25  the tortious interference claim.  But simply saying in a

9

1    deposition that he didn't agree with the chiropractor's

2    care -- Dr. Heligman is an occupational medicine doctor --

3    again, I don't think this shows any sort of pretext, that the

4    real reason these plaintiffs were allegedly fired or the real

5    reason they were fired is allegedly their seeking leave under

6    the Family Medical Leave Act.

7              The Family Medical Leave Act retaliation and

8    interference come from the same premise that you don't have

9    any greater rights.  That the employer could have fired you

10   for the act.  The Family Medical Leave Act doesn't provide you

11   additional rights.

12             And here, the plaintiffs were fired, and then the

13   parties agree that the reason was part of -- was based on

14   CSX's belief, that was ultimately upheld by the public law

15   board almost unanimously, for this fraudulent submission of

16   COIIs.

17             THE COURT:  All right.

18             MR. WALSH:  Thank you.

19             THE COURT:  Thank you.

20             MS. BIRD:  Do you want to hear the FMLA response or do

21   you want to hear the rest of it?

22             THE COURT:  Well, I think the rest of it first.

23             MS. BIRD:  Okay.  Your Honor, let me address one point

24   that you just raised with Mr. Day -- I just said I wouldn't do

25   that, and I did it -- with Mr. Walsh, and that is the timing

10

1    of what happened.

2           The plaintiffs complain of the timing and the speed at

3    which there was a letter charging the employees soon after the

4    letter to the RRB, but you have to keep in context here that

5    we're dealing with a collective bargaining agreement that sets

6    specific time limits for which plaintiffs have to be charged

7    pursuant to that collective bargaining agreement if there is a

8    rules violation.

9           So in these cases, Dr. Heligman's letter is the

10   triggering event that starts that timing for the collective

11   bargaining agreement.  And the first action under the

12   collective bargaining agreement is a charge letter, which

13   charges the employees with a possible rules violation and then

14   starts the investigative process.  So that charge letter is

15   really the only way that CSX could investigate this situation

16   that was suspicious.

17          They had 67 or more COIIs from the same two

18   chiropractors in the same location taking them off work, and

19   what were they supposed to do with that?  Their only recourse

20   really under the collective bargaining agreement, each one of

21   these plaintiffs, was to charge them with a possible rules

22   violation, which they did, and then that led to the

23   investigation, which is the investigative hearing transcripts

24   which we've all seen and are very familiar with, which then

25   led to a termination letter, which was appealed internally and

1    then also appealed to the public law board.

2           So the speed at which this happened, first of all, was

3    dictated by the collective bargaining agreement.  Let's start

4    with that.  But secondly, that charge letter that may have

5    been speedy, as they say, was the only real way to do this

6    investigation.  There was no right for CSX to go out and get

7    information from these plaintiffs otherwise because their

8    collective bargaining agreement started the process.

9           THE COURT:  All right.

10          MS. BIRD:  So I just want to address that part of what

11   was said.

12          THE COURT:  Sure.

13          MS. BIRD:  And you're right, Your Honor, as we were

14   coming in here today, we were talking about how these claims,

15   these causes of action that you asked us to address first do

16   have the same basis and the same arguments.

17          With regard to the ERISA claim, the prima facie case

18   is that it starts with you had to have a prohibited action,

19   which was there for the purpose of interfering or denying

20   somebody their rights.

21          With regard to the West Virginia Human Rights Act,

22   there has to be a protected class and some adverse action

23   taken because of -- because the plaintiff was a member of that

24   protected class.

25          In the Rehabilitation Act, you have to start with

12

1    somebody being disabled and then otherwise qualified for the

2    job but then somehow discriminated against because of that

3    disability.

4           In all three of those causes of action, it starts with

5    something improper has to be shown before there is a prima

6    facie case which shifts the burden of proof to even talk about

7    pretext.

8           In this case, throughout all of the evidence, every

9    single piece of evidence shows a consistent theme, and that

10   theme is the COIIs came in.  There was an excessive number of

11   those COIIs.  CSX, through the collective bargaining

12   agreement, decided to investigate that.  And then these

13   plaintiffs were ultimately terminated because of the rules

14   violation that was alleged in those COIIs.

15          There is zero evidence here that there was any reason

16   or discussion, thought, plan or intention to deny people

17   benefits, and that is what these charges and ultimate

18   terminations came from.  There is zero information, there is

19   zero evidence that these people, these plaintiffs were charged

20   because they were some protected class under the West Virginia

21   Human Rights Act, or because they were disabled under the

22   Rehabilitation Act.

23          Every single piece of evidence, including Dr.

24   Heligman's testimony, including the testimony which we heard

25   from their expert just yesterday, which we don't have the

1    transcript of yet, every single piece of evidence leads to CSX

2    saw a suspicious activity and investigated it.  It had nothing

3    to do with the medical information within that.  The only

4    reason that came into play is because it was a medical

5    document that was suspicious.

6         But what they did was they went out and investigated a

7    situation because of their own belief that a rules violation

8    and a policy consideration had been violated, and that was

9    ethics and honesty.  And every single piece of information

10   leads back to this suspicion resulting in a charge letter so

11   that those suspicions could be investigated.

12        Ultimately the plaintiffs were terminated and, of the

13   remaining plaintiffs, only one was put back to work.  And like

14   Davis said, the public law board in that case said, oh, yeah,

15   you committed fraud, but we're putting you back to work for

16   another reason.

17        Every single other one of these were upheld because,

18   in fact, they were terminated because they violated the ethics

19   policy and the code of honesty.

20             THE COURT:  All right.  Thank you.

21             MS. BIRD:  Thank you.

22             MR. PAUL:  Good afternoon, Your Honor.

23             THE COURT:  Good afternoon.

24             MR. PAUL:  Greg Paul on behalf of the plaintiffs.

25             THE COURT:  Welcome back.

14

1          MR. PAUL:  Thank you.

2          As an initial matter, just before I forget, we have

3     settled six cases, and to the extent there is any rulings made

4     today, you know, at some point maybe we can get those on the

5     record.

6          THE COURT:  Sure.

7          MR. PAUL:  Second, if I could before getting into the

8     FMLA and other the causes of action, Ms. Foster Bird brought

9     up the collective bargaining agreement.  And at some point, I

10    imagine we will be briefing motions in limine, and one of the

11    really important things is there is a long-standing Supreme

12    Court precedent, Gardner versus Great West and others, the law

13    of the land versus the law of the shop.  So anything that

14    happens under the collective bargaining agreement is by its

15    very nature limited to that law of the shop, and that is

16    separate and distinct from any federal employment law or

17    right, whether that is the FMLA, ERISA, et cetera.

18         So, for instance, when the argument was made that the

19    only recourse was to investigate this under the collective

20    bargaining agreement, I don't think that is accurate.  For

21    instance, under the FMLA, this is the substantive provision.

22    Had that COII, the certificate of ongoing illness, which we

23    think we have strong evidence triggered notice of potential

24    FMLA, that would have triggered a series of rights and

25    responsibilities for the employer and the employee, such as

1     CSX sending out the medical certification form.  That form

2     would have to come back within, I think, 15 days.  If CSX had

3     questions about that, they can request clarification, and they

4     can request a second opinion.  There is even circumstances

5     where they could get a third opinion.

6           So there are certain rights under the substantive

7     provision of the FMLA that would have provided a lot of

8     protection and the ability of CSX to investigate and also the

9     employee to respond.

10          And I know that it sounds like I am arguing the FMLA

11    substative provision, but I bring that up now only because

12    it's both intertwined with the FMLA retaliation, and it is

13    directly responsive to one example of how CSX was not limited

14    by the collective bargaining agreement --

15          THE COURT:  Okay.

16          MR. PAUL:  -- substantively.

17          THE COURT:  All right.

18          MR. PAUL:  Turning to the FMLA retaliation provision,

19    we agree in this case, none of the plaintiffs asked for FMLA

20    specifically.  We know that.  Most of them, if not all of them

21    didn't have any training under the FMLA, so it really just

22    starts with that one-page certificate of ongoing illness.

23          And what Ms. Johnson, the FMLA director, and even Dr.

24    Heligman had testified, there is a little box on that Medgate

25    intake form that said, you know, could this be FMLA eligible,

1    and those were checked yes for the plaintiffs.

2          So at that initial gate, it didn't -- it was just

3    known as medical leave, not FMLA, but that doesn't mean that

4    they're not protected under the FMLA retaliation provisions.

5    Because had they been approved, then CSX then would get into

6    the burden-shifting and the pretext about whether there was

7    actual evidence that they were engaged in fraud.

8          Which kind of goes back to one more basic point, if I

9    can.  There is very conflicting evidence from Dr. Heligman

10   directly that sometimes, say the letter to the RRB, he

11   carefully, or the legal department or labor relations

12   carefully wrote that to say they were suspected of fraud.

13   Other times in Dr. Heligman's deposition or in the hearing

14   transcript, he clearly says -- and we quoted in our document

15   at 397, document No. 397 -- that he had already concluded,

16   that Dr. Heligman had already concluded that they had engaged

17   in a scheme of fraud.

18         So those are kind of two different concepts.

19         THE COURT:  Well, I agree.  But I've read through --

20         MR. PAUL:  Yes.

21         THE COURT:  -- I suspect what is probably all or at

22   least a vast portion of his deposition.  And honestly I think

23   it's a fair conclusion, which is the conclusion that I reach,

24   that he was trying to be very careful not to literally accuse

25   people of a crime, not to literally accuse them of fraud.

17

1      But clearly he believed, and he cited reasons for it,

2 that this was sort of a collective action on behalf of the

3 employees, whether it was done as a result of some express

4 agreement which he couldn't prove, or whether it was just a

5 tacit practice, that everybody who went to these two

6 chiropractors at this time and got reports that were similar

7 were really participating in a at least tacit agreement to try

8 to file these COIIs and to get on some type of leave.

9      And so the fact that he admits that he's not accusing

10 them of fraud, to me, really is kind of beside the point.

11      MR. PAUL:  Well, I agree in the context of the letter

12 to the RRB and the insurance company.  His testimony in

13 deposition and then back in 2017 was that he had concluded

14 that they engaged in fraud without any evidence.

15      THE COURT:  Right.

16      So, you know, honestly the principal reason that I

17 wanted to hear this argument is I am at a point in my analysis

18 where I really think that I've got to determine as it respects

19 not only the FMLA retaliation, but the ERISA, Rehab, and Human

20 Rights Act claims, that at least for the purposes of today I'm

21 satisfied that you've stated a prima facie case.

22      CSX comes back with its proffered reasons for taking

23 this adverse action, and I really wanted to hear your

24 arguments about what evidence you have to demonstrate, to meet

25 your burden that that is pretextual.

18

1          MR. PAUL:  Sure.  Yeah, and that starts with I think

2     Dr. Heligman's testimony that we've quoted is inconsistent

3     with itself.

4          Meaning maybe -- okay.

5          THE COURT:  No, I understand what you're saying.

6          MR. PAUL:  And I'm not saying that they had to call

7     out the CSX police and do surveillance, but certainly there is

8     a lot of cases out there where you have that.  But I think all

9     of us expected, at least on our side expected to see just a

10    little bit more.  I mean, just some evidence other than the

11    coincidence of the number of COIIs, which, you know, they're

12    all individual.  And some people -- as we know, Devery Brown

13    had been on disability for over a year, so he would have no

14    incentive to defraud the company of anything.  Others had

15    treated with the chiropractors for years.  So it's -- I mean,

16    each individual is critical to evaluate whether there was a

17    legitimate basis for that fraud.

18         So when they just say everybody was engaged in fraud,

19    I mean, they've got to look a little bit deeper, I think, to

20    articulate that non-discriminatory reason.  Or if the Court

21    felt otherwise, and it was our burden then to shift back and

22    to explain why it was not a legitimate reason, we've gone

23    through the fact that it was a predetermined process, the fact

24    that, you know, the COIIs themselves provided legitimate

25    medical conditions and the length of time.

1         One of their bases is to say that they were all

2    basically two months, but the chiropractors would explain or

3    others would explain that that is a legitimate time to treat

4    those type of conditions.

5         So I think, you know, a jury should certainly be able

6    to --

7         THE COURT:  You've got responses to many of the

8    arguments that CSX raised, but it also seems clear to me that

9    the law is that an employer who offers a justification can be

10   wrong, even about the justification, and that doesn't

11   necessarily lead then to plaintiffs being able to meet their

12   burden to show that there's an inference of discrimination as

13   a result of a pretext.

14        So here, one of the things I am curious about is I

15   understand why you were -- the people you represent were very

16   skeptical of Dr. Heligman's first letter.  But then what I'm

17   looking at is, after that letter, a process that triggered

18   that resulted in some level of hearings consistent with the

19   collective bargaining agreement and ultimately, as I

20   understand it, with the exception of maybe three or four cases

21   where many people didn't appeal, but those who did except for

22   three or four had the decisions against them affirmed.

23        So how is it that -- where is the evidence that this

24   was a pretextual termination process?

25        MR. PAUL:  Sure.

20

1          Well, we cited from Dr. Heligman's testimony.  In

2     those hearings that happened back in 2017, he had testified

3     that they were already guilty before the investigation even

4     happened.  I mean, he testified at the opening of each of

5     those investigations, I have concluded that they engaged in a

6     scheme of fraud, so that is a predetermined investigation by

7     nature.  I mean, he had already reached the conclusion before

8     he heard the testimony.

9          THE COURT:  Was he the decision-maker at the --

10     throughout this process?

11          MR. PAUL:  He -- well, that's tricky.  He was

12     certainly the only witness on behalf of the company, you know,

13     to testify.  I think he was definitely the decision-maker with

14     respect to certain things like initiating the charge.

15          THE COURT:  Okay.

16          MR. PAUL:  But when it comes to the ultimate

17     decision-maker, I think that was referred through labor

18     relations to a management head, who relied exclusively upon

19     Dr. Heligman's testimony.  So --

20          THE COURT:  Well, so I will come back to where I

21     started a moment ago.

22          The fact is an employer can be wrong -- and I'm not

23     saying they even were wrong here because it got upheld through

24     the process --

25          MR. PAUL:  Sure.

21

1    THE COURT:  -- and many people didn't even appeal.

2    But where it's clear even an employer can be wrong,

3    that doesn't in and of itself prove their basis was

4    pretextual.

5    MR. PAUL:  No, not if they were wrong.  And I am not

6    sure if Your Honor is getting to that honest belief doctrine,

7    if this is the time to address it or not, because --

8    THE COURT:  Well, perhaps.  I mean, until I started

9    reading the briefing on this case, I hadn't seen that

10   terminology used, and I don't know that in my mind it's

11   anything other than a label for that which we commonly apply

12   already anyway, which is determining whether an employer had a

13   good faith basis for the action that they took.

14   MR. PAUL:  Right.

15   THE COURT:  And so here, honestly it's hard for me to

16   find that there wasn't a good faith basis for their action

17   when they initiated a process that is performed under the

18   collective bargaining agreement that resulted in largely the

19   approval of the discharges that they filed.

20   MR. PAUL:  So, I mean, that's where I started out with

21   the limitations of the collective bargaining agreement.  I

22   mean, the only scope that the investigation in the collective

23   bargaining agreement has is of the collective bargaining

24   agreement itself, which for railroaders does not include any

25   federal employment law.  It is possible that some other

22

1    collective bargaining agreements do, but they are limited in

2    their very nature by -- so when we talk about the public --

3            THE COURT:  How does that change the result here?

4            MR. PAUL:  Sure.

5            THE COURT:  I agree they're limited, but here it was,

6    I understand, expressly the purpose of this review to

7    determine whether or not the termination decision based upon

8    Dr. Heligman's suspicions was sufficient under the collective

9    bargain agreement.  They said it was.

10           MR. PAUL:  Well, limited to -- sure, those rule

11   violations, but limited to that conduct, not limited to any

12   violation of any federal employment law.  So that just wasn't

13   considered.

14           THE COURT:  Well, but -- okay.  I'm not sure that I

15   think that matters or that I understand perhaps your point.

16   Because what we're talking about is whether or not the

17   employer essentially had a good faith basis for taking the

18   action.  They can be wrong, they can be quick to judge --

19   there are plenty of cases that talk about that sort of

20   thing -- that sort of criticism does not rise to the level of

21   being evidence of pretext.

22           It seems to me there's got to be something more, and I

23   don't know where the more is here.

24           MR. PAUL:  Okay.  And maybe it would be important to

25   draw a distinction between their good faith effort to

1    initially charge versus their supposed good faith effort to

2    terminate, if I can talk about that for a minute.

3            THE COURT:  Sure.

4            MR. PAUL:  I mean, because certainly getting an influx

5    of COIIs would give rise to, sure, let's look into it.  But

6    then when you actually -- and if your reason, one of the

7    reasons was to get out of the coming layoff announcement, and

8    about half the people weren't even subject to the layoff, that

9    is a critical fact that would have come up during a reasonable

10   investigation.

11           As to how --

12           THE COURT:  Well, it seems to me that -- and I admit

13   perhaps I haven't spent as much time as I'd like thinking it

14   through, but it seems to me that cuts both ways.

15           On the one hand, yes, you could say, you know, they

16   took this action quickly in order to reduce, essentially

17   reduce the effect of the furlough.  But it seems to me that we

18   could also say the reverse, that in this case they had little

19   incentive to take this action against people who weren't even

20   on the furlough list.

21           MR. PAUL:  Right.  And I guess --

22           THE COURT:  Because you weren't going to be

23   furloughed, so you don't -- so CSX had no motive to dump them

24   off of the furlough list.

25           MR. PAUL:  Right.  So why would that support -- I

24

1  mean, I'm not asking a question.  I understand --

2          THE COURT:  I guess that's what I get to.

3          So I don't see how -- it seems me it's almost an

4  inference that one could argue could cut in favor of either

5  side here, and that's why I have trouble sort of figuring out

6  if it really deserves to be a material --

7          MR. PAUL:  Yeah.

8          THE COURT:  -- element of my consideration.

9          MR. PAUL:  Well, our argument would be and our, you

10  know, statement on that would be that someone who is not

11  subject to the layoff at all should not be scooped up with all

12  of these other suspicions through the investigation.

13          THE COURT:  Well, you may be right, but the inference

14  that I'm trying to say is that maybe that supports the

15  inference that it was really their reaction to all of these

16  COIIs coming -- and their similarities that was the motivating

17  force here and not trying to play fast and loose with

18  furloughs or that sort of thing.

19          MR. PAUL:  So I'm not agreeing with this, but that may

20  be true in June of 2017, but that certainly wasn't true in

21  August of 2017 when they made the decision to terminate.

22          So, you know, I think Dr. Heligman testified at first

23  he wasn't sure if people were laid off or not, he just saw a

24  pattern that throughout the course of those three months or

25  slightly under three months, you know, evidence certainly did

1  come out and people testified I wasn't subject to lay off or

2  furlough.  Or they said I don't treat with just this

3  chiropractor, I've been treating with an orthopedist, I mean,

4  other things that would substantiate this wasn't, as I think

5  their suspicion was in June, that they were first going to

6  these chiropractors just to get paperwork completed.

7       And just for instance, I mean to cite our brief again,

8  it's document No. 397, page 5 and 6 of 27, Dr. Heligman

9  testified that he had no reason to believe that the illnesses

10 were not legitimate, that the COIIs did not appear fraudulent,

11 because that's at direct odds with the suspicion in June that

12 he would have felt.

13      And then later he testifies that they went to the

14 chiros, quote, with the sole intent of obtaining medical

15 documentation for the purpose of seeking benefits improperly,

16 that is the fraud, end quote.

17      So those are two different worlds to look at this COI

18 and say there's nothing suspicious about it, which he

19 testified to versus the letter to the RRB that suggests

20 otherwise, and then later to say that that was a fraud.  It's

21 that type of inconsistent testimony that could support an

22 inference for a jury to conclude that it was pretextual.

23      Now, you know, we think there is more going on than

24 just this one day when these COIIs came into the medical

25 department.  I mean, we think that there was a plot by CSX to

26

1    try to eliminate the work force.  And that could be done

2    legitimately I suppose, but the way they went about doing it

3    here by accusing people of fraud was not.

4           I don't know if you have any other questions.

5           THE COURT:  Well, I think -- I'm not sure, both sides

6    may have cited the Mercer case.  That was the Fourth Circuit

7    case I know the defense cited because it cited approval of

8    that Seventh Circuit case that they've argued about.  But the

9    language was there, and then there was another per curiam

10   later on in the circuit which also seemed to approve of the

11   Seventh Circuit case, but then used this kind of language:

12          The district court must evaluate whether plaintiff has

13   demonstrated such weaknesses, implausibilities,

14   inconsistencies, incoherencies or contradictions in the

15   employer's proffered legitimate reasons for its action that a

16   reasonable fact finder could rationally find worthy of

17   credence.

18          And while I appreciate that in his deposition

19   Dr. Heligman made the statements you're referred to -- I don't

20   question it's in there, I just haven't read through it -- is

21   that what this boils down to then on the plaintiffs' side?  Is

22   really your evidence of pretext actually just Heligman's

23   inconsistencies in his testimony?

24          MR. PAUL:  So it's not only, but it's primarily

25   because he was the only witness.

1        So this is not an example where an employer did an

2   investigation and had five witnesses, and they said different

3   things so you have to weigh things.  You could argue that that

4   could be inconsistent but not evidence of pretext.  When it's

5   the sole witness, Dr. Heligman, the only witness that they

6   ever had and his testimony is inconsistent over time, that's

7   what would support the pretext analysis.

8        THE COURT:  Well, and maybe you can refresh my

9   recollection about this.

10       So did Dr. Heligman make in his testimony during the

11  investigatory hearings the same type of statements that you

12  pointed to here that were inconsistent or contradictory?

13       MR. PAUL:  Yes.

14       THE COURT:  So --

15       MR. PAUL:  Yes.  And we've summarized those at

16  document 397 starting at page 3 through 8.

17       THE COURT:  I remember some of that being laid out.  I

18  just frankly didn't remember --

19       MR. PAUL:  Yeah.

20       THE COURT:  -- what the source was, whether it was the

21  hearings or whether it was his deposition in this case.

22       MR. PAUL:  It was both because -- well, I mean, I

23  guess you could say it was the deposition because in the

24  deposition we asked him about the hearing.  But there is

25  the -- I don't know if that makes sense.

28

1          THE COURT:  It might, but that still leaves me a bit

2    confused.  Because if in his testimony at the hearings he

3    described really what he summarized in the letter that started

4    all this, and in that summarization he alluded to the fact

5    that there were all of these unusually high number of COIIs in

6    a short period of time, that these were also temporally

7    related to sort of the swirling news around the workplace

8    about the new people at the top and the possibility of major

9    changes, furloughs, layoffs, et cetera, that he found that

10   this sudden influx that, as he reported in his letter, were

11   reports that were very similar, strikingly similar in the way

12   it described the employees' complaints, their symptoms, the

13   conclusions that they should be off work for this precise

14   period, and the fact that these were all coming from two

15   medical providers -- and I attach no negative sort of

16   inference to the fact that these were chiropractors at all.

17          But it would -- those were the things that he said in

18   the letter, and that's what I assume was principally his

19   testimony at the hearings, and so even if he contradicts that

20   later in his deposition testimony or undercuts it by saying,

21   well, I didn't really mean fraud, oh, I'm not saying that they

22   didn't really have problems or medical conditions, I mean,

23   even if he backtracks that in the deposition, I'm not sure how

24   that goes to proving that CSX was essentially guilty of using

25   a pretextual basis for the discharge.

1          MR. PAUL:  Well, there are certainly -- in his

2    depositions, litigation depositions, there were certainly a

3    number of inconsistencies that came up.  But, I mean, I think

4    we've hit this point that in contrast to the letter to the RRB

5    where it was a suspicion, he definitely testified at those

6    hearings, you know, along the lines that, in his deposition,

7    he read the response from the investigation hearing.  I found

8    these employees' actions to be concerted fraud, effort to

9    defraud CSXT and the Railroad Retirement Board and insurance

10   providers for the extended benefits.

11          And the key is that nothing happened between his

12   letter to the RRB and those hearings in terms of what Dr.

13   Heligman did as an investigation that would change that.

14   That's why it's so predetermined.  And the reason it was

15   predetermined is a whole host of reasons that fit into kind of

16   a mix, whether it's the ERISA benefits because they don't have

17   to pay the health insurance if they're not on extended sick or

18   if they're -- have a disability or the use of the FMLA, that

19   they have to hold those jobs.  Because we know or we believe

20   that there was a real effort to eliminate positions, and that

21   wouldn't have happened had they given the FMLA protections and

22   ways to provide other information for the employees to support

23   their medical conditions, rather than just have it rest

24   exclusively with Dr. Heligman just based on his suspicion.

25          THE COURT:  Okay.  Thank you.

1          MR. PAUL:  Thank you.

2          THE COURT:  All right.  Brief reply?

3          MR. WALSH:  In terms of reply on retaliation, there's

4     just a couple little factual points I want to hit on.

5          One, Dr. Heligman is not the only person, not the only

6     actor in this case.  He was the person who identified the

7     issue, brought it forward.  The terminating officer for most

8     all these cases is a gentleman named Brian Barr -- the

9     terminating officer or decision-maker was a gentleman named

10    Brian Barr, who looked at the hearing transcript, the facts

11    established and made his decision.

12         Dr. Heligman is right now, I think, a boogeyman for

13    the plaintiffs, but that's not how the process played out.

14         THE COURT:  Was he the only witness at the hearings?

15         MR. WALSH:  I don't believe that is accurate.

16         The charging officer was also a witness, so they would

17    have somebody in the craft who would charge the employee who

18    would testify, and Dr. Heligman would also testify.

19         THE COURT:  Well, but to your knowledge, was all the

20    evidence that formed the basis for the decision by the board

21    Dr. Heligman's complaints or his criticisms of the COIIs?

22         MR. WALSH:  I think that is generally accurate, but

23    that goes to his analysis.  I think it's inaccurate to say

24    that all -- that nothing happened between the time of the RRB

25    letter and the hearings.  You know, as Ms. Bird pointed out,

1   it started the investigative process.  There was more that was

2   done.  It didn't change anybody's mind.

3          Ultimately, Your Honor, the question I think you've

4   asked is what is the evidence of pretext, and they simply --

5   that there was some sort of motive out there.  And at this

6   point plaintiffs' counsel has only put forward a supposition,

7   frankly a baseless supposition, that there was some plot to

8   eliminate the work force.  There is simply no evidence of that

9   at this point.

10          Pointing out what are perceived inconsistencies from

11  Dr. Heligman saying they did commit fraud to they might have

12  committed fraud simply isn't evidence of pretext, I would

13  submit.  And frankly I also disagree that he was inconsistent.

14  But in terms of retaliation, those are the points I have to

15  make.

16          If you have any questions --

17          THE COURT:  All right.  Thank you.

18          MR. WALSH:  Do you want to talk about -- I'm sorry.

19          MS. BIRD:  Let me just add -- that's okay.  Go ahead.

20          Let me just add one thing to what was said, that Dr.

21  Heligman and the charging officer were the witnesses on behalf

22  of CSX.  On behalf of the plaintiffs, they testified

23  themselves.  They also had the opportunity and were offered

24  the opportunity at every hearing to present any other

25  witnesses they wanted to present, including the chiropractors,

32

1   which did not come, including any medical treaters, which

2   would have alleviated or supported their claim that they were

3   properly off work for a medical condition.  So there were --

4   there was other evidence at the hearings.  It wasn't just Dr.

5   Heligman saying his point.

6         And the person who is missing here is the person who

7   made the decision to charge the plaintiffs and made the

8   decision to terminate the plaintiffs.  He testified in this

9   case for half a day.  His name is Brian Barr.  At one point,

10  he was superintendent of this area, in Huntington and the

11  division here.  He's now at CSX.  He's about the third person

12  in charge of CSX.  He was involved in this process from day

13  one when this information was brought to him to make a

14  decision whether or not to charge these plaintiffs and

15  investigate the situation, which was the way to do this under

16  the collective bargaining agreement.

17        So when he made -- when those charge letters went out,

18  evidence was heard at the hearing.  The plaintiffs all had the

19  opportunity to bring any other evidence they wanted to bring,

20  which would have been carried through through their appeal and

21  through the arbitration to the public law board, and they did

22  what they needed to do.  Some of them submitted medical

23  records.  Some of them submitted other things.  None of them

24  brought any other witnesses, which they were allowed to do,

25  and all of them testified as to the situation on behalf of

33

1    themselves.

2           THE COURT:  All right.  Thank you.

3           MR. PAUL:  May I just briefly?

4           THE COURT:  Yes.

5           MR. PAUL:  I think bringing up Mr. Barr, who was the

6    top management person --

7           THE COURT:  Right.

8           MR. PAUL:  -- his deposition I think was taken after,

9    so we don't have the benefit of that in the briefing.

10          If the Court would want some supplemental briefing --

11          THE COURT:  Well, they brought it up.  I hadn't seen

12   it referred to at all in the briefing before.

13          Is there something you want to say responsive to

14   what --

15          MR. PAUL:  Well, what's probably the biggest, most

16   important thing that came out of his testimony and other

17   managers is that typically almost always after a hearing, the

18   hearing officer would make a recommendation, and that didn't

19   happen in these cases, and there's really no explanation for

20   that other than that it was also predetermined.  But it's kind

21   of an important fact because it shows an irregularity in the

22   way that things were normally done in that collective

23   bargaining agreement process.

24          And not to re-urge what I said earlier about the FMLA,

25   but when counsel says that the plaintiffs could have brought

1    in -- maybe she didn't say their doctor, but medical evidence

2    or something to support their claim, that's exactly what the

3    substantive process of the FMLA would have provided.  So it's,

4    I think, a separate process, but an important one, that would

5    have shown light on why they were treated.

6              THE COURT:  All right.  Thank you.

7              MR. PAUL:  Thank you.

8              THE COURT:  All right.  Let's go with the interference

9    claim, then.

10             MR. WALSH:  Your Honor, on the interference claim, I

11   think again we're down to just a couple issues, and you've

12   already addressed some of them with Mr. Paul.

13             One of the key issues is does the good faith belief

14   doctrine, or however we want to refer to it, apply.  I think

15   the case law, as you've pointed out, is clear that it does

16   apply.  The plaintiffs' main argument I would say against that

17   is to claim that it doesn't apply, that the Fourth Circuit

18   hasn't adopted that.

19             I don't think -- I'm sorry.

20             THE COURT:  No, go ahead.

21             MR. WALSH:  I frankly just disagree.  You've already

22   talked about the cases, I don't need to spend time talking

23   about them, where the Fourth Circuit has cited approvingly to

24   the Seventh Circuit and other circuits' determinations on

25   that.

35

1          So the question simply is did -- I'm sorry.

2          THE COURT:  Well, one of the questions I wanted to

3     raise, and I didn't want to interrupt you, but you caught me

4     thinking about it.

5          MR. WALSH:  That's --

6          THE COURT:  And that is, I'm trying to determine what

7     if any practical effect there was by the way this was handled

8     in terms of the Family Medical Leave Act.

9          So people who filed COIIs didn't go to work.

10         MR. WALSH:  Yes, Your Honor.

11         THE COURT:  They were off work.

12         MR. WALSH:  Yes.

13         THE COURT:  And I assume then that -- so what was

14    their legal status with CSX during the period when they

15    submitted their COIIs and stopped working under those notices

16    up to the point of when they got a discharge notice?

17         MR. WALSH:  I'm going to have to defer to Ms. Bird.  I

18    believe they were just considered off work at that point.

19         MS. BIRD:  That's right, Your Honor, they were

20    considered off work.

21         THE COURT:  Well, they were off work, but what does

22    that mean in terms of entitlement to any benefits or --

23         MS. BIRD:  Everything continued.

24         THE COURT:  Meaning all their health insurance --

25         MS. BIRD:  Except that -- yes, everything continued,

36

1    Your Honor.  Some of them submitted for Railroad Retirement

2    Board medical leave, which they would get medical pay.  Some

3    of them submitted and got insurance benefits for being out of

4    service.  But they were still employees of CSX; their jobs

5    were protected and held until this process played out.  They

6    were receiving RRB benefits in terms of pay because they were

7    off work sick, right, but their jobs were protected and just

8    going through the process of discipline.

9              THE COURT:  Okay.  Thank you for clearing that up.

10             MR. WALSH:  And legally, Your Honor, that's the key

11   second point we wanted to make.  There simply is no prejudice

12   here.  Even if you assume for a second there was interference,

13   and I think that most every piece of evidence that plaintiffs

14   cited goes to the question of whether there was adequate

15   notice for FMLA purposes, that's not something we moved on in

16   the summary judgment, you know, motion.

17             So at the end of the day, the second main point here

18   is there is simply no prejudice because whether they were

19   specifically deemed FMLA off or they were off work sick or

20   they were whatever it may be.  They were still able to take

21   that leave, or they still took that leave.  They weren't

22   required to come to work, they --

23             THE COURT:  But they weren't told they were on family

24   medical leave act.

25             MS. BIRD:  No, they were not told they were on Family

37

1    Medical Leave Act, but I think -- and I am forgetting the

2    cases, but I know we've cited them in our reply, that this is

3    a function of a reform statute in that a technical

4    misclassification does not result in any damages or prejudice

5    to the plaintiff in terms of an interference claim.

6           THE COURT:  Well, okay.  So I understand that would

7    perhaps cover all of the employees and show there's no injury

8    up until the point of the discharge.  The discharge notice

9    certainly went out within the 12-week period that is

10   guaranteed for family medical leave.  So wouldn't then the

11   possibility of interference start to arise again?

12          MR. WALSH:  It is theoretically possible, but that's

13   not what happened here.  Because for the employees who were

14   discharged and ultimately upheld by the public law board, the

15   Family Medical Leave Act, as I said before, doesn't provide

16   any greater rights than they would have otherwise.  They were

17   fired for their breach of the CSX rules, ultimately dismissed

18   for their breach of the CSX rules.

19          For those handful of employees who were reinstated by

20   the public law board, their positions were protected.  They

21   went back to where they were, and that is what required under

22   the Family Medical Leave Act.  Again, whether it was done with

23   a particular paperwork under the Family Medical Leave Act and

24   whatever else is immaterial given the effect was ultimately

25   the same.

38

1          THE COURT:  All right.  Thank you.

2          All right.  Mr. Paul?

3          MR. PAUL:  Thank you.

4          Initially I couldn't find the Fourth Circuit case on

5      it, but the concept of retaliatory discharge under both

6      sections of the FMLA is recognized by the Sixth circuit in

7      Seeger versus Cincinnati Bell, 681 F.3d 274, Sixth Circuit

8      2012.

9          So what I'm hearing is that an argument under

10     interference, it falls something short of termination.  And

11     that can be the case under certain facts, but that's not what

12     happened here.  They're so related.

13         But, in other words, you know, we've already talked

14     about how none of the plaintiffs were informed of their rights

15     or responsibilities under the FMLA, which would have certainly

16     triggered a bunch of deadlines for them and their doctors to

17     respond to get that FMLA certified.  CSX and Jolanda Johnson,

18     Ms. Johnson and others testified that they knew about the

19     possibility of that leave, and Ms. Johnson testified the

20     reason she didn't trigger any FMLA substantive protections was

21     because they were suspected of fraud, which kind of is another

22     predetermined way.

23         I mean, certainly you could send someone the

24     paperwork.  It's really -- I even think they used a third

25     party administrator, Kepro, to send the paperwork, and then

39

1    you can do your investigation.  And if you ultimately

2    concluded there was some improper motive, then you could, you

3    know, invalidate that leave.  But it's very clear, and that's

4    why we moved for summary judgment on this claim, that none of

5    that happened.

6          THE COURT:  Well, although it's characterized in the

7    briefing as this honest belief rule, doesn't this claim also

8    perhaps come down to the same analysis, that being whether or

9    not CSX essentially had a good faith belief that it had the

10   right to take this discharge action in view of its perception

11   that these employees tried to pull a fast one?

12         MR. PAUL:  Yeah, so I'm not sure it's even in dispute,

13   but the briefing is out there that intent is not a requirement

14   for an interference claim.

15         So if that is true, and I --

16         THE COURT:  But it's not interference if they have a

17   legitimate reason for taking the adverse action that's not

18   based upon a discriminatory reason.

19         MR. PAUL:  I think --

20         THE COURT:  It seems to me -- I agree with you, I

21   think it still gets us to exactly the same place in terms of

22   the evidence, and that's whether there is evidence that CSX

23   took this action essentially pretextually to try to defeat one

24   or more of the rights that the employees had under these

25   various federal and state acts.

40

1          MR. PAUL:  I think another way of saying it, if I can

2     try a different way, is because there's no intent requirement

3     in the interference claim, any belief, honest or otherwise, is

4     not relevant.  But I think what Your Honor is suggesting -- if

5     that's true, then honest belief doesn't matter at all.

6          But I think what Your Honor is thinking is that if it

7     later comes -- information comes up that kind of casts doubt

8     on the legitimacy of that -- and I'm not making that up,

9     that's part of the FMLA regulations.  If any reason comes up

10    to cast doubt upon the validity of the certification, then an

11    employer has, you know, an opportunity to request

12    recertification or do all kinds of things.  That's the process

13    that should have been played out for an interference claim.

14    That's how it's very, very different.

15          Because otherwise how can courts almost everywhere, to

16    my knowledge everywhere say intent is not a factor in an

17    interference claim if an employer could pull the honest belief

18    and say that's what we believe.

19          Which leads to another question, which is if -- I

20    believe the -- well, not I believe.  I believe one of the

21    first cases that came out on honest belief was an employer

22    fired someone because they thought the person was stealing

23    from the cash register, and the person was black, and they

24    were fired.  And later the employer found out that that person

25    wasn't even there, so it couldn't have been him.  So they

1    said, well, that's not race discrimination, that was just an

2    honest belief.

3           But there has to be some evidence that they made a

4    mistake, right?  I mean, CSX has not done that at all.

5    Otherwise any employer anywhere could say I honestly believed

6    X, Y and Z, and they would get off the hook in any case.  So

7    there has to be some acknowledgement that what they believed

8    was wrong.

9           THE COURT:  Well, I don't know that -- I may be

10   misconstruing some of these cases, but I've always considered

11   this, that the employer has to have an objective basis for its

12   decision.  Meaning it can be wrong, but there has to be at the

13   time the decision is made an objective good faith belief in

14   what it's doing.

15          And the Mercer case talked about this somewhat.  They

16   kind of rejected the plaintiff's explanation of her sort of

17   defense as to why she was really a good employee and how they

18   had to be wrong about that.  And the court I think is very

19   clear in saying, well, it's not up to us to decide whether the

20   employee was a good employee or a bad employee.  All we can do

21   and all we are authorized to do here is look at whether or not

22   the employer met its responsibility.

23          And they said there, and cited the Seventh Circuit

24   case we've talked about, they said there, showing that there

25   might be inconsistencies in the way that the employer

42

1    justifies their decision, you know, there -- I assume you

2    agree here there is not direct evidence of discriminatory

3    intent under any of these statutory schemes, right?

4         MR. PAUL:  That's correct.

5         THE COURT:  So it's all based on whether or not an

6    inference is to be supported from the other evidence.  And so

7    it seems to me that in the Mercer case and in the Seventh

8    Circuit case and others, it's not literally just an employer

9    saying, well, I believe this, I'm off the hook.  The court

10   looks at the evidence about it and whether there is a good

11   faith basis for it.

12        And so I come back to where I kind of started, and I

13   probably got more confused than helped, but it does seem to me

14   that ultimately the interference claim rests really under the

15   same analysis that the retaliation claims rest on.  And that

16   is, is there evidence here sufficient to have a jury decide

17   that this may have been pretextual on the part of CSX?

18        MR. PAUL:  The only problem, Your Honor, is that with

19   the interference claim, we look at the actual elements.  Not

20   one of those elements asks about intent or about honest

21   belief.

22        THE COURT:  No, but it is not interference to take an

23   adverse action against an employee who is on Family Medical

24   Leave Act.  It doesn't create an inference because the

25   employer may have lots of reasons and basis to do that.  And

43

1    in the Seventh Circuit case, it literally was this person went

2    on Family Medical Leave Act; while that person is on leave, we

3    determined that her basis for that leave -- and I forgot what

4    the facts were there, but they explained it in the Mercer

5    case.  But the basis upon which she sought her leave act leave

6    was false, and so there the court affirmed that the employer

7    still has the right to take action.

8           So here, plaintiff is -- defendant is claiming that

9    even if you were entitled to leave act for all of this time,

10   while you were exercising that time, while you were on leave,

11   we determined that you gave fraudulent or false reasons, a

12   false medical statement essentially, and so we have the right

13   to take that action, and that does not constitute interference

14   with the leave act.

15          MR. PAUL:  I would just -- you know, we referenced

16   that section about the cast doubt on the validity of the

17   certification.  I think that's where that falls in the, in the

18   substantive provision.

19          And I know the cases, they often -- counsel and courts

20   can get those two confused because I think they do sometimes

21   overlap.  But I do think in the substantive provision, there

22   is just no place for that analysis.

23          And the regulations specify that if -- that happens

24   often in the social media context, right?  Somebody is on

25   leave, approved FMLA leave, and a co-worker says, hey, look,

44

1    they're skiing or whatever, and that comes back, that is

2    reason to cast doubt upon the validity that triggers a certain

3    process.

4            Or an employer could not do that --

5            THE COURT:  I completely agree with that.

6            MR. PAUL:  Yeah.

7            THE COURT:  And here what we're faced with is the

8    employer deciding not simply that somebody is or isn't injured

9    or disabled, but rather that essentially they lied, they've

10   committed a fraud by participating in the COIIs under these

11   circumstances.

12           So it's the violation of that truth -- and that's

13   literally what they say, and there's no hiding that.  CSX says

14   in charging letters, we think you provided false information.

15   And under the collective bargaining agreement, we can fire

16   people for providing false information.

17           So that's different from saying, well, we're not sure

18   that you are still disabled or that really your doctor's

19   determination that you can't work for two months is a fair

20   medical determination, so -- they didn't treat this as

21   something under the Family Medical Leave Act clearly, but

22   instead they treated it as an employee providing false

23   information.

24           MR. PAUL:  Under the collective bargaining agreement,

25   and I guess that's the really important point I want to make.

45

1    Had CSX said we received information that cast doubt on the

2    validity, it wouldn't just end there.  Then it goes back to

3    the employer and his and her health care provider to explain

4    why that leave was consistent with the medical reasons.  That

5    never happened in this case.  And if it did, that would have

6    given the employees a huge opportunity under the FMLA to

7    explain the situation rather than just focused solely on the

8    collective bargaining process.

9              THE COURT:  Okay.

10             MR. PAUL:  Okay.  Thank you.

11             MR. WALSH:  Your Honor, just two final points on that

12   part, and then I can address the plaintiffs' motion if you'd

13   like.

14             The first is we've heard a lot about predetermined,

15   but predetermined is not pretextual, and I think that's

16   important in the analysis.  Because even assuming the

17   plaintiffs were right, which we would not give, a

18   predetermined outcome is not evidence that these plaintiffs

19   were fired for seeking Family Medical Leave Act, ERISA

20   benefits, whatever it may be at that point.  So I think

21   there's an important distinction to make there.

22             And frankly the case law simply does not say that CSX

23   must admit it was wrong under the honest belief doctrine.  I

24   think the cases that you and I have talked about, each time

25   the employer still believed, as CSX does, that it was right.

46

1        Mr. Paul has made a point about the process under the

2   Family Medical Leave Act, and that if it had been processed as

3   family medical leave, other things would have occurred.

4   Again, I think the dispositive question is here the honest

5   belief doctrine, but I would point out that under the FMLA,

6   the rights under FMLA are no greater to available to the

7   employee than would have otherwise been available.  So this is

8   a place where the CBA sets forth rights that are available to

9   the plaintiff that were followed, that went through and

10  ultimately led to dismissal.  The FMLA, as stated in the

11  regulations, did not provide any greater protections or rights

12  to the employee, you know, when those things are followed.

13        On the plaintiffs' motion that was discussed briefly,

14  I'm happy to answer any questions, but I do want to point out

15  that in the reply the plaintiffs have effectively conceded

16  their motion.  In the original motion, the plaintiffs moved on

17  FMLA in toto, both interference and retaliation.  In the

18  reply, the plaintiffs have now stated they are only moving on

19  two elements of retaliation and two elements of interference.

20  That is frankly not what they moved on.  Rule 56 would require

21  them to state what they moved on in the original motion.

22        And we can talk about -- Judge Faber has an opinion

23  that hits on the proper use of summary judgment.  There is

24  other ones out there.  This is not a circumstance where the

25  plaintiffs were moving on liability, but not damages.  They're

47

1  now moving on just two elements after seeing the fact that

2  they frankly can't meet the other elements.

3          So I'm happy to address any questions you may have.

4          THE COURT:  All right.  Thank you.

5          All right.  One more to go, that is the Rail Safety

6  Act.

7          MS. BIRD:  That's right, Your Honor.

8          Your Honor, this is a very specific statute, very

9  specific because it is there to promote the safety at the

10  railroad and also to reduce accidents and injuries at the

11  railroad.

12          And part of the basic factor that goes through all of

13  the argument I'm going to make, it is necessary, if the

14  plaintiffs are complaining about an injury and that they were

15  terminated because of an injury, that they have to also prove

16  that that injury occurred at work.  The case law supports

17  that, the statute supports that, and it is a necessary element

18  under both the Third Circuit case and the Sixth Circuit case

19  that we filed in our briefing that they must have been injured

20  while they were at work.

21          And in this case, there is absolutely no evidence

22  whatsoever that any of these plaintiffs were injured while

23  they were at work, and I'll point to a couple of things.

24          And I can go through the statutory scheme, but I know

25  the Court has read the briefs and understands the briefs that

1    we have in front of us.

2          On 20109(a)(4), that is one cause of action, that is

3    the one for retaliation for reporting a work-related injury.

4    That was a claim that plaintiffs made in the complaint.  We

5    moved for summary judgment on that issue.  Plaintiffs dropped

6    that claim in their response.  In their response, they did not

7    address 20109(a), which is retaliation for reporting of

8    work-related injury or illness.  I think the reason is clear,

9    they didn't do that because there was no work-related injury

10   or illness to report.

11         As to 20109(b)(1)A, 20109(b)(1)A, that is the claim

12   that plaintiffs were fired for reporting a hazardous condition

13   at work.  Let's start with the fact that they did not exhaust

14   their administrative remedy on that issue.  Under the scheme

15   with the FRSA, they have to go through the Department of Labor

16   through OSHA in order -- as a first step for making those

17   claims.  In those claims to the OSHA, they did not at all

18   mention any of this hazardous activity reporting argument that

19   they now try to make.  So they have not exhausted their

20   administrative remedy on that issue and have in fact then

21   waived making that claim in this court.

22         The third argument they tried to make under the FRSA,

23   20109(c), is that they claim that they can -- that the

24   defendants interfered with their ability to follow a treatment

25   plan walking -- with their treating provider, or physician is

49

1    what the statute says, and we can argue about whether or not

2    the chiropractor falls under that.  Under the plain language

3    of 209 -- 20109(c), a chiropractor does not fall under that,

4    and there is a case specifically on point that we cited in our

5    motion that held that chiropractors are not treating

6    physicians, that the language of the scheme requires that, and

7    they do not meet that.  So that is one reason.

8        More importantly, as to 20109(c) it requires that

9    there be a workplace injury in order for that treating

10   physician plan to come into play.  That did not happen here.

11   Although there are some broad-based arguments about they were

12   weakened by their work on the railroad, there is simply no

13   evidence to support that.

14       The chiropractor, when asked that specific question,

15   Dr. Johnson testified -- I asked him or Megan asked him, once

16   you noticed influx, did you reach out to CSX to determine if

17   there was anything happening to cause an influx?  He said,

18   Well, no.  It had nothing to do with CSX.  It had to do their

19   being hurt at home.  Not one person that I'm aware of came in

20   during that time that were CSX employees that claimed that it

21   was a work accident.

22       There is simply no information in this case from him

23   or from anyone else that this happened off the job or they

24   were somehow weakened which caused their out-of-work injury

25   which they reported on the COIIs.

1          They said they would rely on Dr. Freeman, their expert

2     retained witness for this evidence.  Dr. Freeman was deposed

3     yesterday.  Unfortunately we don't have the benefit of Dr.

4     Freeman's transcript.  Dr. Freeman said, No, I don't know.  I

5     don't know how they were hurt, that's not what I'm looking at.

6          Every one of the COIIs said they were injured off of

7     job.  Their complaints to OSHA said they were injured off the

8     job.  OSHA complaints were denied because they were injured

9     off the job.  And there is no evidence that is presented in

10    this case to show that they were injured in any other way that

11    would allow 20109(c) to apply.

12         I can walk through the statutory scheme if the judge

13    would like, or you can ask questions, however you'd like to

14    handle it, but that is the crux of this entire motion.  There

15    is no work-related injury to allow for a claim that FRSA was

16    violated.

17         THE COURT:  All right.  Thank you.

18         MR. PAUL:  Your Honor, it is correct, the (a)(4) claim

19    is gone, so we do not respond to that because, you know --

20         THE COURT:  Okay.

21         MR. PAUL:  The (b)(1)A has to do with two things

22    actually, I think a little bit more than counsel had argued.

23    It's a hazardous safety condition but also -- and B is also

24    the refusal to work because of that hazardous condition.  And

25    there are some new cases, two out of the ARB, Ingrodi and

1   Cieslicki, which is actually in the Fourth Circuit, but not a

2   Fourth Circuit -- just within the Fourth Circuit at the

3   Department of Labor, and then the Kurec versus CSX case, those

4   are all in the last couple of years, that have clearly said

5   that those hazardous conditions do not have to be work

6   related.

7           And so the examples in those cases were one gentleman

8   who was not on call -- I think that's an important fact -- he

9   was called a derailment.  He had had two glasses of wine with

10  dinner, and he said, I don't feel safe to work, you know, and

11  he was terminated.  And they found in his favor because

12  clearly drinking wine would not be a work-related event, but

13  nonetheless it impacted the safety that would happen at work.

14          And there was -- the other example, the gentleman in

15  Grady was vomiting and had diarrhea, and so he had reported

16  back that he didn't feel he was safe to work because of those

17  conditions and was terminated, and that was also overturned.

18          THE COURT:  Weren't those cases where the employee was

19  being required by the railroad to come in to work?

20          MR. PAUL:  Yes.

21          THE COURT:  And did that happen here?

22          MR. PAUL:  Well, normally -- I want to answer this

23  way, I am not evading it.  I mean, to answer your question,

24  no, at the time they completed the COIIs, the certificates of

25  ongoing illness, they were not being required to work, but

52

1    that's why they did the certificate of ongoing illness.

2          In other words, if they didn't do a certificate of

3    ongoing illness, they would be terminated -- excuse me --

4    terminated for not showing up.

5          THE COURT:  Well, okay.

6          MR. PAUL:  It --

7          THE COURT:  So they indicated to CSX they had this

8    illness, they filed the COII, their conditions prevented them

9    from working, and CSX did not try to make any of them come in.

10         MR. PAUL:  Well, no, that's correct, but it was

11   because they needed the treatment, whether it was a couple

12   hours to sober up -- two glasses of wine, but whatever -- to

13   get back to where you could work safely or, for these

14   gentlemen, a couple of weeks or two months to get back to

15   where they could work safely.

16         THE COURT:  What did CSX do in response to the COIIs

17   that constituted or resulted in some hazardous condition?  I

18   mean, it seems to me in those cases those are striking

19   examples of the difference.

20         Because those cases involve CSX tried to make somebody

21   come to work who shouldn't be at work, and had they gone to

22   work, they might have been a danger to themselves or others.

23   And here we've got people who said, we've got injuries or

24   conditions that keep us from being able to work, and CSX

25   allowed that, they didn't call them in to work.

53

1          Now we know they took punitive action --

2          MR. PAUL:  Of course.

3          THE COURT:  -- and stated that that action was because

4    of other reasons, this supposed lie about these forms, but

5    what I don't see is where -- I don't see how you could argue

6    that there is a failure of CSX or an intent by CSX to

7    discriminate against somebody for reporting a hazardous

8    condition that never existed because people were never called

9    in to work.

10          MR. PAUL:  Well, there are a different set of facts

11    between those cases, they are.

12          THE COURT:  Right.

13          MR. PAUL:  But, I mean, in our situation here, CSX did

14    not honor that report of an unsafe condition.  And it is

15    complicated when you are reporting yourself as an unsafe

16    condition, but they didn't recognize that.  They immediately

17    questioned it for the reasons we've already talked about.

18          THE COURT:  Well, they questioned it, though, in a

19    completely different context and not a context, it seems to

20    me, that implicates the Rail Safety Act.

21          As you can probably tell from my responses to your

22    argument, I think you're really stretching this act beyond

23    reasonable application by making these claims here.  These

24    people all said we've got medical conditions that keep us from

25    working.  Those medical conditions you now agree are not

54

1    work-related conditions that would result in the implication

2    of an (a)(1) or (a)(4) argument, but you argue that they fall

3    within this hazardous conditions or even the other provision

4    about interfering with somebody's treatment.

5             So --

6             MR. PAUL:  Yeah, if I could address that.

7             THE COURT:  Well, okay.  But first, just in terms of

8    the hazardous work condition, I don't see that a hazardous

9    work condition was created or suggested since CSX didn't try

10   to make these people come to work despite their health.

11            MR. PAUL:  I think the only -- or not the only way,

12   but one way of looking at it is if the employees had not

13   submitted the certificate of ongoing illnesses and reported to

14   work, and then they would have avoided this entire suspicion,

15   they would have put themselves and others at risk for the

16   injuries that they had --

17            THE COURT:  Well, obviously I think if CSX had called

18   people the next day and said, hey, despite your COII, come to

19   work tomorrow, then maybe you've got -- maybe then you've got

20   a plausible argument that CSX at that point knows that these

21   people have a health condition that makes it perhaps hazardous

22   for them to come to work, and in that context, I could see an

23   argument that this is a violation.

24            But somebody calls CSX and says, I've got the flu, I'm

25   not working today, then I don't think CSX is on notice that

55

1    there's a hazardous work condition possible just because that

2    person is sick and should not work that day.  I think a

3    hazardous condition arises only if CSX is telling them you

4    need to come to work despite that.

5          MR. PAUL:  Well, I don't think that the plaintiffs in

6    this case knew that they were going -- by submitting the COIIs

7    at that time.  But certainly the effect of all of these

8    people, people other than the plaintiffs being charged for

9    submitting the certificate of ongoing illness would certainly

10   be a deterrent to other employees submitting them in the

11   future.

12         I mean, that's --

13         THE COURT:  Okay.

14         MR. PAUL:  And obviously the plaintiffs would have no

15   reason to have known, you know, not to submit the COIIs.  They

16   thought they were doing the right thing, and almost

17   immediately CSX took negative action, you know, on them.

18         The (c)(2) plan I think is pretty straightforward in

19   the sense that, yes, the Fourth Circuit has not ruled on it,

20   but other circuits have, requiring there to be a

21   work-related -- a treatment plan for work-related.  And our

22   argument is very simple.  If these were sedentary jobs, we

23   would have no argument for the most part under the normal set

24   of facts.  But when you have cumulative, repetitive stress

25   injuries, and CSX has had a cumulative program for years,

56

1    acknowledging that machinists and electricians and the

2    plaintiffs themselves testified about working in small corners

3    at repetitive angles, that it is very reasonable that a jury

4    could conclude that part of the treatment with the

5    chiropractors was related to the years of work.  If an

6    employee was there six months, maybe not.

7             THE COURT:  Where is the interference with that

8    medical treatment?

9             MR. PAUL:  The interference is with questioning their

10   treatment, accusing them of fraud with treating with these two

11   chiropractors, and then saying we're not going to accept your

12   paperwork for it.

13            THE COURT:  From those particular --

14            MR. PAUL:  From those two providers.

15            THE COURT:  Well, so first I have to admit it strikes

16   me as questionable in that CSX did not say you can't go get

17   treatment from these two chiropractors.  Or even we're going

18   to tell the insurer that -- not to pay for treatment rendered

19   by these guys because, you know, we think they're lying or

20   whatever.  And I'm not sure where the interference with

21   treatment arises.

22            I understand CSX said we're not going to trust the

23   chiropractors' reports when it comes to approving you for

24   being off work.  And in fact, we think you're lying about

25   this, and this is all part of a scheme, and so we're

57

1    discharging you.  Again, it seems to me that the -- I'm not

2    sure where this could constitute a violation of this provision

3    of the Rail Safety Act.

4         MR. PAUL:  Well, I mean, I certainly understand Your

5    Honor's distinction between treatment and paperwork related to

6    the treatment, but let's use FMLA as an example.  If someone

7    was treating with a chiropractor and having great success,

8    whatever the case may be, and then they need FMLA

9    certification paperwork, and an employer said we're not going

10   to accept that -- excuse me -- not going to accept that from

11   Dr. Johnson or Dr. Carey, that is interference with a very

12   important part of not just their medical treatment, but the

13   justification for the absence.

14        THE COURT:  And I think you're probably right, it

15   might be a violation of the Family Medical Leave Act, but I

16   don't think that means that it also constitutes a violation of

17   this part of the Rail Safety Act.

18        MR. PAUL:  I think only in the sense that it's

19   interfering with the treatment plan because while, yes, on the

20   one hand a railroader, one of the plaintiffs could continue to

21   treat with Dr. Johnson or Dr. Carey, any paperwork necessary

22   to justify an absence related to that treatment for a flare-up

23   of pain would not be accepted.

24        THE COURT:  Then the other question I've got is, as I

25   recall -- and I admit, I have not spent a lot of time

58

1    especially recently looking over the COIIs themselves, just

2    kind of generally got familiar when I started reviewing all

3    this.  But it seems abundantly clear that none of the COIIs

4    claim that this -- that these conditions were work-related

5    injuries.

6              MR. PAUL:  Should I respond?

7              THE COURT:  Yeah.

8              MR. PAUL:  Yeah, okay.  So, one, the certificate of

9    ongoing illness form is a CSX form, and it is true that there

10   is no box or anything that asks that question.  It would be

11   nice if there was.  That's one thing, they designed the form.

12             Two, most of them are just discussing the treatment.

13   All of them discuss some measure of treatment that the

14   chiropractors performed.  Some of them indicate, and we don't

15   dispute this, that the straw that broke the camel's back is

16   what we would say happened outside of work, lifting a hot tub,

17   changing a wheel, et cetera.

18             Yeah, so we definitely agree that all of the

19   plaintiffs except for one who settled --

20             THE COURT:  Is that Woods, is that who settled?

21             MR. PAUL:  Yeah, that's Woods, that's one of --

22             MS. BIRD:  I didn't hear you.

23             THE COURT:  Woods.

24             MR. PAUL:  That with the exception of Mr. Woods, all

25   the others, the incident that precipitated them going out of

59

1    work occurred off property, right, somewhere else.  But

2    because of the nature of their work and the cumulative

3    build-up, that their testimony is that the treatment was

4    related.  And some even testified that one of the reasons that

5    they treated with one of these chiropractors was because of

6    its location to the workplace.  It was on the way such that

7    they could get treatment before or after work.

8         THE COURT:  Well, the statute that you're quoting

9    from, the prohibition is against interfering with treatment of

10   an employee who is injured during the course of employment.

11   And so if these forms don't indicate -- and I'm sorry I don't

12   have a better recollection.  I thought it was clear that the

13   forms indicated this was all off-the-job conditions, that

14   these were people were not claiming that they got injured on

15   the job or even that the job exacerbated some condition.

16        So --

17        MR. PAUL:  There's two points --

18        THE COURT:  -- I have trouble believing that it would

19   be a violation of the Rail Safety Act for the employer to --

20   I'm trying to think of a hypothetical, but it's probably more

21   complicated to try to do that here.

22        It doesn't seem that the employer was faced with forms

23   that indicated these are people who are claiming that they

24   have a work-related component to their medical -- causation to

25   their medical condition.

60

1        MR. PAUL:  I think there's two parts, the testimony is

2   there's two parts to the form.  I think the employee fills out

3   the very top part which is, like, where you work, your name

4   and address, and then the chiropractor or other physician or

5   health care provider completes the bottom part.

6        But I think that when you look at those, if you look

7   one by one, the majority of them just say something like --

8   it's kind of chicken scratch -- you know, injured on the lawn

9   mower or on the ATV.  There's nothing -- things like that, but

10  there is no --

11       THE COURT:  When a worker is literally claiming that

12  an injury resulted from work, is there not some other form

13  that they have to file, whether it's I fell off the engine, or

14  whether it's I did a lot of lifting at work today, and when I

15  went home, I had to go to the doctor, my back was injured or

16  sore?

17       MR. PAUL:  Most certainly there is when that injury

18  happens at work on property.  I think the gray area for

19  years -- and now we're getting a little bit outside of

20  employment law.  But I think for years, there was this

21  cumulative nature, whether it's carpal tunnel or repetitive

22  stress -- and, sure, people wouldn't, like, run to the office

23  and fill out an injury report because there wasn't a specific

24  acute injury.  It was more an occupational illness over time.

25       And so I think that can get tricky, and I think that's

61

1    a gray area in injury law, and I think that's a gray --

2         THE COURT:  I agree, it probably is a gray area, and

3    that's another reason why I'm skeptical of having the Rail

4    Safety Act apply to this factual scenario, even when I take

5    this in the light most favorable to the plaintiffs.

6         MR. PAUL:  But if it were true, like, let's say that a

7    machinist, you know, works there 20 years, did the same type

8    of repetitive work, received treatment for that, never to the

9    point where it had to take him off of work, but then he goes

10   golfing and then he is doing some yard work, and that build-up

11   of that strain in muscle is what caused him to mark off that

12   day, that is what we're saying the plaintiffs have evidence it

13   happened to them.

14        THE COURT:  Okay.

15        MR. PAUL:  So I think that's -- I think those were all

16   the points that I had.

17        THE COURT:  Okay.  Thank you.

18        MR. PAUL:  Thank you.

19        MS. BIRD:  That's the evidence that hasn't been shown

20   because that's the evidence we haven't seen.

21        And you're right, there is a form called a PI-1A for

22   CSX -- that's the name of it -- that allows you to fill out a

23   form if your injury or illness occurs at work or is related to

24   your work, and that was not filled out in any of these cases.

25        More importantly, after the COIIs were produced, which

62

1    had the chiropractor's assessment of how the injury happened

2    in many respects -- loading a kayak, falling off a car,

3    tailgate of a truck, overturning a lawn mower -- none of them

4    said, none of the COIIs said that anything happened at work or

5    related to their work at all.

6           More importantly, in every one of the cases that were

7    filed with OSHA through the Department of Labor -- the

8    Department of Labor and OSHA through the FRSA process, not one

9    of them said it was work related, not one.  And in fact,

10   that's why they were all denied by the Department of Labor.

11   And those complaints and those denials are evidence in this

12   case because every one of them said it happened at home, it

13   did not happen on the job.

14          This was evaluated, and this issue has been determined

15   in two different circuits, the Third Circuit in the Port

16   Authority Transportation Hudson Corp. versus U.S. Department

17   of Labor case -- that's the Third Circuit case -- and in the

18   Sixth Circuit case, the Grand Trunk Railroad Company versus

19   U.S. Department of Labor case.

20          In both of those cases, this exact issue was

21   discussed, and this is --

22          THE COURT:  Meaning where an employee claims that

23   they've got a condition that is aggravated?

24          MS. BIRD:  Had a condition that did not occur at work,

25   but in fact they were filing a Federal Rail Safety Act

63

1    complaint.

2         THE COURT:  Okay.

3         MS. BIRD:  And in both of those cases, it was found

4    that only applies to work-related, on-the-job injuries in both

5    of those cases.

6         There is -- there is, number one, no evidence

7    whatsoever in this case about this cumulative trauma disorder

8    leading up to an off-the-job injury.  There is no evidence to

9    even say that in this case.  But secondly, even if this

10   cumulative trauma had a part in this, these two cases would

11   say those are not on-the-job, work-related injuries and,

12   therefore, they are not covered by the FRSA.

13        So in both of those cases that have been decided by

14   two different circuits -- there is not a case in the Fourth

15   Circuit, let's not make one.  In the Fourth Circuit, there is

16   not a case on point but, in fact, that work-related injuries

17   are not covered, and you cannot violate the Federal Railroad

18   Safety Act by terminating someone who did not have an

19   on-the-job injury.

20        THE COURT:  All right.  Thank you.

21        MS. BIRD:  Thank you.

22        THE COURT:  All right.  So first I appreciate the

23   briefing that you all have done in this case, it was quite

24   well done, and I appreciate the arguments today.

25        I can tell you this much right now, and that is,

64

1   first, I'm inclined to say I'm going to end up granting

2   summary judgment for the defendant as to the Rail Safety Act

3   claim.  I want to think about the arguments I've heard with

4   respect to the leave act in both contexts as well as the other

5   acts.

6          Also I've got I guess what I consider bad news, and

7   that is that as you, I'm sure, are aware, we've had compressed

8   periods where we've had jury trials, and jury trials have been

9   interrupted.  As a result, we're currently in a period where

10  we are having jury trials.  I hope that continues.  I'm not

11  completely sure that it will if West Virginia's COVID numbers

12  continue to deteriorate the way they have in the last

13  literally few days.

14         Be that as it may, as a result of the backlog of

15  criminal cases, I cannot give you the trial date that we had

16  selected long ago and tried to plan on in this case.  I've

17  just got too many criminal cases that are coming up.  I have

18  to schedule them under a speedy trial clock.  That means that

19  I have to schedule them for trial during a fixed period.  And

20  that unless we get back to where we are precluding all trials,

21  which wouldn't help you either, I'm going to have trials,

22  criminal trials scheduled throughout the period the three

23  weeks or so that we had hoped to try this case.

24         So as a result, I don't -- this is the kind of case

25  that I think there is too much to it to expect you all to kind

65

1    of be ready at the drop of a hat, and so I'd rather not expect

2    that of you.  Given that I have to schedule trials through

3    this period, I'm going to continue this case.

4          What I'd like to suggest is this.  I hope to make my

5    decision on the remaining motions within the next week.  Once

6    I've done that, that will -- honestly, it seems to me, that

7    unless I grant summary judgment in favor of the defendant and

8    there is no trial necessary, if trial is going to proceed on

9    one or more of these claims, it's probably going to be the

10   same evidence and the same length of trial and so forth that

11   we currently expect.  So what I would be inclined to do is

12   make my decisions, and once I do, if there are claims that

13   survive, I would then expect to have some type of

14   teleconference with you as quickly as possible to talk about

15   scheduling and to get this back on the calendar.  And honestly

16   that's about the best I can tell you right now.

17         So I'm happy to hear any questions or reactions you

18   might have to that.

19         MR. PAUL:  The only immediate question is, does that

20   impact our pretrial order that was due today?

21         THE COURT:  Yes.  I can't see a need for you to go

22   through the steps of the pretrial and the other things, the

23   other disclosures that are required unless and until we have a

24   better fix of the trial date --

25         MR. PAUL:  Thank you, Your Honor.

66

1          THE COURT:  -- because I know there's a lot of work to

2     that.

3          And then honestly I want to decide these motions also

4     before I expect you to go through that process because it will

5     be dramatically affected by my rulings if I don't grant full

6     summary judgment.

7          MS. BIRD:  Thank you, Your Honor.  That was it.  I was

8     going to ask the same question.

9          THE COURT:  Okay.  All right.

10          Yes?

11          MR. PAUL:  I mentioned this earlier.  Could we put the

12     settlements on the record for those plaintiffs?

13          THE COURT:  Sure.

14          MR. PAUL:  They are Tony Abdon, Mike Campbell --

15          THE COURT:  Go slow here so we can -- go ahead.

16          MR. PAUL:  Should I start again?

17          THE COURT:  Yes.

18          MR. PAUL:  The first one is Tony Abdon, A-B-D-O-N.

19     Mike Campbell.  Chad Little, the Estate of Chad Little.

20     Matthew Woods.  John Frasure, F-R-A-S-U-R-E.  And Kevin

21     Palmer.

22          THE COURT:  All right.

23          MS. BIRD:  That's correct, Your Honor.  That brings me

24     to one additional point, though, that I want to just bring to

25     the Court's attention.

67

1          In this case, there are individually named defendants,

2    as you know.  There is CSX Transportation, there is Dr.

3    Heligman, the medical provider, and then there are eight other

4    defendants.  With the settlement of those cases, that removes

5    six of the defendants.  Am I right about -- six, removes six

6    of the defendants from having anything to do with this case.

7          We've approached the plaintiffs and asked that those

8    people be voluntarily dismissed, those six that have nothing

9    to do with the other cases.  We'd also ask that the two -- you

10   know, the other individually named defendants are dismissed,

11   but we're not there yet, but that is out there.  And we're

12   hoping that we can get those dismissals for those six

13   individually named defendants that only have to do with those

14   settled plaintiffs.

15         THE COURT:  Well, I take it the way you're addressing

16   this, there wasn't an explicit part of the settlement that

17   contemplated dismissal of claims against those defendants.

18         MS. BIRD:  We did not because the settlements were

19   done one by one.

20         THE COURT:  Well, all right.  So I expect you all to

21   address that with each other and then see where that leads.

22         Typically when we get a settlement, we do an order

23   giving the parties like 30 days to finalize everything and

24   submit an agreed order.  I'm not inclined to do that here.

25   With the case active, I'm sure you all will take care of that.

68

1          But how long do you expect it will be before you

2     execute settlement agreements and prepare orders as to those

3     particular plaintiffs --

4          MS. BIRD:  Very likely --

5          THE COURT:  -- and/or the defendants?

6          MS. BIRD:  Easily within 30 days, Your Honor.  We just

7     came to an agreement on the terms sheets today.  I don't think

8     there's any hold-up or liens or anything else but for one

9     person.  Could be, but I don't even know that that's right,

10    it's a possibility.  So I anticipate within 30 days it will be

11    resolved.

12         THE COURT:  All right.  Well, we're not going to enter

13    any special orders or separate orders with respect to those,

14    then.

15         All right.  Is there anything else we need to take up

16    on the record?

17         MR. PAUL:  No.  Thank you.

18         THE COURT:  All right.  We're going to go off the

19    record.

20       (Off the record at 2:59 p.m.)

21         THE COURT:  All right.  Thank you all for your

22    appearance today.  We stand adjourned.

23            (Proceedings were concluded at 3:01 p.m.)

24                         ---o0o---

25

CERTIFICATION:

    I, Kathy L. Swinhart, CSR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter as reported on August 5, 2021.


September 10, 2021
DATE

/s/ Kathy L. Swinhart
KATHY L. SWINHART, CSR